## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MONDIS TECHNOLOGY LTD.,

                Plaintiff,

      v.

LG ELECTRONICS, INC. and
LG ELECTRONICS U.S.A., INC.,

                Defendants.

Civil Case No.: 2:15-cv-04431 (SRC)(CLW)

*Electronically Filed*

**Public Version**

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF MONDIS TECHNOLOGY LTD.'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR LACK OF WRITTEN DESCRIPTION

*Of Counsel*

Jeffrey B. Plies (*pro hac vice*)
jeff.plies@dechert.com
DECHERT LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
Telephone: (512) 394-3000
jeffrey.plies@dechert.com

Jeffrey S. Edwards (*pro hac vice*)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000
jeffrey.edwards@dechert.com

Martin J. Black
Brian M. Goldberg
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000
martin.black@dechert.com
brian.goldberg@dechert.com

*Attorneys for Plaintiff Mondis Technology Ltd.*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ......................................... 3

    A.      Litigation history .................................................................................... 3

    B.      Television Licensing Negotiations ......................................................... 4

    C.      Reexaminations and IPR's ...................................................................... 5

    D.      Overview Of '180 Patent ....................................................................... 6

III.    LEGAL STANDARDS ...................................................................................... 7

    A.      Motions for Summary Judgment ........................................................... 7

    B.      Written Description ................................................................................. 8

IV.     ARGUMENT ..................................................................................................... 9

    A.      The Disputed "Type" ID Limitation Was Of Central Focus During
        Prosecution, Indicating That The Patent Office Was Not In Doubt As To It
        Having Written Description Support ..................................................... 10

    B.      LG Provides No Evidence Regarding How a Person of Ordinary Skill In
        the Art Would Understand The Disclosures Of The '180 Patent ....................... 11

    C.      The '180 Specification Demonstrated to Those of Ordinary Skill That The
        Inventors Invented What Is Claimed ................................................... 14

        1.      The '180 Specification Describes Different Types of Displays ............. 15

        2.      A PHOSITA Understood, And The '180 Specification Teaches,
            That Different Display Types Required Different Input Signals............. 15

        3.      The '180 Specification Demonstrates That the Inventors Were
            Concerned About Signal Compatibility Between a Computer and a
            Display ..................................................................................... 16

        4.      The PHOSITA Understood That Display Type ID's Were Used To
            Ensure Signal Compatibility And Enabled Computers To
            Communicate With Displays Of Different Types .................................. 18

        5.      The '180 Specification Describes The Use Of ID Numbers To
            Enable Communications Between A Computer And Display And
            A PHOSITA Understood This To Include a Display Type ID ............... 19

    D.      LG's Sole Focus on Individual Preferred Embodiments is Factually and
        Legally Flawed.................................................................................... 22

        1.      Both The First Preferred Embodiment And The Summary of The
            Invention Disclose The Use of A Display Type ID ............................... 22

i

**TABLE OF CONTENTS**
(continued)

**Page**

     2.    LG's Embodiment-by-Embodiment Analysis Is Also Legally Flawed .................................................................................................... 23

  E.    Mondis Did Not Admit The Type ID Liitation Lacked Support ........................ 27

V.    CONCLUSION ............................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AAT Bioquest, Inc. v. Texas Fluorescence Labs., Inc.*,
  14-cv-03909 (DMR), 2015 WL 1738402 (N.D. Cal. Apr. 13, 2015) .....................................13

*Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*,
  35 F.Supp.3d 163, 178 (D. Mass. 2014) ..........................................................................3, 27

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
  98-cv-2359, 2002 WL 32068939 (S.D. Cal. Jan. 11, 2002) ..................................................23

*Allergan, Inc. v. Sandoz Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015) ..............................................................................................8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................................8

*AstraZeneca AB v. Hanmi USA, Inc.*,
  11-cv-760 (JAP), 2012 WL 3779381 (D.N.J. 2012) ............................................................13

*Blue Calypso, LLC v. Groupon, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016) .........................................................................................9, 21

*Centocor Ortho Biotech, Inc. v. Abbott Labs.*,
  636 F.3d 1341 (Fed. Cir. 2011) ............................................................................................26

*Chiron Corp. v. Genentech, Inc.*,
  363 F.3d 1247 (Fed. Cir. 2004) ..............................................................................................8

*Commonwealth Scientific and Indus. Research v. Buffalo Tech., Inc.*,
  542 F.3d 1363 (Fed. Cir. 2008) ............................................................................................11

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
  807 F.2d 955 (Fed. Cir. 1986) ..............................................................................................12

*Elcommerce.com, Inc. v. SAP AG*,
  745 F.3d 490 (Fed. Cir. 2014) ..............................................................................................26

*Falko-Gunter Falkner v. Inglis*,
  448 F.3d 1357 (Fed. Cir. 2006) ................................................................................... passim

*In re Application of Driscoll*,
  562 F.2d 1245 (C.C.P.A. 1977) ............................................................................................26

*In re Gabapentin Patent Litig.*,
    395 F.Supp.2d 175 (D.N.J. 2005) ........................................................13

*In re Skvorecz*,
    580 F.3d 1262 (Fed. Cir. 2009) .............................................................24

*In re Wright*,
    866 F.2d 422 (Fed. Cir. 1989) ..........................................................24, 27

*Kimberly-Clark Corp. v. Johnson & Johnson*,
    745 F.2d 1437 (Fed. Cir. 1984) .............................................................12

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ........................................................12, 25

*Marino v. Indus. Crating Co.*,
    358 F.3d 241 (3d Cir. 2004) ....................................................................8

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009) ...................................................12, 24, 25

*Matsushita Elec. Indus Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................8

*Metro. Life Ins. Co. v. Bancorp Services LLC*,
    527 F.3d 1330 (Fed. Cir. 2008) .............................................................13

*PIN/NIP, Inc. v. Platte Chem. Co.*,
    304 F.3d 1235 (Fed. Cir. 2002) .............................................................26

*Reiffin v. Microsoft Corp.*,
    214 F.3d 1342 (Fed. Cir. 2000) .............................................................24

*Rexnord Corp. v Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) ........................................................24, 25

*Scriptpro, LLC v. Innovation Associates, Inc.*,
    762 F.3d 1355 (Fed, Cir. 2014) .............................................................27

*Stored Value Solutions, Inc. v. Card Activation Techs., Inc.*,
    499 Fed. Appx. 5 (Fed. Cir. 2012) .........................................................26

*Stored Value Solutions, Inc. v. Card Activation Techs., Inc.*,
    796 F.Supp.2d 520 (D. Del. 2011) ...............................................25, 26, 27

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
    665 F.3d 1269 (Fed. Cir. 2012) ...............................................8, 9, 11, 21

*Tan v. Integrated Silicon Solutions, Inc.*,
   07-cv-06166 (WHA), 2008 WL 2340217 (N.D. Cal., June 5, 2008) .....................................11

*Thorner v. Sony Computer Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012).......................................................................................30

*Utter v. Hiraga*,
   845 F.2d 993 (Fed. Cir. 1988).........................................................................................24

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991)................................................................................ passim

*Vasudevan Software Inc., v. Microstrategy, Inc.*,
   782 F.3d 671 (Fed. Cir. 2015)................................................................................. passim

## Statutes

35 U.S.C.112........................................................................................................2, 8, 11, 14

35 U.S.C. § 282(a) .......................................................................................................8

35 U.S.C. § 286.............................................................................................................5

Mondis Technology Ltd. ("Mondis), submits this memorandum of law in opposition to LG Electronics, Inc. and LG Electronics U.S.A., Inc.'s (collectively, "LG" or "Defendants") motion for summary judgment for lack of written description.  D.I. 215.  Mondis relies on the accompanying Declaration of Brian M. Goldberg in Support of Mondis' Opposition to LG's Motion for Summary Judgment for Lack of Written Description and the Declaration of Joseph D. Lamm in Support of Mondis' Opposition to LG's Motion for Summary Judgment for Lack of Written Description.  For the reasons set forth below and in the accompanying declaration of Joseph D. Lamm, Mondis respectfully requests that the Court deny LG's motion for summary judgment.

