**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                                    :
MONDIS TECHNOLOGY LTD,                :
                                                    :
          Plaintiff,                               :          Civil Action No. 15-4431 (SRC)
                                                    :
               v.                                  :
                                                    :          **OPINION & ORDER**
LG ELECTRONICS, INC.                      :
et al.,                                              :
                                                    :
          Defendants.                           :
_____:

**CHESLER, U.S.D.J.**

This matter comes before the Court on six motions: 1) the motion by Defendants LG

Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LG") for judgment as a matter

of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages and

willfulness; 2) LG's motion for judgment as a matter of law under Rule 50(b) and/or a new trial

under Rule 59 regarding invalidity; 3) LG's motion for judgment as a matter of law under Rule

50(b) and/or a new trial under Rule 59 regarding noninfringement; 4) the motion by Plaintiff

Mondis Technology Ltd ("Mondis") for enhanced damages, pursuant to 35 U.S.C. § 284; 5)

Mondis' motion for attorney fees, pursuant to 35 U.S.C. § 285; and 6) Mondis' motion for pre-

judgment and post-judgment interest.  For the reasons that follow, as to the motion for a new

trial on damages, the Court grants it in part, denies it in part, and reserves decision on it in part,

pending further briefing; the remaining motions are denied.

This case arises from a dispute between Mondis, owner of U.S. Patent No. 7,475,180

(the "'180 patent"), and LG, a television manufacturer, over allegations that LG manufactured

1

and sold televisions that infringed claims 14 and 15 of the '180 patent.  A jury trial was held on

April 3, 5, 8, 9, 10, 11 and 12, 2019.  At the conclusion of the liability phase of the trial, the

jury returned a verdict that claims 14 and 15 of the '180 patent were valid and infringed.  At the

conclusion of the damages phase of the trial, the jury returned a verdict that the infringement

was willful, and awarded Mondis compensatory damages of $45 million.

## I.      LG's motions regarding patent validity

LG moves for judgment as a matter of law, pursuant to Rule 50(b), and/or a new trial,

pursuant to Rule 59, on the issue of the invalidity of claims 14 and 15 of the '180 patent for

failure to satisfy the written description requirement.  At the conclusion of the liability phase of

the jury trial, the jury returned a verdict stating, *inter alia*, that LG did not prove by clear and

convincing evidence that claims 14 and 15 of the '180 patent are invalid.  At trial, LG had

argued to the jury that claims 14 and 15 of the '180 patent are invalid for failure to satisfy the

written description requirement, pursuant to § 112, paragraph 1.

In moving for judgment as a matter of law and/or a new trial, LG argues that no

reasonable jury could have found that the '180 patent meets the written description

requirement.  LG contends that there was insufficient evidence for the jury to find in Plaintiff's

favor on this issue.

At the outset, the Court notes that the present case presents challenging circumstances for

LG to succeed on this motion: 35 U.S.C. § 282(a) states that a "patent shall be presumed valid"

and, under Federal Circuit law, "[t]o overcome the presumption of validity of patents, the

accused must show that the claims lack a written description by clear and convincing evidence."

Hynix Semiconductor Inc. v. Rambus Inc., 645 F.3d 1336, 1351 (Fed. Cir. 2011).  As Mondis

notes, the Federal Circuit has held:

> [E]ven though a patentee never must submit evidence to support a conclusion by a judge or jury that a patent remains valid, once a challenger introduces evidence that might lead to a conclusion of invalidity--what we call a prima facie case--the patentee would be well advised to introduce evidence sufficient to rebut that of the challenger.
>
> However, this requirement does not in substance shift the burden of persuasion, because the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation.

Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1360 (Fed. Cir. 2007) (citations omitted).  "Under the law set by Congress, a jury or a court may reach a conclusion that a patent remains valid *solely* on the failure of the patent challenger's evidence to convincingly establish the contrary."

Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1570 (Fed. Cir. 1986).  Thus, for LG to succeed on this motion, it must show that its written description case was so clear and so convincing that no reasonable jury could have found otherwise.

> LG states its argument on this motion as follows:
>
> LG's expert, Dr. Stevenson, testified from the perspective of a person of ordinary skill in the art that the '180 patent failed to comply with the written description requirement. Plaintiffs' own expert, Mr. Lamm, conceded that the patent specification does not expressly recite claim 14's limitation "an identification number for identifying at least a type of said display unit." And contrary to what Plaintiffs promised at the summary judgment stage, Mr. Lamm did not provide any trial testimony that the inventors were in possession of the claimed invention at the time of filing.
>
> Mr. Lamm's failure to provide at trial the very testimony that served as Plaintiffs' entire basis for avoiding a judgment as a matter of law at the summary judgment stage left Dr. Stevenson's expert testimony that the '180 patent is invalid for lack of written description unrebutted and unimpeached. There was no longer a factual dispute for the jury to decide, thus requiring entry of JMOL of invalidity.

(D.'s Br. 1.)  There are two crucial flaws in this argument: 1) the assertion that Dr. Stevenson's testimony was unimpeached; and 2) the unspoken assumption that, in the absence of a rebuttal case, the jury had no role to perform.  Neither is correct.

3

Mondis points to several examples of how Dr. Stevenson was impeached.  For example, on direct examination, Dr. Stevenson testified: "The LG TVs do not claim the -- do not contain the claimed identification number for identifying a type of display unit."  (Tr. 533:12-14.)  On cross-examination, Dr. Stevenson was shown a test report on an LG television that he had generated (LG-297 at LGEMOND00183157), and he testified:

> Q. You came to Dechert's Austin office and you printed out this report, correct?
>
> A. I printed it out and I spent a fair of amount looking at the raw data just to make sure it printed out something reasonable.
>
> Q. You printed it out and you saw that it said "display type RGB color," right?
>
> A. Yes.

(Tr. 665:10-17)  A reasonable jury could have heard this testimony and concluded that Dr. Stevenson's credibility as a witness had been impaired.

Second, LG's implicit assumption that, in the absence of a rebuttal case, there was nothing for the jury to decide, is just wrong.  Again, consider Orthokinetics: "Under the law set by Congress, a jury or a court may reach a conclusion that a patent remains valid *solely* on the failure of the patent challenger's evidence to convincingly establish the contrary."  806 F.2d at 1570.  The proper role of the jury was to hear Dr. Stevenson's testimony, weigh it, and weigh all relevant evidence to determine whether LG had met its burden of proof, which is what the jury did.  The jury reached the conclusion that the claims were valid based on the failure of the patent challenger's evidence to clearly and convincingly establish the contrary.  The jury concluded that the clear and convincing standard had not been met, which appears to be a reasonable conclusion, in view of the evidence presented at trial.

This Court is not persuaded that LG's invalidity case was so clear and so convincing that

4

no reasonable jury could have found claims 14 and 15 to be valid.  LG's motion will be denied.

