# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONDIS TECHNOLOGY LTD., HITACHI MAXELL, LTD., n/k/a MAXELL HOLDINGS, LTD., and MAXELL, LTD., | Civil Action No. 15-04431(SRC/CLW) |
| Plaintiffs, | |
| v. | *Electronically Filed* |
| LG ELECTRONICS INC. and LG ELECTRONICS U.S.A., INC., | **REDACTED VERSION** |
| Defendants. | |

---

## LG'S MOTION TO EXCLUDE THE SUPPLEMENTAL REPORT AND TESTIMONY OF WALTER BRATIC UNDER *DAUBERT*

---

*Of Counsel:*

Michael J. McKeon (*pro hac vice*)
Christian A. Chu (*pro hac vice*)
R. Andrew Schwentker (*pro hac vice*)
Michael J. Ballanco (*pro hac vice*)
FISH & RICHARDSON P.C.
1000 Maine Ave. SW, Suite 1000
Washington, D.C. 20024
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

Liza M. Walsh
Selina M. Ellis
WALSH PIZZI O'REILLY
FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Telephone: (973) 757-1100
Facsimile: (973) 757-1090

*Attorneys for Defendants*
*LG Electronics Inc. and*
*LG Electronics U.S.A., Inc.*

## **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................1

II.  RELEVANT BACKGROUND......................................................................2

III. LEGAL STANDARD ..............................................................................4

IV.  ARGUMENTS .....................................................................................5

    A.   Mr. Bratic's Revival of his Threshold Theory Should Be Excluded....5

        1.   Recap of Mr. Bratic's Now-Rejected Threshold Theory...........5

        2.   Theory No. 6 Relies on a Threshold Licensing Approach .........6

        3.   The Unstricken Portion of Theory No. 3 Relies on Threshold Licensing ...................................................................8

    B.   The Royalty Rate Calculations for Theory No. 7 Are Flawed ...........9

        1.   The *Innolux* Verdict Does Not Justify the Narrow Focus on Just Three Patents...........................................................10

        2.   Mr. Bratic Cannot Ignore the Value of the '088, '970, and '181 Patents in the '090 Patent Family .............................12

        3.   Mr. Bratic Improperly Ignores the '845 and '147 Patents in the '090 Patent Family ..................................................15

    C.   The Royalty Rate Calculations for Theory No. 1 Are Flawed ..........16

        1.   The Attempt to Apportion the *Innolux* Verdict Is Unreliable ..16

        2.   The *Innolux* Verdict Is Not Comparable to the Hypothetical Negotiation................................................................19

        3.   The *Innolux* Verdict Is an Improper Starting Point for a Damages Analysis........................................................21

    D.   Mr. Bratic Fails to Apportion the Royalty Base .................................25

    E.   Mr. Bratic Uses an Improper Basis for his Uncertainty Discount ......28

        1.   The Court Has Not Yet Addressed this Admissibility Issue ....29

        2.   Mr. Bratic's Uplift Multiplier Is Untethered to the Patent-in-Suit or to the Date of the Hypothetical Negotiation ................32

    F.   Mr. Bratic Failed to Apportion Out the Value of Standardization as Required by this Court ......................................................35

    G.   Mr. Bratic Should Not Get a Third Bite at the Apple .........................38

V.   CONCLUSION ...................................................................................40

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
  324 F. Supp. 3d 470 (D. Del. 2018)...........................................................23, 24

*Amgen Inc. v. Hospira, Inc.*,
  336 F. Supp. 3d 333 (D. Del. 2018)..................................................................34

*Aqua Shield v. Inter Pool Cover Team*,
  774 F.3d 766 (Fed. Cir. 2014) ...................................................................23, 33

*Arizona v. California*,
  460 U.S. 605 (1983)..........................................................................................29

*Atlas IP, LLC v. Medtronic, Inc.*,
  2014 WL 5741870 (S.D. Fla. Oct. 6, 2014) .....................................................23

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012) .........................................................................39

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ...........................................................28, 35, 38

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018) ........................................................................15

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018) ........................................................................27

*Flexuspine, Inc. v. Globus Med., Inc.*,
  2016 WL 9282314 (E.D. Tex. Aug. 5, 2016)....................................................23

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)............................................................................................5

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ...........................................................24, 25

*Golden Bridge Tech. v. Apple Inc.*,
  2014 WL 4057187 (N.D. Cal. June 1, 2014).....................................................39

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)............................................................................................4, 5

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ...............................................................................28

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
449 F.3d 1209 (Fed. Cir. 2006) ...............................................................29, 30, 31

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................................................................20, 34

*Netfuel, Inc. v. Cisco Sys., Inc.*,
2020 WL 1274985 (N.D. Cal. Mar. 17, 2020) ...................................................20

*Network Prot. Scis., LLC v. Fortinet, Inc.*,
2013 WL 5402089 (N.D. Cal. Sept. 26, 2013)....................................................39

*Pepper v. United States*,
562 U.S. 476 (2011)............................................................................................29

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018) .............................................................................27

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) .......................................................................32, 33

*Riles v. Shell Expl. and Prod. Co.*,
298 F.3d 1302 (Fed. Cir. 2002) ..........................................................................32

*Rite-Hite Corp. v. Kelley Co., Inc.*,
56 F.3d 1538 (Fed. Cir. 1995) ............................................................................32

*Syneron Med. Ltd. v. Invasix, Inc.*,
2018 WL 4696969 (C.D. Cal. Aug. 27, 2018) ..............................................34, 35

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .....................................................................22, 28

*Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*,
69 F.3d 512 (Fed. Cir. 1995) ..............................................................................33

*Univ. of Pittsburgh v. Varian Med. Sys., Inc.*,
    561 F. App'x 934 (Fed. Cir. 2014) ......................................................................32

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) .........................................................5, 27, 28

*Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ......................................................................20

**Rules**

Fed. R. Evid. 702 ..............................................................................................4, 31

iv

## LIST OF COMMON ABBREVIATIONS

| | |
|---|---|
| **'180 patent** | U.S. Patent No. 7,475,180 (introduced at trial as MON-0001) |
| **ASP** | Average sale price |
| **Bratic Supp.** | Supplemental Expert Report of Walter Bratic, served on June 19, 2020 and redacted by agreement of the parties in compliance with the October 2, 2020 Order and November 6, 2020 Order.  The redacted report is attached as *Exhibit A* to this brief. |
| ***Daubert* Tr.** | Transcript of March 22, 2019 *Daubert* Hearing, the cited portions of which are attached as *Exhibit B* to this brief |
| **Hitachi** | Hitachi Ltd. and its alleged successors-in-interest Hitachi Maxell, Ltd. (now known as Maxell Holdings, Ltd.) and Maxell, Ltd. |
| **Hon Hai Agreement** | Patent License Agreement (DDC/Televisions) between Mondis Technology Ltd. and Hon Hai Precision Industry Co., Ltd., dated Aug. 22, 2011 |
| **LG** | Defendants LG Electronics Inc. and LG Electronics U.S.A., Inc. |
| **Mondis** | Plaintiff Mondis Technology Ltd. |
| **Monitor Agreement** | Mondis-LG Settlement and Patent License Agreement, dated Sept. 22, 2009 |
| **Oct. 2020 Order** | Opinion & Order dated October 2, 2020 (entered on the docket as D.E. 672) |
| **Plaintiffs** | Mondis and Hitachi |
| **PnP** | Plug-and-Play |
| **Sept. 2019 Order** | Opinion & Order dated September 24, 2019 (entered on the docket as D.E. 558) |
| **Tr.** | Transcript of April 2-3, 5, 8-12, 2019 Jury Trial proceedings, the cited portions of which are attached as *Exhibit C* to this brief |

**NOTE: All emphases in this brief have been added, unless otherwise noted.**

v

## I.   INTRODUCTION

This Court has already had to strike three and a half of Mr. Bratic's supplemental damages theories for failing to heed its Orders establishing the parameters of the damages re-trial.  Now, the Court should strike the remaining three and a half theories for failing to abide by the basic tenets of established damages precedent, including per-patent apportionment, apportioning the royalty base, properly accounting for uncertainty, and discounting the value of standardization.

First, Mr. Bratic's now-rejected "threshold theory" pervades and infects all but one damages theory.  Although the Court expressly found the threshold theory to be flawed and admonished Mr. Bratic against further use of this theory, he revives it by hiding behind economically incomparable data points, such as the *Innolux* Verdict, ███████████████████, and the Hon Hai Agreement.  In actuality, these data points are mere facades for his threshold theory.