## I.      INTRODUCTION

Claim 14 of the '180 patent has survived Patent Office review, a jury trial, and multiple prior invalidity attacks by LG.  Nevertheless, LG asks the Court to strip Mondis of the presumption of validity and to declare the claim invalid as a matter of law.  Extraordinary assertions require extraordinary proof, and here LG provides none at all.  Instead, LG supports its motion with bare lawyer argument.  In the face of the expert declaration submitted by Mondis, there is, at the minimum, a genuine issue of fact for trial.

The Patent Office allowed claim 14 after extensive discussion with the examiner specifically concerning the addition of the disputed "type ID" limitation.  Indeed, the Patent Office actively negotiated, and expressly agreed to, the amendment of the claim to include the "type ID" limitation so that the claim could be allowed.  Additionally, claim 14 has not only survived a trial, in which the jury found it to be both valid and infringed,[1] but it has also survived

_____

[1] Ex. 1 (Final Judgment, 2:07-cv-565-TJW-CE (E.D. Tex.)).

four reexaminations initiated by LG.  Nevertheless, LG now alleges that claim 14 is so clearly

invalid for failure of written description, an issue of fact for which LG bears the burden by clear

and convincing evidence, that LG is entitled to summary judgment.  But if invalidity was so

clear, why did LG not even mention this alleged failure of written description in its invalidity

contentions from the earlier Texas case between the parties?[2]  Similarly, if such invalidity was so

clear, why didn't LG's co-defendants from the earlier Texas litigation raise the issue of written

description at trial?[3]

LG has suddenly discovered this new written description argument and now tries to

elevate it to case dispositive status, but the motion is simply LG's latest attempt to avoid a jury

trial, a trial in which the jury will hear about how LG previously ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████  A trial in which the jury will also hear about how LG secretly

filed reexamination petitions at the Patent Office, during what Mondis thought were good faith

licensing negotiations, and then lied to Mondis by denying that LG was responsible for those

petitions. A trial in which the jury will hear how claim 14 survived four Patent Office

reexaminations instituted by LG.

LG mangles the law of written description, inviting error.  The relevant test is whether

the specification as whole demonstrates that the inventors invented what is claimed.  This inquiry

---

[2] See D.I. 106-3 at 15, 19-20 (LG invalidity contentions for claim 14 of '180 patent raising
written description issues for "display unit information," "characteristic information" and "other
than characteristic information," but not for an identification number identifying at least a "type"
of display).

[3] See Ex. 2 (Joint Final Pre-Trial Order, 2:07-cv-565-TJW-CE) at pp. 11-13 (written description
under 35 U.S.C. § 112 not among the contested issues to be tried)

is a question of fact that is made from the perspective of one of ordinary skill in the art.  As a result, written description is rarely[4] grounds for summary judgment, precisely because the Patent Office is presumed to have read the specification and vetted the claims, and amendments thereto, for written description support.

Here, the only direct evidence of record as to how one of ordinary skill in the art of displays would have understood the '180 specification in 1993 is the accompanying declaration of Mr. Lamm, a technical expert who has worked extensively in the field of displays since 1977. Mr. Lamm provides a detailed opinion that those of ordinary skill would have understood that the inventors were in possession of the claimed invention, including ID numbers for identifying the type of display.  Despite having the burden of proving invalidity on this disputed question of fact by clear and convincing evidence, LG submitted no such evidence of its own.  Additionally, the indirect evidence, such as the Patent Office actively negotiating the disputed claim amendment, and LG's silence as to the written description issue in the previous litigation, further demonstrate that summary judgment is plainly inappropriate here.

LG's motion to invalidate claim 14 should be denied and the disputed issues submitted to the trier of fact.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Litigation history

Mondis and LG are no strangers.  Mondis originally sued LG on December 31, 2007, in the Eastern District of Texas, Case No. 2:07-cv-565, alleging that certain LG computer monitors

---

[4] *See, e.g, Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*, 35 F.Supp.3d 163, 178 (D. Mass. 2014) (it is a "rare instance[]" when the facts firmly establish the failure to meet the written description requirement such that summary judgment can be granted).

infringed, *inter alia*, U.S. Patent No. 7,475,180, the same patents asserted in the instant case. Ex. 3,[5] Case No. 2:07-cv-565 (E.D.Tex.), D.I. 1 (complaint); Ex. 4, D.I. 102 (second amended complaint).  Before claim construction LG settled out of that case, ███████████████ ████████████████████████████████████████████████████████████████████████████ ████████  Mondis' claims against LG's televisions were preserved so that the parties could continue to negotiate over those television claims.  LG's televisions are the subject of the instant case.

One of LG's three co-defendants in the prior case, TPV, took a license to the patents shortly before trial on June 14, 2011.  The remaining two of LG's co-defendants in the prior case, Innolux and Hon Hai, continued to seek invalidation of the patents at trial.  The jury reached its verdict on June 27, 2011, finding claim 14 of the '180 Patent to be both valid and infringed.  Ex. 5, Case No. 2:07-cv-565 (E.D.Tex.), D.I. 586.  The Court confirmed the jury's findings over Innolux's post-trial motions and entered final judgment in Mondis' favor on August 30, 2011.  Ex. 6, Case No. 2:07-cv-565 (E.D.Tex.), D.I. 662; Ex. 7, Case No. 2:07-cv-565 (E.D.Tex.), D.I. 666.

B.     **Television Licensing Negotiations**

Following the final judgment, Mondis and LG renewed discussions for LG to extend its license to cover LG's televisions as well.  D.I. 174-7, Declaration of Michael B. Spiro, Feb. 17, 2015 ("Spiro Decl."), at ¶ 11.  Mondis met with LG in Korea and elsewhere at least twelve times to reach agreement on a license for LG's television products.  D.I. 174-7, Spiro Decl., ¶¶ 7, 14,

---

[5]     References to "Ex. __," are to exhibits attached to the Declaration of Brian M. Goldberg in Support of Mondis' Opposition to LG's Motion for Summary Judgment, dated August 23, 2017.

16, 17, 19, 20, 21, 23, 30, 33, 36, and 37.  Numerous licensing proposals were exchanged.

Although the discussions were slow, Mondis assumed that LG was proceeding in good faith.

*E.g.,* D.I. 174-7, Spiro Decl., ¶¶ 30, 32.  By June 2014, after expiration of the last of the patents-

in-suit, and with the 6-year damages window of 35 U.S.C. § 286 threatening to cut into Mondis'

rights to compensation for LG's prior infringement, Mondis filed the present suit on June 21,

2014, but did not serve it initially in order to continue the negotiations.  D.I. 174-7, Spiro Decl.,

¶¶ 32-37.  Mondis told LG that the suit had been filed, and Mondis was lulled into believing that

the negotiations could be completed before service was ultimately due.  D.I. 174-7, Spiro Decl.,

¶¶ 32-40.