## II.     LG's motions regarding noninfringement

LG moves for judgment as a matter of law, pursuant to Rule 50(b), and/or a new trial, pursuant to Rule 59, on the issue of infringement.  At the conclusion of the liability phase of the jury trial, the jury returned a verdict stating, *inter alia*, that Plaintiffs had proven that it is more likely than not that LG infringed claims 14 and 15 of the '180 patent.  LG challenges the verdict of infringement on two grounds: 1) no evidence supports the inference that LG's televisions contain the claimed communication controller; and 2) no evidence supports the inference that LG's televisions contain the claimed identification number.

As to the communication controller, LG contends, correctly, that Mondis offered no direct evidence that the accused televisions contain one.  LG argues that, therefore, the jury's determination of infringement must be due to improper speculation and conjecture.  LG has, however, overlooked the role of circumstantial evidence: "Although a jury is entitled to draw reasonable inferences from circumstantial evidence, reasonable inferences themselves must be more than speculation and conjecture."  Phillip M. Adams & Assocs., LLC v. Dell Comput. Corp., 519 F. App'x 998, 1004 n.10 (Fed. Cir. 2013).  The question is, then, whether the jury could have drawn a reasonable inference about the presence of a communications controller based on the circumstantial evidence presented to them, or whether it could only be speculation and conjecture.

Mondis, in opposition, lays out the circumstantial evidence presented to the jury on this issue: 1) LG stipulated:

All of the accused instrumentalities include at least one HDMI input port.
All of the accused instrumentalities include a memory-storing EDID data that is connected to at least one HDMI port.

5

(Tr. 269:4-8.)  2) practice of the HDMI standard requires implementation of the VESA DDC

standard (MON-0516 at 9 ("HDMI carries a VESA DDC channel")); 3) LG's televisions

implement the DDC2B and I2C communications protocols, which allow bidirectional

communication and allow a video source to read the television's EDID data (Tr. 342:16-344:11);

4) Lamm explained how use of the DDC2B and I2C protocols enabled an LG television to

communicate the EDID data to the video source (Tr. 345:9-352:21); 5) Lamm stated that, for an

LG television to communicate the EDID data to the video source as required by the DDC2B

protocol, it must have a communications controller to perform six functions that enable the

communication.  (Tr. 353:3-354:5.)  Having presented this foundation, Lamm then stated his

conclusions:

> Q. In your opinion, is there any way for the accused LG  televisions to implement
> the VESA Plug-N-Play EDID and DDC standards without using a bidirectional
> communication controller?
>
> A. No. The standards require that you perform these  protocol functions, and that
> requires a communications controller and it's clearly bidirectional.
>
> Q. And same question with respect to the HDMI standard.  Could you implement
> an HDMI capability in the television  without using a bidirectional
> communication controller to implement the DDC2B protocol?
>
> A. No. The HDMI standard says you have to do it this  way, and there is no way
> to not do it this way.
>
> Q. So would it be your opinion that a bidirectional  communication controller is
> necessarily present in all the  accused products?
>
> A. Yes, it is.

(Tr. 354:6-23.)  As Mondis contends, a reasonable jury could have heard this evidence and

concluded that Lamm's conclusions were more likely than not to be correct.

Lamm's conclusions constitute a reasoned inference from the underlying evidence and

6

are not speculative and conjectural.  The Federal Circuit approved similar reasoning in Fujitsu

Ltd. v. Netgear Inc., 620 F.3d 1321, 1327 (Fed. Cir. 2010):

> We hold that a district court may rely on an industry standard in analyzing infringement. If a district court construes the claims and finds that the reach of the claims includes any device that practices a standard, then this can be sufficient for a finding of infringement. We agree that claims should be compared to the accused product to determine infringement. However, if an accused product operates in accordance with a standard, then comparing the claims to that standard is the same as comparing the claims to the accused product.

In the present case, Mondis presented evidence that the accused televisions operate in accordance

with the DDC2B standard, and then compared the claims to that standard.  The jury's inference

that the accused televisions contain a communications controller was reasonable, not speculative

and conjectural.

As to the identification number, LG argues: "there was no showing that these two bits

actually identify a type of display unit in accordance with the Court's construction of the

term."[1] (D.'s Br. 1.)  The Court does not agree.  As already discussed, Dr. Stevenson was

cross-examined about a report he generated using a publicly available software program.  The

evidence indicates that the program read the two bits in question inside an LG television and

correctly identified the type of display unit as "RGB color."  (Tr. 665:10-17.)  The evidence

contained a document describing the VESA EDID 1.3 standard, which showed that bits 3 and 4

of Feature Support byte 1 are labeled, "Display Type," with values indicating "monochrome

display," "RGB color display," "non-RGB multicolor display," and "undefined."  (MON-0509

at 14, MONLG 00023168.)  Lamm provided testimony that confirmed this understanding of the

---

[1] To be precise, during claim construction, this Court determined that "identification number"
has its ordinary meaning.  (Opinion dated September 28, 2017 at 14.)  The Court, in passing, also
stated: "The ordinary understanding of "identification number" is that it is for the purpose of
identifying something . . ."  (Id. at 13.)

EDID standard.  (Tr. 333:19-334:2.)  This evidence constitutes a showing that, in an actual LG

television, those two bits actually identified a type of display unit, which, in the example just

described, was "RGB color."  LG did not explain how this is inconsistent with the Court's

construction of "identification number."  This, along with other evidence, constitutes a

sufficient basis for the jury to have determined that LG's televisions contain the required

identification number.

LG has not demonstrated that no evidence supports the jury's determination that LG's

televisions contain the claimed communication controller or the claimed identification number.

To the contrary, substantial evidence supports the finding of infringement.  LG's motion for

judgment as a matter of law, pursuant to Rule 50(b), and/or a new trial, pursuant to Rule 59, on

the issue of infringement, will be denied.

### III.    LG's motion for a new damages trial

LG challenges the jury's verdict in the damages phase of the trial: the jury awarded $45

million in damages and found that LG's infringement was willful.  LG moves for judgment as a

matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages

and willfulness.  As to the damages verdict only, the jury verdict will be vacated.

Federal Rule of Civil Procedure 59(a)(1) states:

Grounds for New Trial. The court may, on motion, grant a new trial on all or
some of the issues—and to any party—as follows:
(A)    after a jury trial, for any reason for which a new trial has heretofore been
granted in an action at law in federal court . . .

When reviewing damages in patent cases, the Federal Circuit applies regional circuit law to

procedural issues and Federal Circuit law to substantive and procedural issues pertaining to

patent law.  Wordtech Sys. v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1318 (Fed. Cir.

2010).  Under Third Circuit law, "[a] new trial should be granted only where the great weight of the evidence cuts against the verdict and where a miscarriage of justice would result if the verdict were to stand." Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006).