Second, Mr. Bratic completely ignores certain patents that comprise his data points.  In Theory No. 1, for example, Mr. Bratic disregards four of the seven patents at issue in the *Innolux* trial, giving them no value.  His Theory No. 7 fares even worse, as he disregards five of the eight patents in the '090 patent family.  Not only does Mr. Bratic neglect these patents, he is also silent as to why he assigns them no value whatsoever.  This silence cannot stand because Mr. Lamm's trial testimony made clear that the relevant standard requires some of these ignored patents.  By

ignoring these patents, Mr. Bratic contravenes the legal requirement to apportion.

These are just a sampling of the defects present in Mr. Bratic's Supplement. As summarized below, however, they are not the only deficiencies that render his opinions unreliable and unsuitable for presentation at trial:

| *Daubert* Bases | Theory 1 (¶¶ 18-21) | Theory 3 (¶¶ 25-26) | Theory 6 (¶¶ 37-40) | Theory 7 (¶¶ 41-46) |
|---|:---:|:---:|:---:|:---:|
| Threshold theory | ✗ | ✗ | ✗ | |
| *Innolux* Verdict not comparable/apportioned | ✗ | | | |
| Failure to address value of other pats. in family | | | | ✗ |
| Failure to apportion base by using ASP | ✗ | | | ✗ |
| Improper uplift multiplier | | | | ✗ |
| Failure to apportion out value of standardization | ✗ | ✗ | ✗ | ✗ |

For these reasons, the Court should strike Mr. Bratic's Supplement in full, and decline to grant Mr. Bratic a third bite at the proverbial apple.

## II.   RELEVANT BACKGROUND

On June 19, 2020, Plaintiffs served a supplemental expert report of Plaintiffs' damages expert, Mr. Bratic, that advanced seven damages theories. [D.E. 635-1 Ex. B.] LG moved to strike this Supplement as violating the Court's Orders precluding the use of new evidence outside the April 2019 trial's record. [D.E. 635.] On October 2 and November 6, 2020, the Court issued orders striking various parts of this Supplement, [D.E. 672, 689], leaving three and a half theories still standing:

Theories Nos. 1, 6, and 7, and part of Theory No. 3. [*See* Ex. A (Bratic Supp.).][1]

In his Theory No. 1, Mr. Bratic (i) divides the 0.75% rate from a verdict in the *Innolux* case (the "*Innolux* Verdict") by three patents from the '090 patent family, one of the two patent families at issue in that case, (ii) multiplies the resulting 0.25% by the ASP of LG's televisions, and (iii) multiplies the earlier step's $▮ per-unit rate by the number of LG televisions, as shown by the following formula:



[Bratic Supp. ¶¶ 18-21 (Theory No. 1).]

Theory No. 6 takes the $▮ royalty rate from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and multiplies this non-apportioned rate by the number of LG televisions sold:



[*Id.* ¶¶ 37-40 (Theory No. 6).]

Under Theory No. 7, Mr. Bratic (i) multiplies the ASP of LG's televisions by the 0.25% rate for the '090 patent family, (ii) divides the result by 3 for just the '180, '090, and '342 patents, (iii) multiplies by 3 as part of his "uplift," and (iv) multiplies

---

[1] Applying the Court's October 2, 2020 Order and November 6, 2020 Order, LG and Plaintiffs have agreed on a redacted version of Mr. Bratic's supplemental report, attached as Ex. A, that redacts out all portions stricken by the Court. For simplicity, this redacted version will be referred to herein as the "Bratic Supplement."

the resulting $ ▮ per-unit rate by the number of LG televisions sold:



[*Id.* ¶¶ 41-46 (Theory No. 7).]

Finally, the Bratic Supplement had also advanced Theory No. 3, which calculated $ ▮ million in damages by starting with the Hon Hai Agreement's unapportioned $0.70 rate for the entire family. [D.E. 635-1 Ex. B ¶¶ 24-26 (Theory No. 3).] Although the October 2020 Order struck ¶¶ 26(c)-(d) of the Supplement, the unstricken portion still contains an opinion assigning the non-apportioned portfolio royalty to the '180 patent alone. [Bratic Supp. ¶¶ 26(a)-(b).]

## III.   LEGAL STANDARD

An expert may testify only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Plaintiffs bear the burden of showing the admissibility of Mr. Bratic's testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

A hallmark of reliability is whether the expert's methodology is generally accepted. *Id.* at 151. Failure to comply with principles established in accepted

damages precedent results in unreliable, and inadmissible, testimony.  *E.g.*, *VirnetX, Inc. v. Cisco Sys., Inc*., 767 F.3d 1308, 1328 (Fed. Cir. 2014).  Courts must exclude testimony where, as here, "there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV.   ARGUMENTS

### A.   Mr. Bratic's Revival of his Threshold Theory Should Be Excluded

#### 1.   Recap of Mr. Bratic's Now-Rejected Threshold Theory

The hypothetical negotiation in this case must focus only on the '180 patent, not on the other non-asserted patents in this eight-patent family.  [Tr. (Bratic) at 1108:5-16.]  Although the royalty rate for "a license for the '090 family of patents was 0.25%," [D.E. 558 (Sept. 2019 Order) at 10], Mr. Bratic did not apportion this 0.25% rate to the incremental value of the '180 patent in the first trial.  [*Id.* at 11-12.]  He instead advanced a "threshold theory" that "charg[ed] a royalty for use of the DDC technology, rather than the use of particular patents."  [*Id.* at 10.]  In Plaintiffs' own words, "'[t]hreshold licensing involves *a single rate* for access to the technology of the patent family being licensed, *regardless of the number of patents*, and regardless of how many of them block'" a potential licensee from practicing a relevant standard.  [*Id.* at 15 (quoting Pl. JMOL Opp. Br. at 12).]  By using this threshold theory, Mr. Bratic "captur[ed] the value of the VESA DDC standard rather than the incremental value of the '180 patent."  [*Id.* at 16.]

To justify this threshold theory, Mr. Bratic heavily relied on provisions in the

Monitor Agreement requiring LG to pay the same portfolio rate regardless of the patents being licensed, practiced, or invalidated. [Tr. (Bratic) at 1075:24-1078:3.] As Plaintiffs recently told this Court, these provisions are—as indicated by their use of "i.e."—the crux of threshold licensing. [D.E. 639 (Pl. Opp. to Mtn to Strike) at 6 (referring to "the provisions in the license agreements which ***required a royalty to be paid in full*** if a single infringed patent was used – ***i.e., threshold licensing***").]

Although the Court rejected the threshold theory as a matter of law, [D.E. 558 at 15-21], the Supplement revived this methodology in Theories Nos. 6 and 3.

### 2.     Theory No. 6 Relies on a Threshold Licensing Approach

In his Theory No. 6, Mr. Bratic simply multiplies the ▮▮▮ royalty rate from ▮▮▮▮▮▮▮▮▮▮▮▮ by the number of LG televisions sold. [Bratic Supp. ¶¶ 37-40.] This ▮▮▮ rate is not, however, the rate for just the '180 patent.

As the evidence shows, this $▮▮ royalty rate corresponds to ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [Ex. L (MON-0177, LG Interrog. Resp.) at 18.] Mr. Ryu, who testified at trial via deposition, confirmed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ [D.E. 516 at 37:01-06 (Ryu Depo. played at trial); D.E. 520 at 2 (order adding same to trial record).]

As the Monitor Agreement indicates, ▮▮▮ is not a rate for just the '180 patent; it is instead the full portfolio's rate of "one percent discounted by about a

third" based on LG's upfront lump-sum payment for millions of monitors. [Tr. (Spiro) at 976:18-20, 978:2-16.]  That is, ███ is the rate for the entire Monitor Agreement, which is a threshold license covering 35 U.S. and foreign patents, including the eight patents in the '090 patent family (related to DDC/2B) and the additional patents in the '812 patent family (related to DDC/CI).   [D.E. 558 (Sept. 2019 Order) at 14-15.]   As a threshold license, this agreement "does not have apportionment built in" and "differs substantially from the scope of the property found to be infringed at trial, claims 14 and 15 of the '180 patent."  [*Id.; see also id.* at 17-18 (finding that this agreement "does not capture the incremental value of the patented technology").]  Simply put, the ███ rate is a non-apportioned, threshold rate covering two patent families.