Prior to filing the instant complaint, Mondis learned that two anonymous petitions for

reexamination had been filed against its patents in May 2014 (herein, the "May 2014 Reexam

Request").  Mondis was unwilling to defer litigation if LG was in any way connected with those

petitions, and twice asked LG's senior personnel whether LG was involved.  On both occasions

LG flatly denied any involvement.  D.I. 174-7, Spiro Decl. at ¶¶ 33, 37.  On that basis, Mondis

continued to negotiate with LG in good faith, and deferred service of the complaint to allow

negotiations to conclude.  *Id.*  However, the parties failed to reach a licensing agreement before

Mondis' deadline for service, and Mondis served LG with the complaint on October 16, 2014.

D.I. 7.  In a terse letter dated February 6, 2015, LG's counsel admitted that LG was behind the

May 2014 Reexam Request after all.  Ex. 8.  LG's previous representations to the contrary were

deceptive, and manifestly aimed at procuring delay.

### C.    Reexaminations and IPR's

LG's desperation to avoid a jury trial on the '180 patent is reflected by the fact that it has

filed <u>four</u> petitions for *ex parte* reexamination and <u>one</u> petition for *inter-partes* review at the

Patent Office.  The petition for inter-partes review was filed on March 27, 2015, but was denied

by the PTO on September 17, 2015.  Ex. 9.  Three *ex parte* reexamination petitions were filed on

May 12, 2015 (90/013,237), November 3, 2014 (90/013,390), and March 27, 2015 (90/013/481).

Two of these reexamination proceedings (Control Nos. 90/013,237 and 90/013,390) were

merged by the Patent Office.  On June 30, 2015, the PTO confirmed claim 14 as being

patentable.  Ex. 10, '237/'390 Reex NOA at 31.  Shortly after the PTO confirmed claim 14 for

the third time (Ex. 11, '481 Reex NIIRC), LG launched yet a fourth petition for reexamination of

claim 14 (Control No. 90/013,784).  The PTO, however, promptly confirmed the claims once

again.  Ex. 12, '784 NIIRC.

### D.     Overview Of '180 Patent

The '180 patent claims priority to a Japanese patent application JP 5-022212 filed on

February 10, 1993, and is a continuation from a chain of U.S. applications stemming from U.S.

utility application 08/190,848 filed on February 3, 1994.  The pertinent disclosures in the

Japanese priority application, the first U.S. utility application, and the issued '180 patent are

substantially the same. Lamm Decl. ¶ 11.  As a result, for simplicity Mondis cites to the

specification of the issued '180 patent, as does LG.

In general, the '180 patent relates to data communications between a computer and a

display using an interface. *See, e.g*., Ex. 14, FIG 1.  In this exemplary embodiment display 6

receives video and vertical and horizontal synchronization signals from a display controller 3 in

an attached computer 1.  These signals are used to generate an image on display screen 14.

Computer 1 and display 6 are also connected via a digital interface between a communication

controller 5 in the computer and a communication controller 8 in the display.  *Id*. at 6:10-13.

The display also includes a memory 9 operably connected to communication controller 8 in the

display.  Memory 9 stores data including: factory data, user adjustment data, delivery adjustment data, frequency range data, and various identification numbers.  *See id*. at FIG.2, 5:15-28.  The stored ID numbers are used for several different purposes, including: enabling an attached computer to communicate with the display unit (3:14-21), informing an attached computer that the display supports a "communication function" (5:62-67), indicating that the display unit is capable of receiving control instructions for adjusting the image (5:67-6:9), and identifying one specific display from among a set of displays (FIG. 5, 7:10-41).  *See also* Lamm Decl. at ¶¶ 11-14.

During prosecution of the '180 patent, the PTO issued a non-final Office Action, rejecting claims 14 and 16 as anticipated by U.S. Patent No. 5,276,458 ("Sawdon"), and claim 15 as obvious over Sawdon in view of U.S. Patent No. 5,375,210 ("Monnes").  On April 30, 2007, the applicant and the examiner negotiated an amendment to the pending claims during an Examiner Interview in order to obtain their allowance.  *See* LG Ex. B[6].  Specifically, "[a]pplicant propose[d] to more clearly specify identification number as a 'type' of display unit which examiner agree[d] [would] read over the previous art applied."  *Id*.  Accordingly, on May 4, 2007, applicants amended independent claim 14 to require that the identification number identify "at least a type of" said display unit.  *See* LG Ex. C, at 5-6.  On October 22, 2007, the examiner allowed the claims and issued a Notice of Allowance.  LG Ex. D.

## III.   LEGAL STANDARDS

### A.    Motions for Summary Judgment

---

[6] References to "LG Ex. __," are those attached to the July 21, 2017, Declaration of Liza M. Walsh In Support of LG's Motion for Summary Judgment.

Summary judgment is appropriate only when the moving party demonstrates that there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law.  F.R.C.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All evidence must be viewed in light the light most favorable to the non-movant, Mondis, and all reasonable inferences must be drawn in Mondis' favor.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Patents are presumed to be valid under 35 U.S.C. § 282(a).  A party seeking to invalidate a patent on a motion for summary judgment must submit clear and convincing evidence of invalidity such that no reasonable jury must find otherwise.  *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253 (Fed. Cir. 2004).

## B.    Written Description

The patent statute states that, "the specification shall contain a written description of the invention …."  35 U.S.C. § 112 ¶ 1.  Compliance with the written description requirement is a "question of fact." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1363 (Fed. Cir. 2006).  As an invalidity defense, LG must prove the lack of adequate written description by clear and convincing evidence.  *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1309 (Fed. Cir. 2015).

The test for written description is "whether the disclosure 'conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'"  *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012) (quoting *Ariad*

*Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010)). "'Although [the applicant] does not have to describe exactly the subject matter claimed, … the description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed.'" *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991) (alterations in original) (quoting *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989)).

The sufficiency of the written description is assessed "from the perspective of a person of ordinary skill in the art" (a "PHOSITA").  *Streck*, 665 F.3d at 1285 (quotation omitted); s*ee also Falko-Gunter,* 448 F.3d at 1363 ("Written description is … judged from the perspective of one of ordinary skill in the art as of the relevant filing date.").  As a result, "in some instances, a patentee can rely on information that is 'well-known in the art' to satisfy written description." *Streck*, 665 F.3d at 1285.  Moreover, "[t]he level of detail required to satisfy the written description requirement depends, in large part, on the nature of the claims and the complexity of the technology." *Id.*

While the specification must contain a description of the claimed subject matter, it need not recite the claimed invention *in haec verba*.  *See Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1345 (Fed. Cir. 2016) (reversing the PTAB's conclusion that the claims lacked written description support where the Board did not cite any evidence other than the fact that the terms were not present in the specification); *Vasudevan Software Inc., v. Microstrategy, Inc.*, 782 F.3d 671, 682-83 (Fed. Cir. 2015) ("The fact that these portions of the specification do not speak *in haec verba* of accessing 'disparate databases' does not eliminate as a genuine issue of material fact the existence of at least some discussion, and, therefore, possession, of the accessing of disparate databases, as claimed.").