A.     *The $45 million damages verdict*

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.  The Federal Circuit has established two basic methods for determining a reasonable royalty:

> Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining. . . .
>
> The second, more common approach, called the hypothetical negotiation or the "willing licensor-willing licensee" approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.

Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009).

This case involves patents for electronics technology developed by Hitachi and transferred to Mondis.  As Plaintiff's expert Bratic explained in his expert report, and the parties do not dispute, the relevant patents transferred from Hitachi to Mondis are the DDC patents, which form two patent families: 1) the '090 patent family, which relates to DDC/2 and DDC/2B technology; and 2) the '812 patent family, which relates to DDC/CI and later technologies. (Walsh 11/28/18 Dec. Ex. A at ¶ 10.)  The '180 patent is a member of the '090 patent family; technical expert Lamm testified that there were eight patents in the '090 patent family, and Bratic agreed.  (Tr. 1045:10-12; 1099:18-21.)  Bratic contended as well that his observations, based on

review of over 25 relevant license agreements, fit with a document provided by Hitachi to a

California court, which indicates that Hitachi generally applied a "DDC Royalty Norm," which

Bratic explained as follows:

> At the time, the DDC Royalty Norm required licensees of the DDC Patents to pay
> Hitachi a royalty rate of either: (1)1% for all DDC-compliant monitors, regardless
> of whether they complied with the DDC/2 and DDC/2B or the DDC/CI standard;
> or (2) 0.25% for monitors compliant with the DDC/2 and DDC/2B ("Pre-
> DDC/CI") standard and 1.75% for monitors compliant with the DDC/CI ("Post-
> DDC/CI") standard (or any smaller or larger percentage for Pre-DDC/CI and
> Post-DDC/CI compliant monitors so long as the sum of the corresponding royalty
> percentages was 2%).

(Walsh 11/28/18 Dec. Ex. A at ¶ 48.)  Bratic concluded that the "implicit royalty rate" for a

license for the '090 family of patents was 0.25%.  (Id.; Id. at ¶ 222.)

Mondis contends that its prior licenses were negotiated on a "threshold basis," charging a

royalty for use of the DDC technology, rather than the use of particular patents.  (Tr. 966:7-18.)

The royalty rate did not change according to the number of patents licensed.  (Id.)

Bratic also stated that the past licenses showed a two-tiered rate schedule with a lower

pre-litigation royalty rate and a post-litigation royalty rate that was three times higher.  (Walsh

11/28/18 Dec. Ex. A at ¶¶ 46, 47, 226.)  Bratic characterized these rates as reflecting an

"uncertainty discount," with the pre-litigation rate at one-third of the post-litigation rate as a

discount because of the uncertainty about patent validity and infringement.  (Id.)  Bratic

concluded that, because the hypothetical negotiation rate would not include an uncertainty

discount, the hypothetical negotiation would have resulted in a reasonable royalty rate of 0.75%

of sales for the '180 patent.  (Walsh 11/28/18 Dec. Ex. A at ¶ 228.)  Mondis therefore contends

that it is entitled to a reasonable royalty of 0.75% of the sales revenue for LG's infringing

televisions.  The parties did not dispute that the entire market value of the 19 million infringing

televisions was about $10 billion.  Mondis thus asked for a reasonable royalty of $75 million.  As already stated, at the conclusion of the damages phase, the jury awarded $45 million in compensatory damages and found that LG's infringement was willful.

LG challenges the damages verdict on three grounds: 1) Plaintiff's damages theory violates the apportionment requirement; 2) Plaintiff's threshold theory violates Federal Circuit law; and 3) Plaintiff's use of a damages multiplier is legally improper.

As to the apportionment requirement, LG's argument is straightforward: Federal Circuit law requires that patent damages be apportioned to the incremental value that the patented invention adds to the end product, and the damages case presented to the jury by Mondis did not comply.  The parties do not dispute the first proposition: Federal Circuit law requires that patent damages, pursuant to 35 U.S.C. § 284, be so apportioned.  The post-trial dispute here concerns the question of whether Plaintiff's damages case complies with the apportionment requirement.

At the conclusion of the liability phase of the trial, the jury found that Mondis had proven that LG infringed claims 14 and 15 of the '180 patent.  Pursuant to 35 U.S.C. § 284, therefore, Mondis is entitled to, at a minimum, a reasonable royalty.  During the damages phase of the trial, the jury was tasked with determining that reasonable royalty.  Under Federal Circuit law, "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."  Ericsson, Inc. v. D-Link Sys., 773 F.3d 1201, 1226 (Fed. Cir. 2014).  The question presently in dispute, then, is whether Mondis presented a damages case that satisfies this governing rule.

LG begins by pointing to the testimony of Plaintiff's damages expert, Mr. Bratic, who stated that he did not do any apportionment because he believed none was necessary.  (Tr.

1161:19-21.)  Plaintiff's opposition brief does not dispute that he stated this.  Instead, Mondis

contends that it used the approach to apportionment approved by the Federal Circuit in

Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., 809 F.3d 1295, 1303 (Fed.

Cir. 2015) ("CSIRO").  Mondis argues that, in CSIRO:

> the apportionment function was achieved through application of comparable
> licenses or negotiations, which reflected "already built in apportionment." 809
> F.3d at 1303. That is what happened here.

(Pl.'s Opp. Br. 7.)  This the crux of Plaintiff's argument that it did indeed satisfy the

apportionment requirement: the damages analysis was based on comparable licenses which

reflected "already built-in apportionment," just as was done in CSIRO.  This is unpersuasive,

because this case is distinguishable on the facts.

First, consider the facts and holding of CSIRO, as stated by the Federal Circuit:

> Fundamentally, the smallest salable patent-practicing unit principle states that a
> damages model cannot reliably apportion from a royalty base without that base
> being the smallest salable patent-practicing unit. That principle is inapplicable
> here, however, as the district court did not apportion from a royalty base at all.
> Instead, the district court began with the parties' negotiations. At trial, the district
> court heard evidence that, around the time of the hypothetical negotiations, the
> parties themselves had brief discussions regarding Cisco taking a license to the
> '069 patent. According to the district court's factual finding—which is supported
> by the testimony at trial—Cisco informally suggested $0.90 per unit as a possible
> royalty for the '069 patent. The district court used this rate as a lower bound on a
> reasonable royalty.  For the upper bound, the district court looked to the $1.90 per
> unit rate requested by CSIRO in its public Rate Card license offer. Because the
> parties' discussions centered on a license rate for the '069 patent, this starting
> point for the district court's analysis *already built in apportionment*.  Put
> differently, the parties negotiated over the value of the asserted patent, 'and no
> more.'