Mr. Bratic's Supplement even acknowledges the "threshold" nature of this ███ rate, by asserting that LG would "have to pay a royalty per TV of ███, even when it did not know which of the patents would ultimately survive litigation and the stream of patent re-examinations filed at the Patent Office."  [Bratic Supp. ¶ 38.] That is, "there is no indication that this royalty rate was dependent on the number of Mondis patents."  [*Id.*]  This characterization of the ███ rate demonstrates prototypical threshold licensing, as it "involves a single rate . . . regardless of the number of patents[.]"  [D.E. 558 at 15.]  And like the threshold theory presented at trial, Mr. Bratic again relies on provisions in the Monitor Agreement that "required

the full payment of the initially stipulated royalty if only a single patent was infringed."  [Bratic Supp. ¶ 38; *compare id.*, *with* D.E. 639 at 6 (referring to "the provisions in the license agreements which required a royalty to be paid in full if a single infringed patent was used – *i.e., threshold licensing*").]

Despite the Court's mandate to apportion, [D.E. 558 at 11-21], Mr. Bratic did not take any further steps to apportion to just the '180 patent.  [Bratic Supp. ¶¶ 38-39.]  He simply takes this non-apportioned rate and multiplies it by the number of LG televisions sold.  [*Id.* ¶ 39.]  Because his method contravenes precedent and the Court's ruling barring the threshold theory, it is unreliable and should be excluded.

### 3.   The Unstricken Portion of Theory No. 3 Relies on Threshold Licensing

Paragraph 25 of the Supplement asserts that the Hon Hai Agreement reflects a $0.70 per-unit rate corresponding to the 0.25% rate for the '090 patent family. [Bratic Supp. ¶ 25.]  Although the Hon Hai Agreement covers eight patents, [Ex. M (MON-0249) at § 1.6], Mr. Bratic refuses to apportion this portfolio rate, by arguing that the rate "for a license to only the '180 patent" is "0.70 per TV" because the Agreement's § 4.4 provides "that the *full royalty rate was due so long as a single claim* from a list of specified claims in 5 patents remained valid."  [Bratic Supp. ¶¶ 26(a)-(b).]

This argument is nothing more than another iteration of the threshold theory. This requirement to pay the same inflated portfolio price regardless of the number

of patents licensed meets the very definition of threshold licensing, which "involves a single rate . . . regardless of the number of patents[.]" [*Compare id.*, *with* D.E. 558 at 15 (defining threshold theory).] As with the Monitor Agreement, Mr. Bratic also invokes a contract provision in the Hon Hai Agreement mandating the use of a portfolio rate as long as any patent is infringed and/or valid. [*Compare* Bratic Supp. ¶¶ 26(a)-(b), *with* D.E. 639 at 6.] And as with Theory No. 6, Mr. Bratic does not take any steps to apportion this rate to just the '180 patent. Because this non-apportioned rate implicates the threshold theory that the Court has rejected as a matter of law, this opinion cannot stand and should be excluded.[2]

## B. The Royalty Rate Calculations for Theory No. 7 Are Flawed

Under Theory No. 7, Mr. Bratic attempts to follow Mr. Hansen's lead by trying to apportion Mondis's 0.25% rate for the '090 patent family to just the '180 patent. [Bratic Supp. ¶¶ 42, 44, 46.] To perform a proper apportionment analysis, Mr. Bratic now agrees with Mr. Hansen that "the ***proper methodology*** involved determining '***which patents*** within the '090 patent family ***had value***,'" [*id.* ¶ 44 (quoting Tr. (Hansen) at 1195:11-18).] Despite this agreement, Mr. Bratic arbitrarily decides that only three patents in this family—the '180, '090, and '342 patents— have any value and, on this basis, he divides the 0.25% family rate by three. [*Id.*

---

[2] Although Mr. Bratic cannot apply his rate from the Hon Hai Agreement in some damages amount since ¶¶ 26(c)-(d) were stricken, a presentation of this unreliable rate and theory at the re-trial would distort the new jury's damages horizon.

¶ 44.]  The only reason given is the bald assertion that "there would be at most 3 patents [with value] – the ones on which the Innolux Verdict were based."  [*Id.*]  As this reason does not withstand scrutiny, he has failed to properly apportion.

### 1. The *Innolux* Verdict Does Not Justify the Narrow Focus on Just Three Patents

Mr. Bratic cannot use the *Innolux* Verdict to disregard the value of other patents in the '090 patent family.  As will be discussed in more detail in Section IV.C, the *Innolux* Verdict implicates not just the three patents on which Mr. Bratic relies, but seven patents in total.  In addition to two patents in the '812 patent family, the *Innolux* Verdict also covers five patents in the '090 patent family: the three patents on which Mr. Bratic relies ('180, '090, and '342 patents), as well as the '088 and '970 patents.  [Ex. D (*Innolux* Verdict) at 2-3.]  Yet, his Theory No. 7 fails to mention the '088 and '970 patents, much less explain why he ignores them.  [*See generally* Bratic Supp. ¶¶ 41-46.]  This failure renders his theory unreliable.

While there is no mention of these patents in its Theory No. 7's discussion, the Bratic Supplement mentions these two patents in passing as part of Theory No. 1, where he states that the "Innolux jury invalidated the '088 and '970 patents," so that "these 2 patents formed no basis for the royalty rate set in the Innolux Verdict." [*Id.* ¶ 19.]  This statement related to Theory No. 1 cannot excuse his disregard of these patents in Theory No. 7, because the *Innolux* Verdict is so different from the context of Theory No. 7 as to render it inapposite.  Unlike Theory No. 1 which tries

to apportion the *Innolux* Verdict's 0.75% rate for televisions, Theory No. 7 purports to apportion the 0.25% rate set in the Monitor Agreement for the entire '090 family, [*id.* ¶ 44], which includes eight separate patents.  [Tr. (Lamm) at 1045:10-14 ("Q. Now, of course, as you know, there's eight patents in the '090 family.  Isn't that right? A. That is correct.").]   The differences underpinning the two theories are substantial and significant, including in the rate to be apportioned (0.75% vs. 0.25%), legal context (jury verdict vs. license agreement), counter-parties (Innolux vs. LG), and number of relevant patents in the family (5 patents vs. 8 patents).  Even the dates do not match, with the Monitor Agreement (like the hypothetical negotiation) being set in 2009 and the *Innolux* Verdict issuing in 2011.  [*Compare* Tr. (Bratic) at 1065:1-6 (setting hypo. negotiation on Jan. 6, 2009), *with* Ex. D (*Innolux* Verdict) at 5.]  Despite these differences, Mr. Bratic offers no explanation.

Even if the *Innolux* Verdict were relevant to Theory No. 7, the invalidation of some claims of the '088 and '970 patents in that case does not strip these patents of all value as Mr. Bratic seems to assume.  The *Innolux* jury only invalidated three claims of the '088 patent (claims 9, 22, 25) and one claim of the '970 patent (claim 18).  [Ex. D (*Innolux* Verdict) at 3.]  Without these invalidated claims, the '970 patent still had 28 claims and the '088 patent still contained 30 claims after the verdict, with all of these remaining claims presumed to be valid.  [D.E. 1 (Initial Compl.) Exh. A ('088 pat.) at cls. 1-33, Exh. B ('970 pat.) at cls. 1-29.]

And Mondis's actions confirm that these patents retained value when it asserted them against LG in 2014 in this *present* case.  [D.E. 1 (Initial Compl.) ¶¶ 10-11, 36-51 (alleging LG infringed the '088 and '970 pats.).]  Mondis even provided claim charts mapping claims 3-4 of the '088 patent and claim 22 of the '970 patent onto an LG television.  [Ex. E (Jan. 30, 2015 Infring. Conts.) at 1-2; Ex. F (*id.* Exh. B) (chart comparing '088 pat. to LG 39LN5700 TV); Ex. G (*id.* Exh. C) (chart comparing '970 pat. to same TV).]  Mondis's own allegations and contentions in this case undercut Mr. Bratic's implicit dismissal of the '088 and '970 patents' value.[3]

Mr. Bratic simply lacks a legitimate basis to cherry-pick three patents from the *Innolux* Verdict while ignoring the value of other patents in the same verdict.

### 2.   Mr. Bratic Cannot Ignore the Value of the '088, '970, and '181 Patents in the '090 Patent Family

There are at least three other patents in the '090 patent family that have value. As the Supplement recognizes, the family includes, in addition to the '180 patent, at least five other patents: "the '181, '342, '090, '088 and '970 patents."  [Bratic Supp. ¶ 6.]  By dividing 0.25% by three, Theory No. 7 implicitly assumes that only three of them (the '180, '090, and '342 patents) have value, and that the other three (the '088, '970, and '181 patents) have none.  [*Id.* ¶ 44.]  This is unsupportable.