**IV.   ARGUMENT**

9

**A.      The Disputed "Type" ID Limitation Was Of Central Focus During Prosecution, Indicating That The Patent Office Was Not In Doubt As To It Having Written Description Support**

.       In April 2007, during the original prosecution of the '180 patent, the applicant conducted an in-person interview with the patent examiner to discuss claim rejections that had been made in view of certain prior art.  LG Ex. B.  The interview summary reflects that during the interview:

> Applicant proposes to more clearly specify identification number as a **"type"** of display unit **which the examiner agrees** will read over the previous art applied regarding the claims.

*Id.* (emphasis added).  Indeed, in a May 4, 2007, Amendment filed by the applicant shortly thereafter, pending claim 40 (issued claim 14) was amended to recite "an identification number for identifying at least a type of said display unit." ("the type ID limitation"). LG Ex. C at 6.  In the accompanying remarks, the applicant reiterated the agreement reached with the examiner that the claim would be allowable if amended in the agreed upon manner.

> As noted in the Interview Summary … **Examiner agrees that the amendment**, as presented herein, will read over the previous prior art applied regarding the claims.  That is, applicants submit that neither Sawdon nor Monnes provide any disclosure or teaching … of the recited features of the independent and dependent claims that a memory stores an **identification number for identifying at least a type of the display unit** …

*Id.* at 12 (emphasis added).  In response to this amendment, the examiner allowed pending claim 40 (issued claim 14). LG Ex. D.  In the examiner's Notice of Allowance, he stated that one of the reasons for allowance was that the prior art neither taught nor suggested "a memory which stores an identification number for identifying at least a type of said display unit…."  *Id.* at 2.

In view of the foregoing, it is clear that the disputed "type ID" limitation was not clandestinely slipped into the claim, but was instead <u>actively negotiated with the examiner</u> in order to secure allowance of the claim.  Significantly, the examiner is tasked with determining

whether claim amendments comply with the written description requirement of 35 U.S.C. § 112 ¶ 1 and to reject such amendments if they do not.[7]  Here, the Patent Office itself participated in the addition of the disputed amendment.  It is clear that the Patent Office did not perceive any written description deficiency with the amendment to add the type ID limitation.  As a result, LG faces an enhanced burden of establishing invalidity, because the Patent Office possessed the '180 specification and presumably properly evaluated compliance with the written description requirement when it negotiated the claim amendment.  *See, e.g., Commonwealth Scientific and Indus. Research v. Buffalo Tech., Inc*., 542 F.3d 1363, 1379-80 (Fed. Cir. 2008) (stating that in the context of whether a claim amendment complied with the written description requirement, the PTO's allowance of the amendment, "is entitled to an especially weighty presumption of correctness in a subsequent validity challenge") (citing *Brooktree Corp. v. Advanced Micro Devices, Inc*., 977 F.2d 1555, 1574-75 (Fed. Cir. 1992)); *Tan v. Integrated Silicon Solutions, Inc.*, 07-cv-06166 (WHA), 2008 WL 2340217, at *3 (N.D. Cal., June 5, 2008) (same).

### B. LG Provides No Evidence Regarding How a Person of Ordinary Skill In the Art Would Understand The Disclosures Of The '180 Patent

LG bears the burden of establishing invalidity of the '180 patent for lack of written description—a question of fact—by clear and convincing evidence.  Further, whether there is adequate written description is assessed "from the perspective of a person of ordinary skill in the art." *Streck*, 665 F.3d at 1285 (quotation omitted); s*ee also Vasudevan*, 782 F.3d at 682.  This reflects the fact that, "the patent specification is written for a person of skill in the art, and such a

---

[7] *See* Ex. 13, Manual of Patent Examining Procedure (MPEP), "Guidelines for the Examination of Patent Applications Under the 35 U.S.C.112. para 1, 'Written Description' Requirement," Chapter 2163, at § I.B. ("New or amended claims which introduce elements or limitations which are not supported by the as-filed disclosure violate the written description requirement.").

person comes to the patent with the knowledge of what has come before." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).

The knowledge of the PHOSITA is therefore comprised of the prior art, and a PHOSITA is presumed to be aware of all pertinent prior art. *See Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453 (Fed. Cir. 1984) ("… the real meaning of 'prior art' in legal theory—it is knowledge that is available . . . to a person of ordinary skill in an art."); *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) (A "person of ordinary skill . . . is presumed to be aware of all the pertinent prior art.") (citation omitted).  As a result, "'[a] patent need not teach, and preferably omits, what is well known in the art.'" *Falko-Gunter*, 448 F.3d at 1365 (citing *Spectra–Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1534 (Fed.Cir.1987)) (alteration in original).

Accordingly, in order to properly address the written description requirement from the perspective of a PHOSITA, the factfinder frequently relies upon expert testimony for evidence relating to the level of skill possessed by a person of ordinary skill in the relevant art, the types of problems and prior art solutions described in the art, and how a PHOSITA would understand the content of the written description in view of this knowledge.  For example, in *Falko-Gunter*, the Federal Circuit affirmed the BPAI's decision that the claims were supported by the written description.  448 F.3d at 1366.  In doing so, the court referred to the BPAI's review of the application in conjunction with expert testimony establishing that a "skilled person would have been readily able to choose an essential vaccina gene' based on references that have been publicly available since 1990." *Id.*; *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1371 (Fed. Cir. 2009) ("Dr. Wang provided more than a mere conclusion that the 1988 application discloses the claim limitations.  He relied on specific statements in the 1988

12

application and explained how, in his opinion, a person of ordinary skill in the art would understand those statements."). In *AAT Bioquest, Inc. v. Texas Fluorescence Labs., Inc.*, 14-cv-03909 (DMR), 2015 WL 1738402, at *5 (N.D. Cal. Apr. 13, 2015), the court denied summary judgment noting the movant's lack of useful evidence regarding the perspective of a PHOSITA:

> TEFLabs did not address or provide evidence relating to: (1) the level of a person of ordinary skill in the art; (2) the nature of the invention claimed; (3) what a person of ordinary skill in the art would have understood based on the disclosure within the four corners of the '165 Patent specification; or (4) what that person would have understood based on what was well-known in the art. TEFLabs presented only attorney argument to suggest that a person of ordinary skill in the art would not have understood the claimed invention to be adequately described.

Because the written description inquiry is fact-intensive and depends upon the perspective of one of ordinary skill, courts routinely find that genuine issues of material fact exist when the parties submit conflicting expert opinions or when, as is the case here, the nonmovant submits uncontroverted expert testimony. *See Vasudevan*, 782 F.3d at 683 (reversing summary judgment of invalidity for lack of written description where the nonmovant submitted uncontested expert testimony that the patentee had possession of the claimed inventions)*; Vas-Cath*, 935 F.2d at 1567 ("We hold that the Ash declaration and Vas-Cath's no-refutation thereof, without more, gave rise to a genuine issue of material fact inappropriate for summary disposition."); *Metro. Life Ins. Co. v. Bancorp Services LLC,* 527 F.3d 1330, 1338–39 (Fed. Cir. 2008) (finding that "conflict in [expert] declarations created a genuine issue of material fact that made summary judgment inappropriate"); *In re Gabapentin Patent Litig.*, 395 F.Supp.2d 175, 183 (D.N.J. 2005) ("Evidence in the record, including, but not limited to, conflicting expert affidavits, presents a quintessential disputed issue of fact as to whether the claims of the '482 patent are supported by the written description."); *AstraZeneca AB v. Hanmi USA, Inc.*, 11-cv-

13

760 (JAP), 2012 WL 3779381, at *11 (D.N.J. 2012) ("… given the dueling expert reports submitted and the fact that the Court must draw all reasonable inferences in light of the non-moving party, the Court finds that there exist factual issues that would preclude summary judgment in any event.").