809 F.3d at 1302-03 (italics added).  CSIRO concerned infringement of the '069 patent.  During

the damages trial, the court heard evidence that Cisco informally suggested a possible royalty of

$0.90 per unit, and that CSIRO had offered Cisco a license to the '069 patent on terms stated in a

12

standardized form license offer, termed the "Rate Card."  The Federal Circuit found that "this starting point for the district court's analysis already built in apportionment."  Id. at 1303.  The Court then explained its reasoning: "the parties negotiated over the value of the asserted patent, and no more."  Id.  The key characteristic of this fact pattern is that the district court used, as a starting point, evidence of negotiations over the same intellectual property that was the subject of the infringement action, the '069 patent.  Because the negotiation positions used as a starting point had a scope identical to the property at issue at trial, there was no need to perform additional apportionment: the negotiation positions had the apportionment built in, because they concerned the value of the asserted patent "and no more."[2]  Id.

The Federal Circuit has held: "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product."  Ericsson at 1226.  In CSIRO, the patentee presented evidence of the incremental value of the '069 patent, as reflected in negotiation positions taken by the parties.  Crucially, in the instant case, Mondis has not argued that any of the previous licenses on which it based its damages case were limited to the incremental value of the '180 patent.

The facts of the instant case are thus distinguishable from those in CSIRO.  Here, the starting point was a set of licenses not limited to the '180 patent, nor to claims 14 and 15 of the

---

[2] The Federal Circuit confirmed this reading of CSIRO in Elbit:

> In CSIRO, the district court started with evidence of proposed royalty rates from the parties' prior attempts at negotiating a license for the patent. Id. at 1300, 1302-03.  We determined that the district court's analysis was not in error because it "already built in apportionment" by starting from "discussions centered on a license rate" for the same patent, those discussions having already informally apportioned the proposed license rates to the value of the patented technology.

Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC, 927 F.3d 1292, 1301 (Fed. Cir. 2019).

'180 patent.  Instead, here is Plaintiff's description of the evidence presented at the damages

trial:

> The evidence at trial was that licensing is on a threshold basis where the licensee
> pays one price for access to the patented technology, rather than on a patent-by-
> patent basis. The price is to use the technology. The number of patents doesn't
> matter. Threshold licensees seek to avoid further exposure on products licensed
> and paid for. So after the agreed threshold royalty is paid, there would be no
> charge for additional patents, even subsequently acquired ones.

(Pl.'s Opp. Br. 9-10.)  Thus, the threshold licenses here were not structured to have a scope

limited to particular patents, but to particular technology.  Plaintiff's opposition brief cites as an

example the 2009 Mondis/LG monitor license agreement, admitted into evidence at trial.  Here is

how that license defined its scope:

> "Licensed Patents" means any and all patents, utility patents and utility models
> that, at any time during the Term or before, are owned or controlled by Mondis
> and its Affiliates, and that would be infringed, or that Mondis contends would be
> infringed, by a Computer Monitor's compliance with any Video Electronics
> Standards Association (VESA) DDC standard, whether the DDC/2B (or prior)
> standard or the DDC/CI (or subsequent) standard, a full list of which patents (so
> far as Mondis is aware) is set out in Annex 2 hereto, together with all divisions,
> continuations, continuations-in-part, reissues and reexaminations thereof, and all
> foreign counterparts of any thereof.

(Walsh Dec. Ex. 4/Ex. 2 § 1.12, Plaintiff's Exhibit MON-0010 at MONLG 00036697.)  The

scope of this licensing agreement is all patents that would be infringed by a monitor's use of the

VESA DDC standard.  The provision states that Annex 2 contains a list of the included patents.

Annex 2 identifies by number 17 United States patents, 4 German patents, and 15 Japanese

patents.  (Walsh Dec. Ex. 4/Annex 2, Plaintiff's Exhibit MON-0010 at MONLG 00036710-12.)

Annex 2 includes the '180 patent in the list.  (Id.)

The scope of this exemplary agreement differs substantially from the scope of the

property found to be infringed at trial, claims 14 and 15 of the '180 patent.  The 2009 license

covered 35 other patents insofar as those patents would be infringed by use of the VESA DDC

standard.  The 2009 license does not have apportionment built in, because the scope of the

license is far beyond claims 14 and 15 of the '180 patent.  As Mondis explained in its brief, the

scope of the license is defined by the infringing use of the VESA DDC standard, without regard

for whether claims 14 or 15 of the '180 patent are infringed.

As Mondis contends, the other licenses on which Bratic based his analysis had the same

structure.  None of these licenses can be said to have apportionment built in.  None of these

licenses reflects the value attributable to the features of the product which infringe claims 14 and

15 of the '180 patent, and no more.  Ericsson, 773 F.3d at 1226.

This leads to LG's second challenge, which focuses on the threshold basis.  Mondis built

its damages case on evidence of previous licenses which were all structured on a threshold basis.

Mondis defined threshold licensing as follows: "Threshold licensing involves a single rate for

access to the technology of the patent family being licensed, regardless of the number of patents,

and regardless of how many of them block."  (Pl.'s Opp. Br. 12.)  Mondis now claims that, also,

these threshold licenses built in apportionment, but this is paradoxical: a license which is

designed so that the underlying patents have no incremental value cannot at the same time be

evidence of "the incremental value that the patented invention adds to the end product."[3]

Ericsson, 773 F.3d at 1226.

By relying on this "threshold" theory of value, Mondis has truly painted itself into a

corner.  Having built its damages case on licenses which assigned no value to particular patents,

---

[3] This is not to say that threshold licenses cannot be input for the reasonable royalty analysis.
Although the Federal Circuit does not require that comparable licenses show "identity of
circumstances," VirnetX, Inc. v. Cisco Sys., 767 F.3d 1308, 1330 (Fed. Cir. 2014), the analysis
must account for the differences.  Elbit, 927 F.3d at 1300.  Mondis did not account for the

15

but only on access to DDC technology, it cannot now claim that such licenses isolate the incremental value of the '180 patent to the final product.  The problem is not that these licenses are simply too different from the subject matter of the hypothetical negotiation, but that Mondis did not account for or adjust for the differences so as to satisfy the apportionment requirement. The Federal Circuit has stated:

> Prior licenses, however, are almost never perfectly analogous to the infringement action. For example, allegedly comparable licenses may cover more patents than are at issue in the action, include cross-licensing terms, cover foreign intellectual property rights, or, as here, be calculated as some percentage of the value of a multi-component product. Testimony relying on licenses must account for such distinguishing facts when invoking them to value the patented invention.

Ericsson, 773 F.3d at 1227 (citation omitted).  Neither Mondis nor its witnesses accounted for the distinguishing facts when invoking the threshold licenses to value the patented invention.

LG also argues that Mondis' damages case captured the value of the VESA DDC standard rather than the incremental value of the '180 patent.  Mondis, in opposition, denies this, but, given Plaintiff's definition of "threshold licensing," as just quoted, it is undeniable: "Threshold licensing involves a single rate for access to the technology of the patent family being licensed, regardless of the number of patents, and regardless of how many of them block." (Pl.'s Opp. Br. 12.)  The "single rate for access to the technology of the patent family" is a price for access to the technology that enables use of the DDC standard.  The previous licenses charged a royalty based on access to the DDC standard; Mondis has pointed to no license which charged a royalty based on use of the '180 patent alone.