First, Mr. Lamm's trial testimony establishes that the '088 and '970 patents

---

[3] Moreover, as discussed in Section IV.B.2, *infra*, Mr. Lamm testified at trial that these two patents are foundational to the Plug-and-Play standard in LG's televisions.

are foundational blocking patents.  As he testified, the '180 patent, the '088 patent, and the '970 patent "form *the* foundation of the technology we know as Plug-n-Play." [Tr. (Lamm) at 414:5-15 & 1047:5-12, 415:1-6, 415:17-21.]  He also stated that these three patents, along with the related '342 patent, "are required to practice the standard."  [*Id.* at 1050:11-15, 1050:22-1051:4.]  Because these patents are "required to practice the standard, then they block a manufacturer's ability to manufacture a TV compliant with the standards," according to Mr. Lamm.  [*Id.* at 1050:16-20.]  As the Court recognized, "[i]f there are four patents that are essential to the DDC2B standard, of what value is a license to only one of the four?"  [D.E. 558 (Sept. 2019 Order) at 17; *see also id.* (rejecting as "insupportable" Mr. Bratic's position "that the result of the hypothetical negotiation was that LG would have paid top dollar for a license that LG, without licenses to the three other standard-essential patents, could do nothing with commercially").]  Since the '088 and '970 patents are blocking patents, any apportionment of the family's rate must therefore account for their value.  Yet, Mr. Bratic ignores them.

Second, two agreements admitted in the first trial underscore the value of the '088 and '970 patents to televisions.  ████████████ took licenses in 2010 and 2011, respectively, to cover their televisions. [Ex. N (MON-233, ████████ (identifying television as "Licensed Products"); Ex. O (MON-234, ████████ (same).]  Instead of taking a license to all eight patents in the family, ████████

████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ thus took a license to two patents ('088 and '970)

that presumably must have value to televisions but that Mr. Bratic ignores.

Third, Plaintiffs' track record of asserting patents in this family also indicates
that these patents must have some value. [Tr. (Hansen) at 1195:19-1196:15.] As
discussed above, Plaintiffs asserted the '088 and '970 patents against LG in this very
case. [D.E. 1 (Initial Compl.) ¶¶ 10-11, 36-51.] They would not have had a Rule 11
good-faith basis to do so unless these patents had some value. Similarly, in 2009,
Mondis asserted the '181 patent against LG, Hon Hai, Innolux, and TPV in Texas.
[Ex. P (LG-421) ¶¶ 75-80 (alleging infringement of the '181 pat.); Ex. Q (LG-500)
¶¶ 93-100 (same).] Presumably, Mondis made a Rule 11 determination that the '181
patent was infringed before asserting the patent, thus indicating that this patent has
relevant value to the accused products. Yet, Mr. Bratic ignores these three patents.

Despite this overwhelming evidence of value, Mr. Bratic offers no
explanation for his disregard of these three patents. [*See generally* Bratic Supp.]
His unjustified disregard contradicts his own view "that the ***proper methodology***
involved determining which patents within the '090 patent family ***had value***." [*Id.*
¶ 44 (internal quotation marks omitted).] This contradiction renders his Theory

No. 7 unreliable and invalid.  *See Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1350 (Fed. Cir. 2018) (vacating damages award where expert failed to account for other patents in her rate determination).

### 3.     Mr. Bratic Improperly Ignores the '845 and '147 Patents in the '090 Patent Family

Although Mr. Bratic only recognizes six patents in the '090 patent family, [Bratic Supp. ¶ 6], there are actually eight patents in the family.  [Tr. (Spiro) at 999:10-15 (acknowledging 8 pats. in family).]  These two additional patents are the '845 and '147 patents.  [Tr. (Spiro) at 982:14-20 (mentioning the '845 and '147 patents as part of the family); Ex. R (MON-0001, '180 Pat.) at Related U.S. App. Data (listing the '845 and '147 patents).]  These two patents are the first two issued patents in the family, with the other six patents all claiming priority through them.  Yet, Mr. Bratic ignores the '845 and '147 patents.  [*See generally* Bratic Supp.]

Mr. Bratic was well aware of these patents.  [*E.g.*, Ex. H (Bratic 2018 Rept.) at 6 (listing these patents); Tr. (Spiro) at 982:14-20 (discussing these patents).]  His 2018 expert report acknowledged that at least eight licenses granted between 2006 and 2011 expressly cover these two patents.  [Ex. H (Bratic 2018 Rept.) at 77-78.]  These licenses include LG's Monitor Agreement, the Hon Hai Agreement covering televisions, and the ███████████████████████.  [Ex. S (LG-410, Monitor Agreement) at LGEMOND 35872; Ex. T (MON-247, ████████████████████ ██; Ex. M (MON-249, Hon Hai Agreement) §§ 1.6, 1.8.]  There would be no need

for eight separate companies to license these patents if they had no value.

Given the eight licenses (including some directed to televisions) implicating these two patents, Mr. Bratic should have discussed the value of these two patents or explained why they have none.  Yet, he has not done so for Theory No. 7.  Instead, he ignores the '845 and '147 patents, thus rendering his methodology unreliable.

*     *     *

Because Mr. Bratic improperly ignored five of the eight patents in the '090 patent family, his attempt to apportion the 0.25% rate of the '090 patent family to just the '180 patent is fundamentally flawed and should be excluded.

### C.    The Royalty Rate Calculations for Theory No. 1 Are Flawed

Theory No. 1's rate calculation starts with the *Innolux* Verdict's 0.75% rate for televisions and then equally divides by three to generate a 0.25% rate for just the '180 patent.  [Bratic Supp. ¶ 18.]  This flawed rate methodology should be excluded.

#### 1.    The Attempt to Apportion the *Innolux* Verdict Is Unreliable

Mr. Bratic's use of the *Innolux* Verdict in Theory No. 1 yet again demonstrates his failure to abide by basic apportionment principles required by patent damages law.  Instead of properly apportioning the Verdict's rate to just the '180 patent, he improperly ignores several patents that were at issue in the *Innolux* Verdict.

The *Innolux* Verdict awarded $15 million in damages based on two rates— 0.5% for Innolux monitors, and 0.75% for Innolux televisions.   [Ex. D (*Innolux* Verdict) at 4-5.]  The Verdict does not, however, indicate which of the seven patents

16

asserted in that trial support this 0.75% rate.  [*See generally id.*]  The Verdict only shows that Mondis asserted two patents from the '812 patent family (the '812 and '588 patents) and five patents from the '090 patent family (the '090, '342, '180, '088, and '970 patents).  [*Compare id.* at 1-2, *with* Bratic Supp. ¶¶ 6 & 19.]  Yet, Mr. Bratic ***disregards four of these seven patents*** by dividing the rate by three to account for just the '090, '342, and '180 patents.  [Bratic Supp. ¶ 19.]

To justify his narrow focus on these three patents in the '090 patent family, Mr. Bratic can only point to Mr. Spiro's uncorroborated assertion that these three patents supported the 0.75% rate.  [*Id.* ¶ 18 (citing Tr. (Spiro) at 989:17-990:8).][4] But Mr. Spiro's testimony left out patents that Mondis had asserted against Innolux ***televisions*** at trial (including the '588 patent), and that would necessarily have been part of the 0.75% rate.  Indeed, in the *Innolux* trial, Mr. Lamm testified that the Innolux televisions practiced claim 1 of the '588 patent:

> The ***'588 patent, Claim 1***, a display apparatus which displays an image based on a video signal. And again, ***these are monitors and televisions*** that have the ports for receiving the video signal and their display apparatus.

[Ex. I (*Innolux* Trial Tr.) at 135:10-14 (Lamm).]  The *Innolux* jury found claim 1 of

---

[4] The other citations in ¶ 18 either point to Plaintiffs' closing argument which is attorneys' argument and thus not evidence, [Bratic Supp. ¶ 18 (citing Tr. (Pl. Clos.) at 1277:11-14, 1285:18-1286:4, 1287:21-24)], or testimony by Mr. Bratic about the *Innolux* Verdict's rate without identifying the relevant patents, [*id.* (citing Tr. (Bratic) at 1067:18-21, 1144:20-23, 1146:11-1147:18)].

this '588 patent to be infringed and valid.  [Ex. D (*Innolux* Verdict) at 2, 4.]