Here, despite being the movant and bearing the burden of proof, LG fails to support its motion with any evidence as to how a PHOSITA would have understood the '180 specification in view of their knowledge of the art at the time of filing, nearly a quarter century ago.  Indeed, the only evidence of record as to even what the level of skill was is provided by Mr. Lamm, who opines that the PHOSITA would have possessed a bachelor's degree in electrical engineering and two to four years of experience.  Mr. Lamm applied this level of skill in his detailed analysis, and he concluded that claim 14 has written description support.  LG has nothing to refute Mr. Lamm's opinion as to how one of ordinary skill would have interpreted the '180 specification. To grant LG's motion under such circumstances is to invite reversible error.

### C.   The '180 Specification Demonstrated to Those of Ordinary Skill That The Inventors Invented What Is Claimed

According to Mr. Lamm, who holds a degree in electrical engineering from Texas A&M and has been working in the fields of displays and display communications for 40 years, a PHOSITA in 1993 would have recognized that the inventors invented what is claimed, and that the written description requirement of 35 U.S.C. § 112 ¶ 1 was satisfied with respect to the disputed type ID limitation Lamm Decl. ¶¶ 4-7, 15, 36.  Mr. Lamm sets forth the level of ordinary skill in the art at the relevant time.  *Id*. at ¶ 8.  He then methodically goes through the teachings of the '180 specification as well as the knowledge possessed by those of ordinary skill at the time in order to form his opinion.  *Id*. at ¶¶ 15-35.  The framework of Mr. Lamm's opinion is summarized below.

14

1.     **The '180 Specification Describes Different Types of Displays**

The '180 patent expressly refers to the "***type of display device***." Ex. 14 at 1:42-43.  At the time, a PHOSITA understood display "type" to refer to different display technologies, such a cathode ray tube (CRT), flat panel, liquid crystal (LCD), etc.  This understanding is demonstrated by prior art such as U.S. Patent No. 5,262,759.  *See* Ex. 15 at 1:29-42 (referring to "different types" of displays and identifying CRT, flat panel, passive color, etc.).  Lamm Decl. ¶ 16.

The specification also illustrates and expressly describes the use of two different types of displays – CRT and LCD.  Lamm Decl. ¶ 17.  More particularly, FIG. 9 depicts an embodiment in which there is both a CRT display 14 and an LCD display 34.  *See also* 4:35 ("cathode-ray tube"), 8:49:55 ("34 a liquid crystal display panel"); Lamm Decl. ¶ 20. In view of the foregoing, it was clear that the '180 inventors contemplated use of displays of different types.  Lamm Decl. ¶¶ 16-17.

2.     **A PHOSITA Understood, And The '180 Specification Teaches, That Different Display Types Required Different Input Signals**

In the early 1990's those of ordinary skill understood that displays of different types needed different kinds of input signals in order to properly display an image.  Lamm Decl. ¶ 18. This is confirmed by reference to the prior art.  For instance, U.S. Patent No. 5,222,212 explains that:

> Traditionally, personal computing systems have used cathode ray tube (CRT) type display devices.  More recently, however, many manufacturers and vendors have employed flat panel display devices…. a flat panel display has a slower response time than a CRT display because it is a chemically operative system.  This difference in response time **requires differences in timing, sync, horizontal, vertical, and other display control functions for the two types of devices**.

Ex. 16 at 1:22-34 (emphasis added).  *See also* U.S. Patent No. 6,118,413 (Ex. 17) at 2:37-41

(describing CRT and LCD displays as requiring "different drive signals"). Lamm Dec. ¶ 18.

Similarly, the '180 specification makes clear that the inventors understood that different

display types, such as CRT and LCD, required different drive signals to display an image.  More

particularly, FIG. 9 depicts CRT 14 being driven by video and sync signals from a "display

controller" 3 in an external computer 1B.  In contrast, LCD display 34 is driven by an "LCD

controller."  The fact that the controller driving the LCD screen is expressly named an "LCD

controller' indicates that it is specifically configured to output signals compatible with LCD-type

displays.  Lamm Decl. ¶¶ 18-20.

### 3. The '180 Specification Demonstrates That the Inventors Were Concerned About Signal Compatibility Between a Computer and a Display

As explained above, different display types possessed different signal requirements in

order to display an image.  This presented the potential for signal compatibility problems if the

set of signals that the display was configured to receive did not match the set of signals that a

graphics controller in a connected computer was configured to generate.  In such a situation, the

computer's controller might not generate a video signal compatible with the attached display

unit.  Lamm Decl. ¶¶ 21-26.

It was clear to a PHOSITA that the '180 specification described this potential

compatibility problem and was directed at a solution. For instance, the specification teaches that:

> In current display devices as computer terminals, a **wide variety of**
> display positions and sizes on the screen and **video signal frequencies**
> to be displayed are used depending on video signals to be inputted.
> Therefore, a display or a so-called **multi-scan** display has been used so
> that a display device **can handle various video signals**.

Ex. 14 at 1:35-40.  The specification also states that "the display device obtains a most suitable screen display according to the input video signal."  *Id*. at 1:64-66.  In addition, the specification refers to the existence of "various video signal specifications."  *Id*. at 4:26-28.  These passages are recognizing the problem in the art that there existed a wide variety of potential video signal formats (i.e., "specifications") that could be employed between a computer and display and therefore signal compatibility (i.e., ability to "handle various video signals") was an issue. Lamm Decl. at ¶¶ 21-26.  Additionally, as Mr. Lamm explains, the term "multi-scan" as used in the '180 specification specifically refers to a prior art technique that attempted to solve some of these signal compatibility issues.  Lamm Decl. at ¶ 23.

Figure 9 of the '180 patent also demonstrates that the inventors were concerned about signal compatibility for different types of displays.  As discussed above, Figure 9 depicts the CRT 14 and LCD 34 as being drives by distinct controllers 3 and 33, wherein controller 33 is expressly labelled as being an "LCD controller." *See also* Ex. 14, 8:52-53. By illustrating the two different display types being driven by different types of controllers, the inventors demonstrated that they were cognizant that cathode ray tube type displays and LCD type displays required different kinds of signals, and that the correct type of signals for a given display type needed to be generated by a different controller for each display type.  Lamm Decl. ¶ 20.

LG itself has itself characterized the '180 patent as being "directed to a display unit which includes a memory for storing identification numbers…. The display receives signals from the video source that are generated based on the identification numbers…. This allows a video source to configure itself for optimal interaction with a selected display."  Ex. 18 (LG's Petition

17

for Reexamination, 90/013,390) at MONLG 00597797.[8]  Hence, LG has acknowledged that the '180 specification is directed, at least in part, to facilitating compatibility between a computer and display so that images may be displayed optimally.