Bratic testified that he relied on the opinions of Mondis' technical expert, Mr. Lamm, as to all technical questions.   (Tr. 1070:18-22.)  Lamm testified that four patents in the '090 family

---

differences between the threshold licenses and the conditions of the hypothetical negotiation.

were standard-essential patents.[4]  (Tr. 1050:11-20.)  At trial, LG confirmed that Bratic understood from Lamm's testimony that four patents could block a manufacturer's use of the Plug and Play standard.  (Tr. 1165:8-18.)  LG then asked Bratic if that testimony changed Bratic's opinion that LG would have paid the full threshold rate to get a license to only one patent of those four, and it did not.  (Tr. 1165:19-1166:2.)  As LG contends, with this point, Bratic moved into an insupportable position, as he maintained that the result of the hypothetical negotiation was that LG would have paid top dollar for a license that LG, without licenses to the three other standard-essential patents, could do nothing with commercially.  No reasonable jury could accept this proposition, that a business would willingly agree to pay the threshold rate but receive nothing usable in return.  And, indeed, why would any business pay anything for a license that did not allow that business to make and sell its product?  If there are four patents that are essential to the DDC2B standard, of what value is a license to only one of the four?

In the instant case, there is good reason to wonder whether the "threshold licensing" approach conflicts with the principles of CSIRO.  Consider again Plaintiff's description of the evidence presented at the damages trial:

> The evidence at trial was that licensing is on a threshold basis where the licensee pays one price for access to the patented technology, rather than on a patent-by-patent basis. The price is to use the technology. The number of patents doesn't matter. Threshold licensees seek to avoid further exposure on products licensed and paid for. So after the agreed threshold royalty is paid, there would be no charge for additional patents, even subsequently acquired ones.

(Pl.'s Opp. Br. 9-10.)  Mondis states that, with a threshold license, the licensee pays one price for access to the patented technology.  As already discussed, the 2009 Mondis/LG monitor

---

[4] To be fully accurate, Lamm actually testified that four and one-half patents out of the eight in the '090 patent family were standard-essential patents: the '088, '970, '342 and the '180 patents are standard-essential, and the '090 patent is "half standard-essential."  (Tr. 1047:21-1050:10.)

license agreement, admitted into evidence at trial, defined the scope of that license as those patents that would be infringed by a monitor's "compliance" with the VESA DDC standard, whether the DDC/2B (or prior) standard or the DDC/CI (or subsequent) standard.  (Walsh Dec. Ex. 4/Ex. 2 § 1.12, Plaintiff's Exhibit MON-0010 at MONLG 00036697.)  Such a license does not capture the incremental value of the patented technology apart from "value flowing to the patent from the standard's adoption."  CSIRO, 809 F.3d at 1305.  Mondis' threshold model rests on the predicate that the constituent (licensed) patents have no value apart from their standard-essential status, which enables them to block unlicensed use of a standard.  Does the threshold model assign any value to patents apart from their ability to block?  If a threshold license is negotiated without concern for the number of licensed patents, and if the royalty rate for existing licenses does not change when a new patent, such as the '180 patent, issues, is it possible for that royalty rate to capture the incremental value of a particular individual patent?

Mondis argues, in opposition, that LG has cited no case in which a court rejected use of a threshold license.  That, of course, does not mean that any court has ever addressed the issue or found that a past threshold license already built in apportionment, nor does it solve the substantial problems with Plaintiff's damages case.

LG is correct that Mondis and Bratic confused the value of the '180 patent with the value of the DDC/Plug and Play standard.[5]  The Federal Circuit has stated:

> Just as we apportion damages for a patent that covers a small part of a device, we must also apportion damages for SEPs that cover only a small part of a standard. In other words, a royalty award for a SEP must be apportioned to the value of the patented invention (or at least to the approximate value thereof), not the value of the standard as a whole. A jury must be instructed accordingly. Our decision does

---

[5] At trial and in the post-trial briefing, the parties appeared to use the terms "DDC standard" and "Plug and Play standard" interchangeably.  (See Tr. 968:2-3: "DDC2B is the core of the Plug-N-Play Technology.")

not suggest that all SEPs make up only a small part of the technology in the standard. Indeed, if a patentee can show that his invention makes up the entire value of the standard, an apportionment instruction probably would not be appropriate.

Turning to the value of a patent's standardization, we conclude that Supreme Court precedent also requires apportionment of the value of the patented technology from the value of its standardization. . . . In other words, the patent holder should only be compensated for the approximate incremental benefit derived from his invention.

This is particularly true for SEPs. When a technology is incorporated into a standard, it is typically chosen from among different options. Once incorporated and widely adopted, that technology is not always used because it is the best or the only option; it is used because its use is necessary to comply with the standard. In other words, widespread adoption of standard essential technology is not entirely indicative of the added usefulness of an innovation over the prior art. This is not meant to imply that SEPs never claim valuable technological contributions. We merely hold that the royalty for SEPs should reflect the approximate value of that technological contribution, not the value of its widespread adoption due to standardization.

Because SEP holders should only be compensated for the added benefit of their inventions, the jury must be told to differentiate the added benefit from any value the innovation gains because it has become standard essential. Although the jury, as the fact finder, should determine the appropriate value for that added benefit and may do so with some level of imprecision, we conclude that they must be told to consider the difference between the added value of the technological invention and the added value of that invention's standardization.

Ericsson, 773 F.3d at 1232-33 (citations omitted).  This states clearly that, when dealing with a

standard-essential patent, the value added by the patented technology must be differentiated from

the value added by the standardization of that technology.  At trial, Mondis presented extensive

evidence – the licensing history – about the value of the DDC standard and the royalties that

various manufacturers agreed to pay in order to manufacture monitors and televisions which

incorporated the standard.  No attention was paid to "the difference between the added value of

the technological invention and the added value of that invention's standardization."  Id. at 1233.

Mondis did not address the question of what value was added by the invention's standardization. This is error under the Federal Circuit's decision in CSIRO: the Federal Circuit found that the district court, which had increased the royalty rate because of the patent's status as standard-essential, had erred. 809 F.3d at 1305. And the Federal Circuit did not stop there: it proceeded to question whether the starting rates (the royalty rate bounds of $.090 and $1.90)[6] for the analysis had been misvalued because of considerations of standardization, and instructed the district court, on remand, to "consider whether the initial rates taken from the parties' discussions should be adjusted for standardization." Id. at 1305-06.