Following its success in *Innolux*, Mondis then asserted this same claim 1 of the '588 patent against LG's televisions in the current litigation, thus indicating that this patent has technological value to televisions.  [D.E. 1 (Init. Compl.) ¶¶ 68-74 ('588 pat. allegations against LG TVs); Ex. K (Jan. 30, 2015 Infring. Conts) Ex. F (claim chart mapping clm. 1 of '588 pat. to LG 47LW6500 TV).]  And in the first trial in this case, Mr. Lamm testified that this '588 patent is a foundational patent to the Plug-and-Play standard in LG's televisions.  [Tr. (Lamm) at 415:22-417:2.]  Yet, Mr. Bratic utterly ignores this patent (and other patents) in his attempt to apportion the *Innolux* Verdict's 0.75% rate.[5]  The '588 patent is just one example of his unreliable apportionment of the *Innolux* Verdict.

Beyond his failure to explain why other patents (such as the '588 patent) in the verdict did not contribute to the 0.75% rate, Mr. Bratic also fails to address another problem with his use of this rate: the *Innolux* Verdict's 0.75% rate was based on an uplifted ***threshold theory***.  As Dr. Magee (Mondis's damages expert in *Innolux*) explained during the *Innolux* trial, he calculated the 0.75% rate for televisions based on a flat ".25 percent, ¼ of 1 percent" rate using three "TV licenses," followed by trebling to 0.75% to adjust for the elimination of the

---

[5] By his own admission, Mr. Bratic cannot simply divide 0.75% by four instead of three to cure this flaw, because he "disagree[s] with mechanical patent counting generally[.]"  [Bratic Supp. ¶ 20.]

uncertainty about validity and infringement.  [Ex. J (*Innolux* Trial Tr.) at 78:17-79:5, 79:22-80:2.]   Dr. Magee applied this 0.75% rate to televisions regardless of the number of patents infringed by these products, and the *Innolux* jury accepted this premise by adopting the same rate even after invalidating the asserted claims of the '088 and '970 patents.  [*Compare id.*, *with* Ex. D (*Innolux* Verdict) at 3 (invalidating these two patents) and 5 (adopting 0.75% rate for televisions); *see also* Ex. I (*Innolux* Trial Tr.) at 82:14-21 (asserting the '088 patent against monitors and televisions).] Dr. Magee's approach, as adopted by the *Innolux* jury, is exactly the same "threshold" theory that Mr. Bratic used in the first trial in this case and that this Court rejected.  [D.E. 558 at 10 (summarizing Mr. Bratic's use of 0.25% "threshold" rate that is increased to 0.75% to reflect "uncertainty discount").]  If Mr. Bratic can now use the threshold-based rate in the *Innolux* Verdict, he will have succeeded in circumventing the Court's rejection of his threshold theory, by simply adopting another expert's threshold theory.  The Court should not condone this strategy.

For these reasons, the Court should exclude Mr. Bratic's Theory No. 1.

## 2.    The *Innolux* Verdict Is Not Comparable to the Hypothetical Negotiation

More fundamentally, for Mr. Bratic to use the *Innolux* Verdict at all, he must show that it is sufficiently comparable to the hypothetical negotiation.   As the Federal Circuit made clear, expert testimony must provide a jury enough information of comparability to "evaluat[e] the probative value of those agreements," lest the

jury be given "little more than a recitation of royalty numbers" to determine the outcome of the hypothetical negotiation. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1328-29 (Fed. Cir. 2009). This comparability requirement applies both to "economic circumstances" and to technological differences. *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1319-20 (Fed. Cir. 2010).

Mr. Bratic has done no such thing in his Supplement. He only asserts, without any analysis or explanation, that the *Innolux* Verdict "is a very instructive comparable data point that can be used to inform the result of the hypothetical negotiation."[6] [Bratic Supp. ¶ 18.] This conclusory assertion is even more egregious than Mr. Bratic's inadequate (and ultimately excluded) economic comparability analysis in a recent case. *Netfuel, Inc. v. Cisco Sys., Inc.*, 2020 WL 1274985, at *15 (N.D. Cal. Mar. 17, 2020) ("[B]ecause Mr. Bratic failed to account for the 'economic differences,' between the BNP Agreement and the hypothetical license negotiation, he has not shown that the BNP agreement is sufficiently comparable.").

This conclusory shortcut is hardly surprising. Had he tried to address the alleged economic comparability in his Supplement, he would have contradicted his prior admission under oath that he did ***not*** perform such an economic analysis:

> Q.   Okay.  Now in your analysis, sir, ***you didn't do any particular study of the economic circumstances of Innolux as compared to***

---

[6] Paragraph 19 of the Supplement tries to address the technological comparability by eliminating patents at issue in the verdict, without addressing the economic comparability of the verdict to the hypothetical negotiation.

*LG* as part of your consideration of this case.  Is that right?

A.  ***No, I didn't***.

[Tr. (Bratic) at 1148:3-7.]  Mr. Bratic's Supplement provides no indication that he has performed this requisite economic comparison since that testimony.

Nor can Mr. Bratic establish economic comparability given the significant economic differences between *Innolux* and the case against LG.  For example, both Mr. Bratic and Mr. Spiro admitted that the *Innolux* trial involved a different company, different brands, different defenses, and many more patents than the case against LG.  [Tr. (Bratic) at 1147:9-1148:2; Tr. (Spiro) at 1020:4-10 (seven patents in *Innolux* trial), 1020:11-21 (Innolux did not dispute infringement), 1020:22-1021:2 (Innolux TVs, not LG TVs, were at issue).]  Even the product mix was different, as "[m]ost of the accused products in that case were monitors as I [Bratic] recall."  [Tr. (Bratic) at 1148:12-17; *see also* Tr. (Spiro) at 1019:13-24 ("96 percent of the accused products were computer monitors").]  In contrast, the case against LG is only about televisions, not monitors.  The differences are too great to establish the required economic comparability even had Mr. Bratic attempted the analysis.

As Mr. Bratic fails to account for the economic comparability between the *Innolux* Verdict and the hypothetical negotiation, his testimony should be excluded.

### 3.    The *Innolux* Verdict Is an Improper Starting Point for a Damages Analysis

Even if Mr. Bratic could show economic comparability of the *Innolux* Verdict,

a jury verdict post-dating the hypothetical negotiation is not a proper starting point for a reasonable royalty analysis.  His attempt to cast the *Innolux* Verdict as a traditional license agreement and shoehorn it into this case should be rejected.

As a preliminary matter, this Court has not previously addressed the propriety of using the *Innolux* Verdict as a starting point in calculating a royalty rate.  In his 2018 Report, the *Daubert* hearing, and the 2019 trial, Mr. Bratic used the *Innolux* Verdict as a "reasonableness" check for the uplifted threshold rate derived from the Monitor Agreement.  [Ex. H (2018 Bratic Rept.) ¶¶ 229-231; Ex. B (*Daubert* Tr.) at 47:25-48:10; Tr. (Bratic) at 1146:11-18.]  Post-trial, the Court found that the *Innolux* Verdict was evidence supporting the first jury's uncertainty uplift and willfulness findings, [D.E. 558 at 26-28], and was among the evidence preventing a finding of waiver under *Promega*, [D.E. 607 at 6.]  In a recent order, the Court also found that "Bratic's references to the Innolux jury verdict divided by three has sufficient basis in the evidence at trial."  [D.E. 672 at 16.]  But as that order noted, LG's arguments "about the Bratic Supplement's use of the Innolux case . . . raise broader questions about the validity and reliability of Bratic's theories; such aspects should be raised on a *Daubert* motion."  [*Id.* at 16-17.]  LG now addresses this unresolved question.

In addressing the admissibility of damages expert testimony, the Federal Circuit has rejected opinions that relied on "a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation."  *Uniloc USA, Inc.*

*v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (criticizing expert opinion that started with a royalty rate adopted from prior cases).  A "fundamentally flawed premise" starting point for the analysis necessarily results in a "fundamentally flawed conclusion," even if legitimate adjustments are made.  *Id.* at 1317.

In this case, the flawed starting point for Theory No. 1 is a jury verdict from the *Innolux* case.  As many courts have found, "[a] jury verdict does not represent evidence from which a hypothetical negotiation can be reliably determined."[7] *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 489 (D. Del. 2018) ("Jury-determined damages are not evidence of arm's-length negotiations between parties, and will not help the trier of fact determine a royalty."); *see also Flexuspine, Inc. v. Globus Med., Inc.*, 2016 WL 9282314, at *3 (E.D. Tex. Aug. 5, 2016) (excluding, under *Daubert*, damages opinion using jury verdict since "[t]he Synthes jury verdict at issue here is even further removed from a hypothetical negotiation in this case than the settlement license that the Court previously struck."); *Atlas IP, LLC v. Medtronic, Inc*., 2014 WL 5741870, at *6 (S.D. Fla. Oct.