>    **4.     The PHOSITA Understood That Display Type ID's Were Used To Ensure Signal Compatibility And Enabled Computers To Communicate With Displays Of Different Types**

Those of ordinary skill knew that identifying the display type was an effective technique for ensuring signal compatibility, since it permitted the graphics controller in the computer to generate signals appropriate for the type of display that was connected.  Lamm Decl. ¶¶ 27-29. For instance, a PHOSITA would have been aware of the Moriconi '759 patent that describes a portable computer having a main computer body that can receive displays of different types. *See, e.g*., Ex. 15, '759 patent at Abstract ("A portable computer is configured to accept removable modular ***display panels of different types*** that plug into a structure hinged to the body of the computer.") (emphasis added).  The computer body portion of the portable computer stores a set of display drivers.  Each display driver is configured to generate and output compatible signals for a particular type of display.  *Id*. at 2:18-19 ("compatible display driver routine for operating the display").  Further, each display includes a memory storing a unique identify code identifying the display type.  *Id*. at 5:20-22 ("EEPROM 51 is programmed with a unique ***identity code for the specific type of module***.  Each type of module offered for the computer has a specific identity code.") (emphasis added), 2:15-16 ("code stored in a memory device, such as an EEPROM, for identifying the ***type of display***") (emphasis added).

---

[8] LG has acknowledged responsibility for this anonymously-filed petition for reexamination 90/013,390.  *See, e.g.*, D.I. 25 at 3 (LG's Motion to Stay Pending Reexaminations).

The display type ID in Moriconi '759 is sent by the display module to the computer body, which permits the attached computer to load and use the correct routine (driver) that is configured to generate signals compatible with that particular display type.  *Id.* at 5:23-26 ("On initializing, the system BIOS queries the display to ascertain the module type, and loads the correct routines to operate that module."), 2:15-19 ("code … for identifying the type of display, which is accessed by the computer memory and matched with a compatible display driver routine for operating the display."); *see also* Ex. 16, U.S. Patent No. 5,222,212 at 8:55-58 ("receiving an identification signal from the video display device, which signal indicates to the controller which of the plurality of types of video display devices is coupled to the controller.").

In view of the foregoing it was well-known to those of ordinary skill that display type ID's were used to facilitate signal compatibility between a computer and a connected display unit.  Lamm Decl. ¶¶ 27-29.

> ### 5.     The '180 Specification Describes The Use Of ID Numbers To Enable Communications Between A Computer And Display And A PHOSITA Understood This To Include a Display Type ID

The '180 specification describes the display memory 9 as storing all "necessary information.  Ex. 14, at 5:16-18.  In turn, memory 9 is described as storing identification numbers.  *See id.*, at FIG. 2, 5:27-28.  Given the '180 patent's concerns about signal compatibility and the use of different display types, which require different kinds of signals, Mr. Lamm opines that a PHOSITA would have interpreted the "necessary information" as including a display type ID number.  Lamm Decl. ¶ 32.

Further, in the Summary of the Invention section a display ID is expressly described as enabling a computer to communicate with a display.  The '180 specification states:

> In the memory means mounted in the computer, the identification number for identifying the information output device[9] is stored beforehand.  When the **identification number which is sent from the information output device** via the second and first communication means **matches** with the identification number which is stored in the memory means beforehand, **the computer communicates with the information output device**.

Ex. 14, at 3:14-21 (emphasis added).  Again, it is Mr. Lamm's opinion that this passage is concerned about signal compatibility and that one of ordinary skill in the art would understand the communicated ID to represent, at least a display type ID, which would enable the computer to communicate with different types of displays once it receives their type ID.  Lamm Decl. ¶ 30

According to Mr. Lamm, to one of ordinary skill what is being described in the foregoing passage from the '180 specification is similar to what is described in the Moriconi '759 prior art reference.  Lamm Decl. ¶ 31.  The Moriconi reference recites:

> … [m]odular displays for use with a computer configured to accept them have a code stored in a memory device, such as an EEPROM, for **identifying the type of display**, which is accessed by the computer memory and **matched** with a compatible display driver routine **for operating the display**, which the computer then uses.

Ex. 15, '759 patent at 2:13-20 (emphasis added).  In Moriconi, a display type ID is sent to the computer, and is also "matched" to locate a suitable driver associated with the received type ID to enable communications between the computer and display.  Given the parallel descriptions of operation, Mr. Lamm contends that this supports his opinion that those of ordinary skill would have interpreted the foregoing passage from the '180 specification as describing the storing and communication of a display type ID.  Lamm Decl. ¶ 31.

---

[9] The term "information output device" is used by the '180 specification to refer to displays.  *See* '180 patent at 1:25-29.

Finally, LG has acknowledged that "using numbers to identify things was **well known** in the art at the time of the invention…. Such **numbers served as an identifying code** to distinguish a given element from other **types** of elements."  Ex. 18, (LG's Petition for Reexamination, 90/013,390) at MONLG 0597822 (emphasis added).  Further, LG has argued that "persons of ordinary skill in the art recognized that displays had a wide variety of capabilities and, **to be optimally utilized, those capabilities had to be communicated** to a related computer.  In some cases this was **accomplished by storing identification information** in the memory … and allowing the computer to interrogate that memory …."  *Id*. at MONLG 00597798-99 (emphasis added).  Thus, LG has endorsed many of the points made by Mr. Lamm, including that it was known that display type ID's were stored in display memories for optimizing the communications between a computer and display, the very objective that also LG admits the '180 specification is directed towards.  *Id*. at MONLG 00597797.

***   ***   ***

The '180 specification need not expressly recite the disputed claim language *in haec verba* (e.g., "ID number for identifying the display type" or "display type ID").  *Blue Calypso*, 815 F.3d at 1345.  Nor does the specification "have to describe exactly the subject matter claimed." *Vas-Cath*, 935 F.2d at 1563.  Moreover, the written description inquiry is made from the perspective of one of ordinary skill and can take into account what was "well-known" in the art.  *Streck*, 665 F.3d at 1285.  Finally, the level of detail required to satisfy the written description requirement "depends, in large part, on the nature of the claims and the complexity of the technology." *Id*.

Mr. Lamm has explained that the technology involved here is relatively straightforward as storing a display type ID in memory is no different than storing any other information and it

21

was well known how to store and read data from a memory, including memories located in display units. Lamm Decl. ¶¶ 33-34. This low technical complexity of the technology pertaining to the disputed limitation reinforces Mr. Lamm's opinion that the concept of storing and communicating a display type ID would have been apparent to a PHOSITA reviewing the '180 specification given their knowledge of the art. And as a result, the disputed limitation has written description support. Lamm Decl. ¶¶ 15, 33-34, 36.

### D.   LG's Sole Focus on Individual Preferred Embodiments is Factually and Legally Flawed

LG spends the majority of its brief attempting to separately explain each of the eight exemplary embodiments described in the '180 patent. *See* LG Brf. at 14-21. LG's review of each exemplary embodiment purports to demonstrate that none of them disclose an identification number for identifying a display type, and thus that the specification "does not otherwise disclose or imply the use of an 'identification number' that identifies a 'type' of display. LG Brf. at 14. LG's argument is factually incorrect because Mr. Lamm explains that at least one of the exemplary embodiments, as well as the Summary of the Invention, would have been understood by one of ordinary skill to imply the use of a display type ID. Lamm Decl. ¶¶ 30-32. LG's argument is also legally flawed because the pertinent test is not whether a particular claim element is used in a particular exemplary embodiment but instead whether the specification <u>as a whole</u> would have indicated to one of ordinary skill that the inventors were in possession of the invention.