Mondis, in opposition, contends that Mr. Bratic accounted for differences between the comparable licenses and the hypothetical negotiation, and points to the adjustment of a 1% rate to .25%. Mondis does not explain this in the opposition brief, but it appears to refer to Bratic's efforts to separate the royalty rate for the '090 family of patents from the royalty rate for patents from the '812 family. Bratic did thus make some effort to adjust for the difference in scope between the comparable licenses and the hypothetical negotiation: he attempted to carve out the value contributed by the '090 patent family. The problem, of course, is that the entire '090 patent family is not at issue in this case; only one patent from that family, the '180 patent, is at issue. A damages model that begins with previous threshold licenses, and attempts to adjust the royalty based on patent family membership, has taken a step in the right direction, but still has not apportioned to the incremental value added by the '180 patent.

In its opposition, Mondis contends that "Mr. Bratic's opinion about the value of the '180 patent was based on the patent's own technical value." (Pl.'s Opp. Br. 22.) While it is true that

---

[6] Note that these are the same rates that the Federal Circuit determined reflected "already built in apportionment." Id. at 1303.

Bratic did state opinions about the value of the '180 patent, that does not undo the fact that the "threshold license" theory treated the value of each individual patent as equal to the value of the standard, contrary to Ericsson.

LG also argues that Mondis has violated the evidentiary corollary to the Federal Circuit's governing rule:

> Our cases have added to that governing legal rule an important evidentiary principle. The point of the evidentiary principle is to help our jury system reliably implement the substantive statutory requirement of apportionment of royalty damages to the invention's value. The principle, applicable specifically to the choice of a royalty base, is that, where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product.  It is not that an appropriately apportioned royalty award could never be fashioned by starting with the entire market value of a multi-component product—by, for instance, dramatically reducing the royalty rate to be applied in those cases—it is that reliance on the entire market value might mislead the jury, who may be less equipped to understand the extent to which the royalty rate would need to do the work in such instances.

Ericsson, 773 F.3d at 1226-27.  LG argues that Mondis misled the jury during the damages phase by placing undue emphasis on the value of the entire product.  The jury's decision here is opaque: we know the verdict, but not the underlying reasoning, and cannot know what rationale led them to their decision.  Nonetheless, the Court agrees with LG that Mondis repeatedly emphasized the entire market value of LG's accused televisions, $10 billion, and that this may have skewed the damages horizon for the jury.  As the Federal Circuit has held:

> We have articulated that, where multi-component products are accused of infringement, the royalty base should not be larger than the smallest salable unit embodying the patented invention. We have cautioned against reliance on use of the entire market value of a multi-component product that includes a patented component because it cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.

21

Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 894 F.3d 1258, 1270 (Fed. Cir.

2018).  It seems quite possible that Mondis may have placed undue emphasis on the value of the

entire product and did not particularly take care to avoid skewing the damages horizon for the

jury.  Mondis did not offer the jury a method to estimate the incremental value of the '180 patent

from the much broader prior licenses.

The Court finds it possible, even probable, that Mondis' overall approach did skew the

damages horizon for the jury, even if it did not mislead the jury.  As already noted, Mondis failed

to adjust for the differences between the threshold approach to valuation in the previous licenses

from the apportioning approach to patent damages required by the Federal Circuit.  Moreover,

Mondis did not attempt to disentangle the incremental value added by the '180 patent to the

finished product from the value of the DDC standard captured in the prior licenses.

`        Third, LG argues that Mondis' use of a damages multiplier – which Mondis called the

"uncertainty discount" – is legally improper and not supported by substantial evidence.  LG

contends that the use of the damages multiplier conflicts with Federal Circuit law, citing

ResQNet.com, Inc. v. Lansa, Inc, 594 F.3d 860, 869 (Fed. Cir. 2010) (citation omitted), which

held:

> At all times, the damages inquiry must concentrate on compensation for the
> economic harm caused by infringement of the claimed invention. . . .
>
> Thus, the trial court must carefully tie proof of damages to the claimed invention's
> footprint in the market place.

LG argues that the use of the damages multiplier allows compensation based not on economic

harm caused by infringement of the claimed invention, as well as compensation not carefully

tied to the claimed invention's footprint in the marketplace.  LG argues, furthermore, that the

damages multiplier is a penalty provision intended to discourage licensees from challenging the

22

validity of any licensed patents.

In opposition, Mondis argues that the tripling of the royalty rate to remove the effect of the uncertainty discount was both supported by substantial evidence and legally proper.[7]  First, Mondis contends that LG's expert Hansen agreed that this was appropriate, which is correct, although Hansen did not testify that he believed that tripling the royalty rate was appropriate in this case.  Hansen testified:

> A.   Uncertainty generally results in a little bit lower royalty rate, so, a patent that's determined to be valid and infringed, there's upward pressure on the rate to pay for such a license.
>
> Q.   Right. And that upward pressure, you criticized Mr. Bratic for saying that the rate would have been three times the DDC norm rate of .25 percent. You thought that was too much upward pressure. Right?
>
> A.   Yes. Nobody's ever paid that.

(Tr. 1230:6-14.)  Furthermore, Hansen also testified:

> Q. So, an upward evaluation is something that's appropriate and it's up to the jury to decide how much that should be in this case based on the facts that they've heard. Correct?
>
> A. Yes. It's the jury's decision.

(Tr. 1232:13-17.)  LG's expert thus conceded that an increase in damages due to the uncertainty discount is a proper matter for the jury to consider.

Moreover, Mondis argues correctly that Hansen's concession is in accord with Federal

---

[7] In short, the theory here is that a patent that is known to be valid and infringed has a greater market value than one for which there is uncertainty about validity and infringement.  As Bratic pointed out, the hypothetical negotiation presumes validity and infringement: "now, under the hypothetical negotiation, we have the ironclad presumption of validity and infringement."  (Tr. 1085:4-6.)  This is correct under Federal Circuit law.  See Lucent, 580 F.3d at 1325 ("The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed.")  Thus, Mondis argues, it is appropriate for the jury to increase the award of compensatory damages to reflect the absence of uncertainty about validity and infringement.

Circuit law.  The Federal Circuit has recognized the appropriateness of considering an uncertainty discount in the damages inquiry. This is shown most clearly in Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1347 (Fed. Cir. 2011), in which the Federal Circuit reviewed a jury verdict awarding a reasonable royalty for compensatory patent infringement damages.  In deciding a post-trial motion, the district court had found that the jury's verdict, which reflected a "very deep" uncertainty discount, was not unreasonable:

> In this case, the significance of the price paid by Preco to acquire Spectralytics in 2003 depends on what that price suggests about the outcome of the hypothetical license negotiation in 1998. The jury could reasonably have concluded that the former had little to do with the latter. At the time of the 2003 sale, Spectralytics knew that the value of the '277 patent ranged from nothing to possibly tens of millions of dollars, depending on (among other things) whether Noble and Cordis were infringing and whether, if sued for infringement, Noble and Cordis could successfully challenge the patent's validity. Spectralytics suspected that Noble and Cordis might be infringing the '277 patent and hoped that the patent would survive any challenge to its validity, but Spectralytics did not really know for certain, and it could not really know for certain without paying millions of dollars in legal fees to launch lengthy and risky litigation. Thus, the value assigned to the '277 patent in 2003 would have reflected a very deep discount.