---

[7] Plaintiffs cannot rely on their catch-all "book of wisdom" to use a jury verdict, because the book of wisdom is not a blank canvas on which an expert may consider any piece of evidence.  As the Federal Circuit found in *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014), it is incorrect to replace "the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened."  A jury verdict from an unrelated case in 2011 is far from a meaningful data point to reflect a hypothetical negotiation with another defendant in 2009.

6, 2014) ("And it is self-evident jury-determined damages are not evidence of arm's-length negotiations between parties.").  As one of these courts explained, "[a] jury verdict represents the considered judgment of twelve (or maybe fewer) random non-experts as to what a hypothetical negotiation would have resulted in for the patent(s) at issue.  It is, at best, an informed lay opinion." *Acceleration Bay*, 324 F. Supp. 3d at 489 (excluding damages opinion relying on jury verdict from another case).

The legal unsuitability of a prior case's jury verdict as a starting point is apparent when trying to use this evidence within the framework of the *Georgia-Pacific* factors that forms the methodology which Mr. Bratic employs.  [*See* Bratic Supp. ¶ 1.]  Certainly, a jury verdict does not belong under any *Georgia-Pacific* factors related to profitability or business relationship, including factors 5 (parties' relationship), 6 (convoyed sales), 8 (commercial success), 12 (customary profit), or 13 (profit credited to invention).  *See Georgia-Pac. Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (listing factors).  Nor does it fit among the technology-focused factors, including factors 9 (invention's advantages), 10 (benefits to users), or 11 (use by defendant).  *See id.*  Further, factor 14 (opinion of experts) cannot cover a verdict rendered by non-experts, and the usual catch-all factor 15 is inapposite because a verdict's compulsory award implicates a fundamentally different inquiry from a hypothetical ***negotiation*** between ***willing*** licensor and licensee.  *See id.*  Similarly inapt to cover a verdict unrelated to LG are

24

most of the licensing-related factors, including factors 2 (rate paid by LG), 3 (nature of license), 4 (established licensing policy), or 7 (duration of license). *See id.*

The only factor left—factor 1 (royalties for licensing patent)—does not fit as it focuses on license ***agreements*** rather than ***compulsory*** legal process. This lack of a good fit among the *Georgia-Pacific* factors explains why Mr. Bratic did not rely upon the *Innolux* Verdict to calculate a royalty rate in his 2018 report or in the first trial, and confirms the wisdom of cases declining to use verdicts in a royalty analysis.

As such, the use of the *Innolux* Verdict is unreliable and should be excluded.

### D.   Mr. Bratic Fails to Apportion the Royalty Base

In his Theories Nos. 1 and 7, Mr. Bratic uses the $ ▮▮▮▮ ASP of LG's televisions without any apportionment. [Bratic Supp. ¶¶ 21, 43.] While he provides no explanation for this decision in Theory No. 1, his discussion of Theory No. 7 argues that the hypothetical negotiators would have used the non-apportioned ASP of the televisions as their royalty base in the same way as LG and Mondis did in the Monitor Agreement. [*Id.*] Mr. Bratic again fails to properly apportion.

His reliance on the Monitor Agreement to justify his failure to apportion the base ignores the Court's prior finding that "[n]one of these licenses reflects the value attributable to the features of the product which infringe claims 14 and 15 of the '180 patent, and no more." [D.E. 558 (Sept. 2019 Order) at 15.] Because "[t]he previous licenses charged a royalty based on access to the DDC standard," [*id.* at 16], their

use of the end-product's ASP reflects the value attributed to the standard rather than the value of the '180 patent alone.  [*Id.* at 17-18.]  Despite the Court's warning that "the value added by the patented technology must be differentiated from the value added by the standardization of that technology," [*id.* at 19], Mr. Bratic again fails "to disentangle the incremental value added by the '180 patent to the finished product from the value of the DDC standard captured in the prior licenses."  [*Id.* at 22.]  In doing so, he repeats his past mistake by using a non-apportioned base.

By using the televisions' entire market value as reflected in their ASP, Mr. Bratic improperly captures the value of non-accused features and components in LG's televisions.  It is, indeed, uncontroverted that the televisions have a host of non-accused technologies, features, and components like OLED panels, SmartTV feature, or WebOS operating system.  [*E.g.*, Tr. (Alessi) at 707:7-710:8; Tr. (Hansen) at 1212:17-1214:2 (explaining that other non-accused technologies contribute to the value of the televisions).]  It is also undisputed that some of these non-accused components and features—like brand name, screen size, price, and picture quality— are the primary drivers of consumer demand.  [Tr. (Alessi) at 715:22-716:4.]  Even Mr. Lamm accused only a few components in the televisions as practicing the patent.  [Tr. (Lamm) at 316:5-319:18 (HDMI and VGA ports among those components).]  Yet, Mr. Bratic has done nothing to separate the value of non-accused components and features from the accused components.

It would have been easy for Mr. Bratic to separate out the accused components from the non-accused ones.  In his Supplement, Mr. Bratic opines that "each VGA and HDMI connector is *a separate implementation of the invention* of the '180 patent."  [Bratic Supp. ¶ 13.]  In other words, Mr. Bratic views the VGA and HDMI ports as the accused features that embody the '180 patent.  [*Id.*]  When compared to the value of the non-patented components and the televisions overall, the value of the ports is minuscule.  Under such a situation, "[f]urther apportionment was required to reflect the value of the patented technology compared to the value of the unpatented elements."  *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018).  Mr. Bratic could have simply used the value of these ports as his base, as required by precedent, rather than using the full multi-component televisions.  *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (holding that "where multi-component products are accused of infringement, the royalty base should not be larger than the smallest salable unit embodying the patented invention").  But he did not do so.

As the Federal Circuit made clear, even if a component is "valuable, important, or even essential" to the overall product, "the patented feature must be separated" from the unpatented elements. *VirnetX*, 767 F.3d at 1329 (vacating damages where expert failed "to apportion the value attributable to VPN On Demand and Facetime features" and instead "relied on the entire value of the iOS devices").

Where the expert, as Mr. Bratic does here, "fail[s] to apportion value between the patented features and the vast number of non-patented features contained in the accused products," the expert's testimony about the royalty base is inadmissible, because such an approach does not "carefully tie proof of damages to the claimed invention's footprint in the marketplace." *Id.* (quoting *Uniloc*, 632 F.3d at 1317).

Nor can Mr. Bratic allege that the use of the full ASP is appropriately balanced by the royalty rate, because presenting an inflated royalty base "might mislead the jury, who may be less equipped to understand the extent to which the royalty rate would need to do the work in such instances." *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014).  Other Federal Circuit cases similarly found that an inflated royalty base "skew[s] the damages horizon for the jury," "only serve[s] to make a patentee's proffered damages amount appear modest by comparison," and "artificially inflate[s] the jury's damages calculation beyond that which is 'adequate to compensate for the infringement.'" *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) (internal citations omitted).

Because Mr. Bratic's use of the full value of the televisions as his royalty base does not comport with settled principles of apportionment, the Court should exclude his Theories Nos. 1 and 7.  *See VirnetX*, 767 F.3d at 1328.

### E.    Mr. Bratic Uses an Improper Basis for his Uncertainty Discount

Theory No. 7 is the only remaining theory in which Mr. Bratic has used an

uplift multiplier to adjust for his so-called "uncertainty discount." [*Compare* Bratic Supp. ¶¶ 41-46, *with id.* ¶¶ 18-21 & 37-40.]   For this theory, Mr. Bratic relies exclusively on Mr. Hansen's testimony in the *University of Pittsburgh v. Varian* litigation ("*Varian*") to support his proposed uplift.   [Bratic Supp. ¶ 45 (citing and quoting Tr. (Hansen) at 1230:23-1232:8).]   This sole basis to support the uplift multiplier is legally and factually improper.

### 1.   The Court Has Not Yet Addressed this Admissibility Issue

As a preliminary matter, the law of the case doctrine is inapplicable here.   "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Pepper v. United States*, 562 U.S. 476, 506 (2011) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)) (brackets removed).   But "[i]ssues not decided by the court in a prior proceeding are not covered by the law-of-the-case doctrine." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1220 (Fed. Cir. 2006).