### 1.   Both The First Preferred Embodiment And The Summary of The Invention Disclose The Use of A Display Type ID

As set forth above, Mr. Lamm has explained that the first embodiment of the '180 patent (4:17-6:18) is described as possessing a memory 9 that includes identification numbers. Ex. 14,

FIG. 2, 5:16-18.  This memory is also described as possessing "necessary information."  *Id.* at 5:16-17.  Given the compatibility objective of the '180 patent and the description of different display types, Mr. Lamm states that a PHOSTA would have understood the memory to include a display type ID so that compatible signals could be generated for each type of connected display.  Lamm Decl. ¶ 31.

In addition, the Summary of the Invention[10] provides a more generalized embodiment of the invention.  In this embodiment, the invention is described as a display sending an "identification number" to a computer such that the "computer communicates" with the display unit.  As explained by Mr. Lamm, this also would have indicated to a PHOSITA at the time that the ID number enables such communication by indicating to the computer the type of display, so that compatible signals could be generated by the computer.  Lamm Decl. ¶ 30.

In view of the foregoing, Mondis disputes that there are no embodiments that, at least implicitly, describe the storage of a display type ID in the memory. At a minimum, there is a disputed genuine issue of material fact as to how an electrical engineer would have interpreted the disclosures of the '180 specification at the time of filing.

## 2.  LG's Embodiment-by-Embodiment Analysis Is Also Legally Flawed

The test for the sufficiency of the written description "is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Vasudevan*, 782 F.3d at 682 (citation omitted).  "'Although [the applicant] does not have to describe exactly the subject

---

[10] *See Abbott Labs. v. Syntron Bioresearch, Inc.*, 98-cv-2359, 2002 WL 32068939, at *29 (S.D. Cal. Jan. 11, 2002) (relying, *inter alia*, on Summary of Invention for written description support) (rev'd on other grounds).

matter claimed, … the description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed.'" *Vas-Cath Inc.*, 935 F.3d at 1563 (alteration and ellipsis in original). The written description requirement can be met as long as the specification "**as a whole**" indicates to a PHOSITA that the inventors were "in possession" of the invention. *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1346 (Fed. Cir. 2000) ("application considered as a whole" for written description inquiry); *In re Wright*, 866 F.2d 422, 424-25 (Fed. Cir. 1989) ("In deciding the issue, the specification as a whole must be considered."); *In re Skvorecz*, 580 F.3d 1262, 1270 (Fed. Cir. 2009) (citing *In re Wright*).

That a limitation might not be described in a particular exemplary embodiment does not render the claim invalid for want of written description, because the embodiments are only examples and the claims are not limited to such examples. "[A] patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed." *Martek*, 579 F.3d at 1371 (citing cases); *see also Utter v. Hiraga*, 845 F.2d 993, 996, 998-99 (Fed. Cir. 1988) (affirming finding that there was written description support and stating that the preferred embodiments "are examples only and this invention is not restricted thereto.") Nor is an applicant "required to describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) (citing *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc)).

Based on these principles, the Federal Circuit has repeatedly rejected the argument that a claim limitation lacks written description support because of its absence in the preferred embodiments. For instance, in *Martek*, the patent at issue claimed priority to a 1988 application. 579 F.3d at 1370-71. The defendant argued that the 1988 application failed to disclose a

limitation reciting "lipids extracted from a fermentation process for growing microorganisms selected from the group consisting of microorganisms of the genus Thraustochytrium, microorganisms of the genus Schizochytrium and mixtures thereof," in part, because the application contained no working examples that consolidated cells from different strains. *Id.* at 1369-71.  The Federal Circuit rejected defendant's argument noting that "a patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed." *Id.* at 1371.

Similarly, in *Falko-Gunter*, the pertinent portion of the claim at issue recited, "wherein said mutant virus is a mutant *poxvirus* and has a genome which has an inactivating mutation in a viral gene, said viral gene being essential for the production of infectious new virus particles." .  448 F.3d at 1360.  It was argued, in part, that the patent application did not identify any essential genes in poxvirus or describe the inactivation of such genes.  *Id.* at 1362.  The court rejected Falkner's argument that because the specification lacked any examples of essential genes in a poxvirus that the claim lacked adequate written description support.  In doing so, the Federal Circuit relied on its explanation from *LizardTech, Inc. v. Earth Resource Mapping, PTY, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005):

> A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language. That is because the patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before.  Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person or skill in the art that the inventor possessed the invention…

*Falko-Gunter*, 448 F.3d at 1366; *see also Rexnord*, 274 F.3d at 1344.

25

LG relies on *Stored Value Solutions, Inc. v. Card Activation Techs., Inc.*, 796 F.Supp.2d 520 (D. Del. 2011), in which the district court granted summary judgment that there was inadequate written description support for two claims.  LG Brf. at 24-25.  The Federal Circuit affirmed in an unpublished and non-precedential opinion.  *Stored Value Solutions, Inc. v. Card Activation Techs., Inc.*, 499 Fed. Appx. 5 (Fed. Cir. 2012).  LG focuses on the facts that the invalidated claims were amended during reexamination, and the district court's analysis predominately focused on the preferred embodiments described in the specification.  However, the case is not helpful or instructive to the present dispute.

First, the posture of the case was highly unusual as the district court raised the written description issue *sua sponte*.  *Stored Value*, 796 F.Supp.2d at 524.  Thus, the written description defect was so pronounced that the court itself requested briefing on it.  *Id*. ("At my request …").  In contrast, neither this court nor the Eastern District of Texas has similarly requested briefing on the issue.  To the contrary, Mondis previously tried claim 14 to a jury in a case where neither LG nor its co-defendants even raised the issue of written description.

Second, the written description inquiry is fact intensive where each case is decided on its own merits. Therefore cases have limited precedential value.  *See In re Application of Driscoll*, 562 F.2d 1245, 1250 (C.C.P.A. 1977) ("…each case must be decided on its own facts.  Thus, the precedential value of cases in this area is extremely limited."); *Elcommerce.com, Inc. v. SAP AG*, 745 F.3d 490, 506 (Fed. Cir. 2014), vacated by settlement, 564 F. App'x 599 (Fed. Cir. 2014) ("[T]he adequacy of a particular description is a case-specific conclusion, not an all-purpose rule of law.").  Thus, the fact that LG can find a handful of cases[11] in which summary judgment of

---

[11] Two of the cases cited by LG were not decided at the summary judgment stage and instead were a review of the district court's decision to deny JMOL motions of invalidity after a trial on

inadequate written description was granted does not alter the fact that summary judgment is frequently denied (or reversed) due to it being a question of fact that must be proved by clear and convincing evidence.[12]

Third, Mondis does not dispute that it is appropriate to consider the preferred embodiments when assessing written description. However, the inquiry is not limited to the exemplary embodiments but encompasses the specification "as a whole." *In re Wright*, 866 F.2d at 424-25. In *Stored Value*, it appears that the specification consisted "almost exclusively of detailed descriptions of five preferred embodiments" and thus that is all the court had available to consider. 796 F.Supp.2d at 543. Here, as explained Joseph Lamm, a PHOSITA would have considered several teachings from the '180 specification, including teachings from at least the Background of the Invention (1:35-44, 1:64-66), Summary of the Invention (3:14-21), the first embodiment (4:26-28, 5:15-28), and the fifth embodiment (8:53-55) in concluding that the inventors had invented what is claimed.

### E.   Mondis Did Not Admit The Type ID Liitation Lacked Support

LG attempts to manufacture an admission by Mondis that the specification lacks any written description support for the "type ID" limitation in claim 14. LG's argument is a fantasy. There was never any such admission. The Mondis statements cited by LG were directed at arguments made by the examiner when he was attempting to erroneously construe a different

---

the merits. *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002); *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341 (Fed. Cir. 2011).