Spectralytics, Inc. v. Cordis Corp., 650 F. Supp. 2d 900, 915-16 (D. Minn. 2009).  The Federal Circuit reviewed and affirmed, specifically stating that it agreed with the district court that it was appropriate for the jury to weigh this "very deep discount" in computing damages.  649 F.3d at 1347.  In short, the Federal Circuit agreed that it was reasonable for the jury to apply a pre-litigation uncertainty discount which deeply reduced the patent's value.  LG has not pointed to any material difference between the uncertainty discount weighed by the jury in Spectralytics and the uncertainty discount in the instant case.

Similarly, recognition of the uncertainty discount is implicit in this statement in Prism Techs. LLC v. Sprint Spectrum L.P., 849 F.3d 1360, 1369 (Fed. Cir. 2017): "the earlier suit's settlement figure may be too low to the extent that it was lowered by the patent owner's

discounting of value by a probability of losing on validity or infringement." Discounting the value of a patent to adjust for uncertainty about validity or infringement appears to be uncontroversial in Federal Circuit jurisprudence.

Because LG's expert conceded that it was reasonable for the jury to consider application of the uncertainty discount in determining a reasonable royalty, and because the Federal Circuit recognizes such an adjustment to patent value to be proper, the only remaining question is whether the evidence supports the extent to which the jury adjusted damages. The parties agree that all we have from the jury is the $45 million verdict, with no explanation of the underlying computation. The parties agree that a jury which applied a .25% royalty rate to the $10 billion in revenue would award $25 million. The parties also are in agreement in speculating that the $45 million verdict likely includes a $20 million upward adjustment. (See LG's Br. 26 n.9; Pl.'s Opp. Br. 16.) If this speculation is correct, the jury applied the .25% royalty rate to the $10 billion in revenue, and then adjusted the $25 million upward by 80% ($20 million). The question is, then, whether the evidence supports an 80% upward adjustment.

This Court concludes that it does, for two reasons. First, on cross-examination, LG's expert Hansen admitted that he had testified in a prior case that he had adjusted for the uncertainty discount by tripling the royalty rate:

> Q. Do you recall, sir, testifying in a case in the United States District Court for the Western District of Pennsylvania called University of Pittsburgh of the Commonwealth System of Higher Education vs. Varian?
>
> A. I do.
>
> Q. Did you testify in that case under oath?
>
> A. Yes, I did.

MR. BLACK: And could we pull up Page 97 of the transcript of that case, and I'd like you to highlight lines 4 to 13 please.

Q. Did someone, not me, ask you the question:

"And did you, using that provision, did you attempt to demonstrate what the impact of an assumption of validity and infringement would have with respect to the royalty rates at issue in the Stanford license?"

Did you give this answer?

"Yes. For the royalty rates in this particular license, I simply took the effective royalty rates that I calculated, multiplied them by three to reflect validity and infringement. So this would be illustrative of the range of rates after accounting for validity and infringement which would range in the percentages on the far right-hand column."

Do you recall that?

A. Yes.

(Tr. 1230:23-1231:22.)  The jury was entitled to conclude from this evidence that tripling the

royalty to adjust for the uncertainty discount could be reasonable and valid.

Second, Mondis points to the evidence about the Innolux jury verdict.  The jury in this

case heard testimony from both Bratic and Spiro about the 2011 Innolux jury verdict.  Spiro

testified:

Q. All right. So, there are three defendants when the trial started and we're down to one defendant. Who's that defendant?

A. We were left just with Innolux.

Q. And on June 27, 2011, what happened?

A. We got a verdict.

Q. And what was the rate that the jury determined for televisions in that case?

A.That was three-quarters of a percent.

26

Q. And which patents did the verdict for televisions cover?

A. They covered the 2B patents. That was the three that I mentioned before, all the 2B patents.

Q. Which just -- do you know the patent numbers that were actually –

A. Yes. Again, based on the last three numbers, it's the '180, the '342 and the '090.

Q. Okay. Did Innolux appeal the award, the jury verdict?

A. Yes, they did. But they eventually settled it.

Q. Did the settlement involve any reduction of the jury's award?

A. No, none at all. They paid the full rate, whatever was determined.

Q. So, under the agreement with Innolux, what royalty rate did Innolux pay Mondis for the DDC patents for its televisions?

A.      It was three-quarters of a percent, 0.75 percent.

(Tr. 989:17-990:19.)

On cross-examination, Mr. Bratic testified:

Q.      All right, sir. Let's move on to another topic you covered in your direct testimony, namely that the Innolux verdict confirmed -- further confirmed your tripling opinion, right?

A.      No, I don't believe I said that.

Q.      Well, you did discuss the Innolux decision as confirmatory of your .75 percent rate, right?

A.      Of the .75 percent rate, but there was no trebling.

Q.      Okay.

A.      That was a verdict that reflected validity and infringement because the jury reached a conclusion of a royalty of .75 percent for TVs.

Q.      I see. So you're saying you're not exactly sure how they got there, but they wound up at the same place you did through tripling. Is that right?

A.      No, the point -- no, not quite.

Q.      Okay. Well, at the end of the day, the jury there found a rate of .75 percent applicable for televisions, right?

A.      Correct.

Q.      And that's the same -- same number in that red box in your summary chart, right?

A.      It's consistent with that number.

(Tr. 1146:11 - 1147:8.)  Although Bratic denied that the Innolux jury's .75% royalty rate included a tripling uncertainty adjustment, he admitted that the jury verdict "reflected validity and infringement."

       The jury in this case thus heard that the Innolux jury awarded damages using a royalty rate of .75%, and that Innolux eventually settled the case by agreeing to pay that rate.  The jury also heard that Mondis believed that the .25% royalty rate should be tripled to adjust for the uncertainty discount.  The jury had substantial evidence to support a determination that an 80% increase in royalties to adjust for the uncertainty discount was proper and supported by the evidence, since Innolux agreed to a settlement paying triple the .25% rate.

       Furthermore, Mondis aptly cites Prism, 849 F.3d at 1369: "a settlement reached after a determination of liability (though subject to appeal) is particularly reliable as evidence of value."  This is entirely on point, since the Innolux settlement was reached after a determination of validity and infringement.  Thus, under Prism, it is particularly reliable as evidence of value.  In this case, the parties agree that the jury seems to have chosen a royalty rate that reflects an 80% upward adjustment for the uncertainty discount, which is somewhere in between the .25% rate that LG thought was reasonable, and the .75% rate Mondis thought

28

was reasonable.  The evidence supports the jury's decision.

In conclusion, while this Court has determined that Plaintiff's damages case is insufficient, as a matter of law, to support the jury's damages verdict, the problem lies in the failure to apportion, not in the use of the uncertainty discount.  In a new trial, Plaintiff may again present the jury with its uncertainty discount theory.