The Federal Circuit in *Liquid Dynamics* encountered a similar situation as the one here.   In a previous appeal in the same litigation, the Federal Circuit reversed the grant of summary judgment in the defendant's favor because issues of fact existed.   *Id.* at 1212.   On remand, the defendant challenged the admissibility and reliability of the analysis and opinion offered by patentee's expert.   *Id.* at 1220.   The

patentee argued that the Federal Circuit's "previous opinion reversing the district court's grant of summary judgment based on the genuine issue of material fact presented by the vector plots makes the evidence admissible under the law-of-the-case doctrine." *Id.* The Court of Appeals rejected the patentee's argument because its prior decision "did not directly consider the admissibility of the evidence, only that such evidence would be sufficient to create a genuine issue of material fact for trial." *Id.* Concluding that "the admissibility of [the expert]'s testimony had not been previously resolved," the Federal Circuit then turned to the *Daubert* issue. *Id.*

As in *Liquid Dynamics*, this Court's September 2019 Order has not resolved the admissibility of Mr. Bratic's opinion adopting an uplift multiplier based on Mr. Hansen's *Varian* testimony. [D.E. 558 at 23-29.] In that Order, the Court simply applied the standard for a judgment as a matter of law (which is the same as for a summary judgment) by viewing the evidence in the light most favorable to Plaintiffs, and found sufficient evidence in the trial record to sustain the jury's apparent decision to apply some uplift multiplier. [*Id.* at 25-26.] Although the opinion cited Mr. Hansen's testimony among the evidence on which the jury could have relied, the Court did ***not*** explicitly or implicitly address, much less resolve, the admissibility of an opinion based on Mr. Hansen's *Varian* testimony. [*Id.*]

That question was not before the Court at that time because, in the first trial, Mr. Bratic's uplift multiplier opinion expressly and solely relied on Mr. Spiro's

negotiation tactic in which he presented potential licensees a "rate card" chart offering a 1% pre-litigation licensing rate while also threatening a much higher 3% "post-litigation" rate.   [Tr. (Bratic) at 1082:25-1084:2; Tr. (Spiro) at 966:1-3, 974:12-975:3, 1000:5-1004:1; *see also* Ex. B (*Daubert* Tr.) at 41:19-43:22, 89:6-90:12; D.E. 473 (Apr. 11, 2019 Order Regarding the Parties' *Daubert* Motions) (requiring that any uncertainty discount theory "shall be based **solely** on Mr. Spiro's testimony and shall not be based upon the patent challenge provisions of other licenses").]  Mr. Bratic's Supplement abandons Mr. Spiro's negotiation tactic as the basis for the uplift multiplier, and instead presents for the first time an uplift multiplier opinion based on the *Varian* testimony.  [Bratic Supp. ¶¶ 45-46.]

Hence, like the Federal Circuit's prior ruling at issue in *Liquid Dynamics*, the September 2019 Order only decided that Mr. Hansen's *Varian* testimony was substantial evidence precluding JMOL; it did not address the admissibility of Mr. Bratic's opinion using that testimony.[8]  [*Compare* D.E. 558 at 25-26, *with Liquid Dynamics*, 449 F.3d at 1220.]  The law-of-the-case doctrine is thus inapplicable.

---

[8] LG understands that this Court has already approved the use of an uplift multiplier as part of an "uncertainty discount theory" in a re-trial.  [D.E. 558 at 22-29.]  While LG renews its objection to this ruling to preserve its appellate rights, LG respects this decision.  LG's present challenge is premised on the understanding that the Court's decision has not permitted Mr. Bratic's use of this entirely different uplift basis in violation of precedent and Rule 702.

## 2.    Mr. Bratic's Uplift Multiplier Is Untethered to the Patent-in-Suit or to the Date of the Hypothetical Negotiation

Mr. Bratic's use of the *Varian* testimony violates two key principles of a reasonable royalty analysis.   First, "the trial court must carefully ***tie proof of damages to the claimed invention's footprint*** in the market place."  *ResQNet.com, Inc. v. Lansa, Inc*., 594 F.3d 860, 869 (Fed. Cir. 2010).  Second, "[t]he hypothetical negotiation requires the court to envision the terms of a licensing agreement reached . . . between the patentee and the infringer ***at the time infringement began***."  *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc); *see also Riles v. Shell Expl. and Prod. Co*., 298 F.3d 1302, 1313 (Fed. Cir. 2002) ("A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment.").  The uplift multiplier opinion based on *Varian* fails to satisfy both principles.

Mr. Bratic's reliance on the *Varian* testimony has no connection to the '180 patent.  As Mr. Hansen undisputedly stated, his testimony in the *Varian* case "wasn't for the patent-in-suit."  [Tr. (Hansen) at 1231:22.]   In fact, the patent at issue in *Varian* was not even in a remotely similar technological field, being directed instead to "improv[ing] radiation therapy by reducing damage to healthy tissue during treatment."  *Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 561 F. App'x 934, 936 (Fed. Cir. 2014).   In this light, Mr. Bratic's uplift multiplier opinion relies upon evidence from a different case with no relationship to the '180 patent or the present

litigation against LG, and thus violates the settled rule that "[a]ny *evidence unrelated to the claimed invention does not support compensation for infringement* but punishes beyond the reach of the statute." *ResQNet.com*, 594 F.3d at 869 (vacating award where expert relied on licenses unrelated to asserted patent).

Further, Mr. Bratic's reliance on the *Varian* testimony looks beyond the date of the hypothetical negotiation. Although the hypothetical negotiation is set on January 6, 2009, [Tr. (Bratic) at 1065:1-6], Mr. Hansen gave his *Varian* testimony over three years later in April 2012, [D.E. 441-1 at Ex. 3 (dated excerpts of *Varian* transcript)]. Despite the years separating these two events, Mr. Bratic offers no reason to connect them. As a result, the *Varian* evidence is legally irrelevant because it was not contemporaneous to the hypothetical negotiation, and does not reflect the circumstances when the hypothetical negotiation occurred. *See Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 518 (Fed. Cir. 1995) (reversing award because the expert relied on legally irrelevant evidence of circumstances "at the time of the trial" instead of "at the time the infringement began").

Plaintiffs cannot circumvent the focus on the hypothetical negotiation date by resort to the "book of wisdom." Under Federal Circuit law, the book of wisdom permits consideration of some post-infringement activities by the parties, such as a defendant's sales or use of the patent. *E.g.*, *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014) (allowing consideration of "the infringer's actual

profits . . . as probative of his anticipated profits"); *Lucent*, 580 F.3d at 1333 (allowing consideration of the accused infringer's use of the patented invention). But beyond these narrow applications, the book of wisdom "cannot be used to overturn the fundamental precept that requires an *ex ante* hypothetical negotiation between the patentee and infringer at a time before the infringement began." *Syneron Med. Ltd. v. Invasix, Inc.*, 2018 WL 4696969, at *9 (C.D. Cal. Aug. 27, 2018). "To hold otherwise would permit an exception such as the book of wisdom to swallow the foundational rule that requires assessing a reasonable royalty based on a hypothetical negotiation between the patentee and the infringer at a time before the infringing activity began." *Id.* (internal quotation marks omitted); *see also Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 351-52 (D. Del. 2018) (refusing to permit the use of the book of wisdom to capture future knowledge about FDA approval). Yet, that is exactly what would result if Plaintiffs could stretch the book of wisdom to capture the *Varian* testimony, which arose three years after the hypothetical negotiation in a different case that did not involve either LG or Plaintiffs, that implicates a completely different patent and different technology, and that shares no connection to the present case other than having Mr. Hansen as a damages expert. Hence, the book of wisdom cannot save Mr. Bratic's uplift opinion.

As Mr. Bratic's uplift multiplier opinion relies on legally irrelevant evidence unconnected to the '180 patent or the hypothetical negotiation, it should be excluded.

34

### F.   Mr. Bratic Failed to Apportion Out the Value of Standardization as Required by this Court

As the Federal Circuit explained, "[j]ust as we apportion damages for a patent that covers a small part of a device, we must also apportion damages for SEPs [standard essential patents] that cover only a small part of a standard." *Ericsson*, 773 F.3d at 1232-33. This Court's September 2019 Order expressly found that Mr. Bratic failed to comply with this legal requirement in the first trial, because he "confused the value of the '180 patent with the value of the DDC/Plug and Play standard." [D.E. 558 at 18.]  The Court also criticized Plaintiffs and Mr. Bratic because they "did not address the question of what value was added by the invention's standardization" and because their "theory treated the value of each individual patent as equal to the value of the standard, contrary to *Ericsson*." [*Id.* at 20-21.]  Based in part on this finding, the Court found that "Plaintiff's damages case did not satisfy the apportionment requirement" and vacated the damages award. [*Id.* at 29-30.]  After finding that *Promega* was distinguishable, the Court gave Plaintiffs another opportunity to submit a new damages report, but instructed that "[a]ll expert testimony must reflect the Federal Circuit law on apportionment, as discussed in the Court's Opinion in which it vacated the jury damages verdict." [D.E. 607 at 9.]