[12] *Abbott Biotechnology*, 35 F.Supp.3d at178 (MSJ granted in "rare instance[s]"). *See also Vas-Cath,* 935 F.2d 1555 (reversing and remanding district court's grant of summary judgment for lack of written description); *Scriptpro, LLC v. Innovation Associates, Inc.*, 762 F.3d 1355, 1359-61 (Fed. Cir. 2014) (same); *Vasudevan,* 782 F.3d 683 (same).

limitation in a different patent.  The issue of written description support for the type ID limitation in claim 14 of the '180 patent was not at issue or even discussed.

Context is important. The statements relied upon by LG are from a response to an office action in a reexamination concerning Patent No. 7,089,342.  LG Ex. G at 2.  Both statements are from a section entitled "Interpretation Of The Term '***An Identification Number for Identifying the Display Unit,***" which was a limitation in claim 15 of the '342 patent.  *Id*. at 4-5 (emphasis added).  The issue being addressed by Mondis was the examiner's erroneous claim construction of this limitation as permitting the ID number to identify the monitor type even though the limitation was expressly directed at identifying the "display unit" and said nothing about the "type" of display. *Id*.  In rebutting the examiner's claim construction, Mondis explained that:

> The plain meaning of this claim limitation requires the identification number to identify the display unit itself, as opposed to just the type or capabilities of the display. The '342 Patent specification is consistent with the plain meaning of this claim limitation and provides examples in which the identification number serves to identify the display unit itself rather than the type or capabilities of the display unit.

*Id*. at 5.  Mondis then proceeded to explain that the ID number recited in claim 15 of the '342 patent was demonstrated by the exemplary embodiment of FIG. 5, wherein each of three displays possessed its own ID number so that each individual display unit could be identified and individually controlled.  *Id*. at 5-6 ("Thus, this example from the '342 Patent illustrates that an 'identification number for identifying the display unit' is a number that refers to the display unit itself, rather than communicated information about the type or capabilities of the display."). Mondis, also explained that there was additional support in the specification for an ID number that identifies the display unit itself, since such an ID number could be used to achieve data security, which was one of several objectives of the specification. *Id*. at 7-8.

After explaining the correct meaning of the limitation (i.e., that the ID in claim 15 identifies the display unit itself rather than the type of display) and providing support for that construction from the specification, Mondis then proceeded to rebut the examiner's argument that certain passages in the specification required that the ID limitation be construed to include identification of display type.  Mondis prefaced this rebuttal with the statement that "neither the specification nor the claims support Examiner's reference to 'type.'" *Id*. at 8 (emphasis added). Immediately following this statement, Mondis addressed the examiner's specific reliance on column 6, lines 1-11 of the specification as allegedly supporting his construction that the claimed ID represented the type of monitor. *Id*. at 9.  Mondis pointed out that "there is nothing in this relied-upon passage that describes a monitor 'type.'" *Id*.  Mondis concluded, by stating that "the passage relied upon by the Examiner" confirmed that the plain meaning of "identification number for identifying the display unit" required the number to identify the display unit rather than the display type.  *Id*.

As is apparent from the foregoing, written description support was not at issue at all, let alone for the type ID limitation of claim 14 of the '180 patent.  Mondis never represented that the '180 specification failed to support a type ID limitation.  Instead, Mondis merely explained that the particular passage relied upon by the examiner did not support his position that the claim language "identification number for identifying the display unit" could also refer to a display type ID.  Notably, Mr. Lamm's opinion that the specification provides written description support for a display type ID is based on passages other than the one relied upon by the examiner that Mondis rebutted.  In addition, during reexamination of the '180 patent, Mondis indicated that the specification did provide support for different display types when Mondis pointed out that the '180 patent described the use of different types of displays when discussing the proper

construction of "an identification for identifying at least a type of said display unit" in claim 14 of the '180 patent. Ex. 19 ('237/'390, May 11, 2015, Response to Non-Final Action) at 3, n.2.

LG apparently fails to appreciate that the circumstances surrounding this alleged admission that there was no specification support for a display type ID actually demonstrate quite the opposite. More particularly, the record shows that three reexamination examiners were all of the opinion that the specification not only supported a display type ID, but that it actually compelled the ID limitation in claim 15 to be construed so as to include ID numbers that identify the type of display. LG Ex. F at 8 ("the *'342 patent discloses* the identification number as being … an identification number of a particular monitor *type* …."), 26 (signed by three examiners).

LG also makes the meritless argument that the '180 specification's omission of an express definition for "type" somehow shows its deficiency. LG. Brf. at 23 (citing LG Exs. G & H). However,"[a] patent need not teach, and preferably omits, what is well known in the art." *Falko-Gunter*, 448 F.3d at 1365 (alternation in original). Display types were well known in the art and the specifications provides examples of different display types. Lamm Decl. ¶¶ 16-17. That the specification does not provide an express definition for "type" simply means it was intended to bear its well-understood ordinary meaning. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (claim terms presumed to possess ordinary meaning unless explicitly defined).

## V.   CONCLUSION

In view of the foregoing, there is clearly a genuine issue of material fact as to whether LG can prove by clear and convincing evidence that there is inadequate support for the Type ID limitation when viewed from the perspective of one of ordinary skill in the art. As a result, LG's motion should be denied and the dispute resolved by the finder of fact.

Respectfully submitted,

DATED:  August 23, 2017                    By: _/s/ *Brian M. Goldberg*_____

Martin J. Black
Brian M. Goldberg
Jeffrey S. Edwards (*pro hac vice*)
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19106
Tel.: (215) 994-4000
Fax: (215) 994-2222
martin.black@dechert.com
brian.goldberg@dechert.com
jeffrey.edwards@dechert.com

Jeffrey B. Plies (*pro hac vice*)
DECHERT LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
Tel.: (512) 394-3000
Fax: (512) 394-3001
jeff.plies@dechert.com

*Attorneys for Plaintiff Mondis Technology Ltd.*

31

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 23, 2017, I caused a true and correct copy of the

foregoing, BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT FOR LACK OF WRITTEN DESCRIPTION, and supporting documents, to be

served on all counsel of record via the Court's CM/ECF system and via electronic mail on the

following individuals:

> **Jamie B. Beaber**
> **William J. Barrow**
> **Anita Y. Lam**
> MAYER BROWN, LLP – WASHINGTON
> 1999 K Street, NW
> Washington, DC 20006-1101
> Tel.: 202-263-3124
> Fax: 202-830-0304
> Email: jbeaber@mayerbrown.com
> Email: wbarrow@mayerbrown.com
> Email: alam@mayerbrown.com
>
> **Lisa M. Ferri**
> MAYER BROWN, LLP – NEW YORK
> 1221 Avenue of the Americas
> New York, NY 10020-1001
> Tel.: 212-506-2340
> Fax: 212 262-1910
> Email: lferri@mayerbrown.com
>
> **Liza M. Walsh**
> **Selina M. Ellis**
> WALSH PIZZI O'REILLY FALANGA LLP
> One Riverfront Plaza
> 1037 Raymond Blvd., 6th Floor
> Newark, NJ 07102
> Tel.: 973-757-1100
> Fax: 973-7571090
> Email:  lwalsh@thewalshfirm.com
> Email:  sellis@thewalshfirm.com

*/s/ Brian M. Goldberg*
Brian M. Goldberg