The present case is similar to Wordtech Sys. v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1322 (Fed. Cir. 2010), in which the Federal Circuit, applying the law of the Ninth Circuit, reversed the denial of a Rule 59(a) motion and remanded for a new trial on damages. In short, in Wordtech, the Federal Circuit determined that the plaintiff's comparable license evidence did not support the verdict.  Id.  In the instant case, this Court finds that Mondis failed to present a damages case which satisfies the apportionment requirement fundamental to the law of patent infringement damages:

> When the accused technology does not make up the whole of the accused product, apportionment is required.  The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.

Finjan, Inc. v. Blue Coat Sys., 879 F.3d 1299, 1309 (Fed. Cir. 2018); Garretson v. Clark, 111 U.S. 120, 121 (1884) ("The patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative.")  In making its case for damages, Mondis failed to remove the value of non-infringing features from its damages estimates.  This Court finds that, as a matter of law, Plaintiff's damages case did not satisfy the apportionment requirement.  As in Finjan, "[f]urther apportionment was required to reflect the value of the patented technology compared

29

to the value of the unpatented elements."  879 F.3d at 1311.

As already stated, under Third Circuit law, "[a] new trial should be granted only where the great weight of the evidence cuts against the verdict and where a miscarriage of justice would result if the verdict were to stand."  Springer, 435 F.3d at 274.  This standard has been met here. Plaintiff's damages case, as a matter of law, is insufficient to support the damages verdict, due to the failure to apportion.  Because Mondis failed to comply with the apportionment requirement, the jury did not hear evidence sufficient to support the verdict.  This Court determines that a miscarriage of justice would occur if the verdict were allowed to stand.  The Third Circuit's requirements for granting a motion for a new trial, pursuant to Rule 59, have been met.

The Court concludes that Plaintiff's damages case is insufficient, as a matter of law, to support the jury's damages verdict.  The damages verdict will be vacated.  The only remaining question is one that has not been briefed: has Plaintiff now waived its right to a damages award? In Promega Corp. v. Life Techs. Corp., 875 F.3d 651, 666 (Fed. Cir. 2017), the Federal Circuit held:

> But, as explained above, a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory. When a plaintiff deliberately takes a risk by relying at trial exclusively on a damages theory that ultimately proves unsuccessful, and, when challenged, does not dispute that it failed to present an alternative case for damages, a district court does not abuse its discretion by declining to give that plaintiff multiple chances to correct deficiencies in its arguments or the record.

The parties must now have an opportunity to brief this issue, so that this Court may decide whether, having vacated the damages verdict, to grant the motion for a new damages trial.  The parties shall confer and present to the Court a briefing schedule for this next phase of hearing the motion for a new trial.

30

B. *The willfulness verdict*

LG moves for judgment as a matter of law or, in the alternative, a new trial, on the ground that no reasonable jury could have found that LG's infringement was willful. "We review the denial of a motion for JMOL . . . under the law of the pertinent regional circuit." Power Integrations, 843 F.3d at 1326. "A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 373 (3d Cir. 2016).

In Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S. Ct. 1923, 1933 (2016), the Supreme Court revised the willfulness standard, eliminating the objective prong from the standard, but leaving the subjective prong intact: "The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." Under this revised standard, Mondis bore the burden of proof at trial, by a preponderance of the evidence, that LG's infringement was subjectively intentional or knowing.

In brief, this Court cannot conclude that there was insufficient evidence to support the jury's finding of willfulness. Ample evidence shows that the parties had been litigating and negotiating licenses regarding the DDC patents   It is undisputed that Mondis first sued LG, along with other defendants, for infringement of the '090 and other patents in 2007, and that LG resolved that litigation by entering into a settlement agreement with Mondis in September of 2009. It is also undisputed that this original case against LG went to trial after LG settled, and that, on June 27, 2011, the jury returned a verdict that found that the televisions of

31

defendant Innolux infringed claim 14 of the '180 patent, which is at issue in the present case. The jury in the present case heard extensive testimony about the history of the dispute from Mr. Spiro, among others.  (See, e.g., Tr. 98:9-128:9.)  It is also undisputed that, in the instant case, the period of alleged infringement extended from the date of issuance of the '180 patent in 2009 until the '180 patent expired in February of 2014.  There is ample evidence from which a jury could reasonably conclude that LG's infringement of the '180 patent through the manufacture and sale of televisions was, for at least some of the period of alleged infringement, done with knowledge that LG was infringing asserted claims of the '180 patent.  Substantial evidence supports the jury's determination of willful infringement.  The motion for judgment as a matter of law or, in the alternative, a new trial, on the matter of the jury's finding of willfulness, will be denied.

The decision to vacate the jury's damages verdict impacts several pending motions. Because the issue of the amount of damages is now unresolved, the motion for enhanced damages, pursuant to 35 U.S.C. § 284, is premature: there is no damages award to enhance. Because this case has not reached final judgment, the motion for a declaration of an exceptional case, pursuant to 35 U.S.C. § 285, is also premature.  For the same reason, the motion for prejudgment and post-judgment interest is premature.  These premature motions will be denied.

For these reasons,

**IT IS** on this 24th day of September, 2019

**ORDERED** that LG's motion for judgment as a matter of law under Rule 50(b) and/or a new trial under Rule 59 regarding invalidity (Docket Entry No. 486) is **DENIED**; and it is further

**ORDERED** that LG's motion for judgment as a matter of law under Rule 50(b) and/or

a new trial under Rule 59 regarding noninfringement (Docket Entry No. 487) is **DENIED**; and it is further

      **ORDERED** that LG's motion for judgment as a matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages and willfulness (Docket Entry No. 489) is **GRANTED** in part, **DENIED** in part, and decision is **RESERVED** in part pending further briefing; and it is further

      **ORDERED** that the jury verdict returned on April 12, 2019, finding that LG's infringement was willful and awarding $45 million in compensatory damages, is **VACATED** in part, and the jury's verdict awarding $45 million in compensatory damages is hereby **VACATED**, but the jury verdict of willful infringement is unchanged; and it is further

      **ORDERED** that the parties shall confer and present to the Court a schedule for briefing the issue of the application of Promega to the motion for a new trial on damages; and it is further

      **ORDERED** that Mondis' motion for enhanced damages (Docket Entry No. 493), pursuant to 35 U.S.C. § 284, is **DENIED** without prejudice as premature; and it is further

      **ORDERED** that Mondis' motion for attorney fees (Docket Entry No. 491), pursuant to 35 U.S.C. § 285, is **DENIED** without prejudice as premature; and it is further

      **ORDERED** that Mondis' motion for pre-judgment and post-judgment interest (Docket Entry No. 495) is **DENIED** without prejudice as premature.


                                         s/ Stanley R. Chesler
                                     Stanley R. Chesler, U.S.D.J.