Instead of seizing the second chance granted by the Court, Mr. Bratic doubles-down on his refusal to apportion out the value of the standards, by declaring that he has "not relied on the standardization value of the patent, but on the commercial

35

value of the patent." [Bratic Supp. ¶ 47.]  Repeating the same argument previously rejected by the September 2019 Order, he again asserts that "no further apportionment is appropriate because the '180 patent provides" technical value to the standard rather than the other way around.  [*Compare id.* ¶ 48, *with* D.E. 558 at 20-21 (rejecting Plaintiffs' argument that "Mr. Bratic's opinion about the value of the '180 patent was based on the patent's own technical value").]  To support this assertion, he cites a number of trial statements from Mr. Lamm, [*id.* ¶ 49], and points to prior licenses as reflecting the value of the '180 patent, [*id.* ¶ 50.]  On this basis, he claims that there is no need to further apportion out the value of the standard.  [*Id.* ¶ 51.]  By these opinions, Mr. Bratic essentially disagrees with the Court's finding that he conflated the '180 patent's value with that of the standard, and refuses to comply with the Court's instructions to identify and remove the standards' value. The Court should not tolerate this failure to comply with its Orders and findings.

Even if Mr. Bratic had some excuse for non-compliance, his bases are flawed. First, he again points to Plaintiffs' licenses and licensing history as "reflect[ing] the incremental value of Mondis' invention alone, independent of the value of the standards," as part of arm's length negotiations with sophisticated licensees.  [*Id.* ¶ 50.]  But the Court already considered and rejected this argument.  Contrary to Mr. Bratic's latest opinions, the Court found that "[h]aving built its damages case on licenses which assigned no value to particular patents, but only on access to DDC

technology, ***it cannot now claim that such licenses isolate the incremental value of the '180 patent*** to the final product." [D.E. 558 at 15-16.] As the Court further noted, "[t]he previous licenses charged a royalty based on access to the DDC standard; Mondis has pointed to no license which charged a royalty based on use of the '180 patent alone." [*Id.* at 16.] Nor can Mr. Bratic rely on licensing history, because the Court already ruled that this history only reflected "the value of the DDC standard and the royalties that various manufacturers agreed to pay in order to manufacture monitors and televisions which incorporated the standard." [*Id.* at 19.] That is, this licensing history does not show the difference between the value of the patent and the value of standardization. [*Id*. at 19-20.] Mr. Bratic offers no basis to disturb these findings, and no way to apportion out the value of standardization. Instead, he simply insists that he does not need to do such apportionment.

Second, Mr. Lamm's cited trial testimony does not support Mr. Bratic's refusal to apportion out the value of the standard. [Bratic Supp. ¶ 49.] The cited Lamm testimony, which is not new, describes the '180 patent's identification of signal compatibility as a problem to be solved, [Tr. (Lamm) at 286:17-287:23]; the '180 patent's disclosed embodiment and its components in Figure 1 of the patent, [*id.* at 287:24-292:9]; the incorporation of VESA's EDID and DDC standards into the PnP standard, [*id.* at 292:10-294:16]; the alleged similarities between the PnP/HDMI standards and the '180 patent's elements, [*id.* at 306:21-307:8]; and the

patent's alleged benefits for signal compatibility and interoperability, [*id.* at 1026:7-1028:4]. All of these citations simply repeat Mr. Lamm's conflation of the '180 patent with the standards—an error that the Court expressly rejected. [*Compare* Bratic Supp. ¶ 49, *with* D.E. 558 at 15-21.] Not surprisingly, none of these citations addressed "the difference between the added value of the technological invention and the added value of that invention's standardization." [D.E. 558 at 19 (quoting *Ericsson*, 773 F.3d at 1233).] As such, Mr. Bratic again "did not address the question of what value was added by the invention's standardization." [*Id.* at 20.] As the Court found, this failure to address this question "is error under the Federal Circuit's decision in *CSIRO*," [*id.*], and Mr. Bratic has not cured this error.

Because Mr. Bratic refuses to comply with the legal mandate to apportion out the value of the standard, the Court should exclude his opinion.

### G.   Mr. Bratic Should Not Get a Third Bite at the Apple

In the first trial, Plaintiffs made the deliberate, repeated, and unyielding choice to pursue a remedy only in the form of a non-apportioned threshold theory. After their legally-flawed damages theory fell apart at trial and they faced the risk of waiver under *Promega*, Plaintiffs beseeched the Court for another chance over LG's objection. The Court granted them this second chance, but instructed that "[a]ll expert testimony must reflect the Federal Circuit law on apportionment, as discussed in the Court's Opinion in which it vacated the jury damages verdict." [D.E. 607 at

9.]   Driven by the hope of another windfall, Plaintiffs again overreached by advancing legally flawed damages methodologies.  For the reasons presented above, the Court should exclude these flawed theories and preclude Mr. Bratic "from presenting any evidence of damages at trial."  *ePlus, Inc. v. Lawson Software, Inc*., 700 F.3d 509, 523 (Fed. Cir. 2012) (affirming exclusion of expert testimony).

Now that Mr. Bratic has squandered his second opportunity to present a legally permissible damages theory, he should not get a third bite at the proverbial apple.  As this Court made clear, a supplemental expert report from Mr. Bratic was only a "***potential*** exception" to the Court's prohibition against presenting new evidence at a damages re-trial, "***should*** Mondis seek to offer the expert testimony of Mr. Bratic" and his proposed testimony survive "a *Daubert* hearing."  [D.E. 607 at 9.]  And in ruling on LG's motion to strike, the Court stated that it "does not intend its consideration of the Bratic Supplement to be an iterative process in which Mondis has multiple opportunities to further revise the Bratic Supplement based on the Court's feedback."  [D.E. 672 at 4.]

When faced with a similar situation, other courts have declined to permit another bite at the apple.  *E.g.*, *Golden Bridge Tech. v. Apple Inc.*, 2014 WL 4057187, at *1-2 (N.D. Cal. June 1, 2014) (precluding damages expert from trial, after already excluding first opinion based on *Daubert* with leave to submit a new report and then finding that the new methodology was also flawed); *Network Prot.*

*Scis., LLC v. Fortinet, Inc.*, 2013 WL 5402089, at *8 (N.D. Cal. Sept. 26, 2013) (refusing to allow another damages report, as "[o]ver the course of many years and more than a dozen patent trials, the undersigned judge has concluded that giving a second bite simply encourages overreaching on the first bite (by both sides)"). This Court should likewise preclude Mr. Bratic's testimony at the re-trial.

The preclusion of Mr. Bratic's testimony does not leave Plaintiffs without options, as they have repeatedly told this Court that Mr. Bratic is unnecessary to their damages case. [*E.g.*, D.E. 606 (*Promega* Hrg. Tr.) at 25:10-17 (Plaintiffs arguing that, "if you don't allow us to do that [submit new report], we can still put on a case for damages based on the evidence that is admissible"); D.E. 577 (Pl.'s *Promega* Resp. Br.) at 31-33; *see also* D.E. 607 (Apr. 2020 Order) at 6 ("This is not a case in which the exclusion of Bratic's testimony, advancing a legally invalid damages theory, leaves Mondis with no evidence of damages.").] Based on their repeated representations, Plaintiffs cannot now claim undue prejudice from the exclusion of their expert's legally flawed theories. Plaintiffs had a second opportunity to correct their flawed damages case, but they squandered this chance. They must now live with the consequences of their choice.

## V.  CONCLUSION

For the above reasons, LG respectfully requests that the Court exclude Mr. Bratic's testimony at the re-trial.

Dated: January 8, 2021   Respectfully submitted,


        *s/ Liza M. Walsh*
        Liza M. Walsh
        Selina M. Ellis
        WALSH PIZZI O'REILLY FALANGA LLP
        Three Gateway Center
        100 Mulberry Street, 15th Floor
        Newark, NJ 07102
        Telephone: (973) 757-1100
        Facsimile: (973) 757-1090

        *Of Counsel:*

        Michael J. McKeon (*pro hac vice*)
        Christian A. Chu (*pro hac vice*)
        R. Andrew Schwentker (*pro hac vice*)
        Michael J. Ballanco (*pro hac vice*)
        FISH & RICHARDSON P.C.
        1000 Maine Ave. SW, Suite 1000
        Washington, D.C. 20024
        Telephone: (202) 783-5070
        Facsimile: (202) 783-2331

        *Attorneys for Defendants*
        *LG Electronics Inc. and*
        *LG Electronics U.S.A., Inc.*