## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
:
MONDIS TECHNOLOGY LTD,         :
:
     Plaintiff,            :        Civil Action No. 15-4431 (SRC)
:
          v.           :
:         **OPINION**
LG ELECTRONICS, INC.     :
et al.,                 :
:
     Defendants.       :
_____:

**CHESLER**, U.S.D.J.

This matter comes before the Court on three motions: 1) the motion by Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LG") for judgment as a matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages; 2) the motion by Plaintiff Mondis Technology Ltd ("Mondis") for enhanced damages and attorneys' fees, pursuant to 35 U.S.C. §§ 284 and 285; and 3) Mondis' motion for prejudgment and postjudgment interest. For the reasons that follow, LG's motion for judgment as a matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages will be denied; Plaintiff's motion for enhanced damages and attorneys' fees, pursuant to 35 U.S.C. §§ 284 and 285, will be denied; and Plaintiff's motion for prejudgment and postjudgment interest will be granted in part and denied in part.

This case arises from a dispute between Mondis, owner of U.S. Patent No. 7,475,180 (the "'180 patent"), and LG, a television manufacturer, over allegations that LG manufactured and sold televisions that infringed claims 14 and 15 of the '180 patent. A jury trial was held in

April of 2019; the jury returned a verdict that claims 14 and 15 of the '180 patent were valid and infringed, and that the infringement was willful, and the jury awarded Mondis compensatory damages of $45 million. The Court subsequently granted LG's motion to vacate the damages verdict and Ordered a re-trial on damages. The re-trial was held on February 6 and 7, 2023; the jury awarded Mondis compensatory damages of $14.3 million. The Court now considers the parties' post-trial motions arising from the re-trial.

## I.    Mondis' motion for enhanced damages and attorneys' fees

Mondis moves for enhanced damages, pursuant to 35 U.S.C. § 284, and a declaration that this is an exceptional case, pursuant to 35 U.S.C. § 285, with an award of attorneys' fees and costs. The Court begins its consideration of this motion with a brief review of the history of this case.

### A.  The history of the case

In discussing the early history of this case, LG cites a summary written by Mondis in its opening brief in support of its *in limine* motions before the first trial. It is a helpful summary of the early history of the case:

> As noted above, Mondis and LG have a long history litigating the '180 patent and related DDC patents. In 2007, Mondis sued LG and other defendants in the 565 Case for infringement of DDC patents 6,057,812 ("'812 patent"), 6,247,090 ("'090 patent"), 6,304,236 ("'236 patent"), 6,513,088 ("'088 patent"), 6,549,970 ("'970 patent"), 6,639,588 ("'588 patent"), and 6,686,895 ("'895 patent"), later adding patents 7,089,342 ("'342 patent"), 7,475,181 ("'181 patent") and the `180 patent. After LG settled the case with a more-than-$8 million license, trial proceeded to verdict against Innolux on June 27, 2011. Ex. 11 (verdict sheet). The jury found that Innolux infringed all of the claims of the '180 patent asserted in this case, and infringed all asserted claims of the '342 patent, '812 patent, and '588 patents, as well as one of the three asserted '090 patent claims. The jury also found all these infringed claims to be valid. However, the jury found none of the '088 and '970 patent claims infringed, and found invalid all of the '090, '088 and '970 patent claims that it also found uninfringed. Ex. 11.

Between the time of the 2011 trial in the 565 case and 2014, Mondis tried to negotiate a DDC patent license with LG for its televisions. When that effort failed, Mondis filed this lawsuit on June 21, 2014, in Texas for infringement of the then-expired '180, '088, '970, '588 and '342 patents. About a month earlier, LG launched a campaign of what became serial ex parte reexaminations to invalidate the asserted patents. See D.I. 86 at 3. During reexamination the patent office rejected claims to all of the patents, although eventually, it confirmed claims 14-16 of the '180 patent. With the other asserted patents expired, Mondis chose to forego its still-substantial appeal rights, and move forward expeditiously with the confirmed claims of the '180 patent, to avoid further delay.

(Docket Entry No. 331 at 24-25.)  In this Opinion, this Court refers to the case which went to a jury verdict in the District Court for the Eastern District of Texas as the "Texas Case," to distinguish it from the instant case which, though filed in that same district, was transferred to the District of New Jersey and has gone to trial here twice (the "First Trial" and the "Re-trial.")

The Mondis MIL summary lays out much of the relevant background history, but a few points need to be added.  When Mondis filed the complaint in 2007 that began the Texas Case, the claims concerned only computer monitors which were alleged to infringe based on their use of "Plug and Play" technology (also referred to as "DDC" or "DDC2B" technology.)  (Texas Case complaint, Docket Entry No. 1, December 31, 2007.)[1]  In the original complaint, Mondis filed suit against three manufacturers of computer monitors, LG, Hon Hai, and Innolux.  (Id.)

Thus, when Mondis filed its first patent infringement suit against LG, the complaint did not allege that LG televisions infringed its patents, nor did it mention the '180 patent, which had not yet issued.  At the first trial in the instant case, Mr. Alessi, former Director of Product Development for LG, testified that LG sold televisions with HDMI[2] ports as early as the 2005

---

[1] The Court takes judicial notice under Rule 201 of the public record from that litigation, Mondis v. Innolux et al., Civil Action No. 07-565 JRG (E.D.Tx. 2007).

[2] HDMI ports use the '180 patent's technology. (Pl.'s Trial Brief (1st) at 4 ("use of HDMI inputs

3

model year.  (First Trial Tr. 721:4-7.)  The '180 patent issued on January 6, 2009.  On March 9, 2009, Mondis filed the first amended complaint in the Texas Case and added claims for infringement of the '180 patent by monitors; the claims did not yet target televisions.   (Texas Case Docket Entry No. 103.)  At the first trial in the instant case, Mr. Spiro, Director of Mondis, testified that Mondis first raised the issue of infringement by LG televisions at a meeting with LG in April of 2009.[3]  (First Trial Tr. 114:20-117:22; 195:1-17.)  Spiro also testified that LG and Mondis settled the Texas Case in principle in May of 2009, and the settlement was finalized in September of 2009.  (First Trial Tr. 118:19-119:16.)  LG was dismissed from the Texas Case on consent on September 17, 2009.  (Texas Case Docket Entry No. 135.)  Spiro testified that, pursuant to the settlement agreement, LG purchased a license to use the DDC patents in monitors; "about 8.85 million was paid when the license was signed and then over time another 400,000 was paid further."  (First Trial Tr. 111:22-23.)

On January 15, 2010, Mondis filed the third amended complaint in the Texas Case, adding claims that televisions sold by the remaining defendants infringed the '090, '088, '970, '342, and '180 patents.  (Texas Case Docket Entry No. 153.)   As already described, the Texas Case went to trial, with the jury finding that the asserted claims of the '180 patent were valid and infringed by the televisions of defendant Innolux, and awarding damages.  Spiro testified that Innolux appealed the verdict but ultimately settled with Mondis for the full amount of the verdict.[4]  (First Trial Tr. 990:9-15.)

---

results in practicing the '180 patent because the HDMI specification incorporates and utilizes the above described VESA and I2C standards."))

[3] The parties stipulated that the damages period ran from April 2, 2009 to February 3, 2014. (Docket Entry No. 469.)

[4] Bratic's expert report, dated February 5, 2018, states a date of March 5, 2013 for the

The '180 patent expired on February 3, 2014. As stated in the Mondis MIL summary, in May of 2014, LG filed the first of a series of reexamination requests with the PTO for the patents at issue. The following month, Mondis filed the instant suit for infringement of the '180, '088, '970, '588 and '342 patents. During reexamination, the PTO rejected all claims in the '088, '970, '588 and '342 patents. During reexamination of the '180 patent, the PTO issued an initial office action rejecting the claims at issue in the '180 patent, claims 14-16, but ultimately reversed course and affirmed claims 14-16;[5] the remaining claims of the '180 patent were rejected on reexamination.

Having reviewed the history of this case, the Court proceeds to consider the motion for an award of enhanced damages, pursuant to 35 U.S.C. § 284, which states: "the court may increase the damages up to three times the amount found or assessed." When considering a motion for

---

Mondis/Innolux settlement agreement. (Docket Entry No. 639 Ex. 2 at ╟ 113.)
[5] On June 30, 2015, the PTO issued a final Office Action in Ex Parte Reexamination that confirmed claims 14-16 of the '180 patent, while rejecting other claims from that patent. (Docket Entry No. 86 Ex. B at 16 (page numbers for Exhibit B are based on the Court's numbering, not the PTO's.)) In the accompanying explanation, the PTO recited the full reexamination history of the '180 patent, which had first been challenged in June of 2009. (Id. at 18.) On October 6, 2009, the PTO issued a First Action on the Merits with claims 1-16 and 21-29 under rejection. (Id. at 19.) On October 14, 2011, the PTO issued an Action Closing Prosecution which maintained these rejections. (Id. at 20.) On April 11, 2014, however, this first reexamination of claims 14-16, and others, was dismissed. (Id. at 21.) Nonetheless, the reexamination of claims 14-16 continued in two other reexaminations, which were merged. (Id. at 22.) On March 9, 2015, the PTO issued another First Action on the Merits that rejected claims 14-20, and others. (Id. at 22.) In this merged reexamination, in the Final Office Action dated June 30, 2015, the PTO then reversed course with regard to claims 14-16, based on the patent owner's arguments. The PTO explained, in short, that it agreed that the Schmidt reference did not disclose certain elements of claims 14-16, and it withdrew the rejection of these claims. (Id. at 36.) The PTO also explained that it disagreed with the other four arguments of the patent owner about claims 14-16 and the Schmidt reference. (Id. at 35-39.) One argument had succeeded, however, and claims 14-16 were confirmed in the final Office Action of June 2015. (Id. at 46.)

enhanced damages under § 284, the Court applies the principles set forth by the Supreme Court

in Halo:

> Section 284 gives district courts the discretion to award enhanced damages
> against those guilty of patent infringement. In applying this discretion, district
> courts are "to be guided by [the] sound legal principles" developed over nearly
> two centuries of application and interpretation of the Patent Act. Those principles
> channel the exercise of discretion, limiting the award of enhanced damages to
> egregious cases of misconduct beyond typical infringement.

Halo Elecs., Inc. v. Pulse Elecs., Inc., 579 U.S. 93, 110 (2016) (citation omitted.)  Prior to the

Halo decision, Federal Circuit law required courts considering an award of enhanced damages to

weigh the nine factors stated in Read Corp. v. Portec, Inc., 970 F.2d 816, 827 (Fed. Cir. 1992).

Following the Halo decision, the Federal Circuit no longer requires consideration of the Read

factors:

> [T]he district court is not required to discuss the *Read* factors. . . . The *Halo* test
> merely requires the district court to consider the particular circumstances of the
> case to determine whether it is egregious.

Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 875 F.3d 1369, 1382-83 (Fed. Cir.

2017).  Here, Mondis has used the Read framework to argue for enhanced damages.  In light of

this, the Court will begin by considering Plaintiff's application of Read to the issue of enhanced

damages.

    B.  Mondis contends that the Read factors support an award of enhanced damages

As to the first Read factor, copying, the jury determined that LG willfully infringed the

claims at issue; Mondis contends that this clearly demonstrates that LG copied its designs.  LG

argues, in opposition, that it began use of DDC2B technology prior to the issuance of the '180

patent.  The parties did not litigate the question of when LG began to incorporate DDC2B

technology into the designs of its televisions, nor how it developed its DDC2B designs, and so

6

the Court cannot now determine whether LG did in fact deliberately copy a Mondis or Hitachi design or arrived at the infringing design by some other route.[6]  Mondis cites no evidence that LG copied anything directly from Mondis or Hitachi.

In any case, the ultimate issue is whether Mondis has demonstrated that LG engaged in "egregious [] misconduct beyond typical infringement."  Halo, 579 U.S. at 110.  While the jury determined that LG's infringement was willful, and thus beyond typical infringement, Mondis has not pointed to circumstances that evidence egregious misconduct – conduct that is malicious or characteristic of a pirate.  The Court concludes that the first Read factor reflects the willfulness finding, but does not do more to tip the balance toward a finding of egregious misconduct.

The second Read factor asks "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed."  Read, 970 F.2d at 827.  It is undisputed that Mondis informed LG about the '180 patent at the start of the period of infringement.  Mondis argues, in essence, that this Court should make an adverse inference against LG because LG has not offered evidence of if or when it formed such a good-faith belief.   This Court declines to make an adverse inference.

---

[6] It is undisputed that the Video Electronics Standards Association (VESA) established a standard that used DDC2B technology, and that this occurred prior to the issuance of the '180 patent.  As already stated, the parties did not litigate the origins of LG's infringing designs, but this case appears to present a situation in which LG began use of DDC2B technology before the patent was issued, the television manufacturing industry adopted a standard which required use of DDC2B technology before the patent was issued, and the period of infringement began later, after the patent issued.  No evidence was presented that demonstrates that LG began use of the DDC2B technology with knowledge that the technology was the intellectual property of Hitachi. Mondis did not establish that LG began use in circumstances indicative of piracy or malicious intent.

Mondis has pointed to no evidence about LG's investigation of the scope of the patent nor whether LG had a good-faith belief that the '180 patent was invalid or not infringed.

The third <u>Read</u> factor concerns the infringer's behavior as a party to the litigation. Mondis contends that LG worked to prolong the litigation, asserted meritless positions, filed duplicative motions, and made improper arguments to the jury. As LG argues in opposition, this case did not begin until several months after the expiration of the '180 patent, which ended the period of infringement. Even if Mondis had support for its allegations of litigation misconduct, it would need to persuade the Court that there is a nexus between such conduct and the "egregious infringement behavior" that <u>Halo</u> recognized as essential for enhancement of damages under § 284.[7] Mondis has given the Court no reason to consider LG's post-infringement conduct of the litigation as "infringement behavior." LG also cites <u>Spectralytics, Inc. v. Cordis Corp.</u>, 649 F.3d 1336, 1349 (Fed. Cir. 2011): "attorney misconduct or other aggravation of the litigation process may weigh heavily with respect to attorney fees, but not for enhancement of damages."

Furthermore, even if Mondis had persuaded the Court that LG's post-infringement litigation conduct should be considered "infringement behavior," the Court does not agree that LG's conduct of the litigation has been egregious. This case has been hard-fought by determined adversaries, and neither side distinguished itself as either virtuous or malicious. The third <u>Read</u> factor, LG's behavior as a party to the litigation, is neutral.

As for the fourth <u>Read</u> factor, LG's size and financial condition, Mondis argues only that

---

[7] The Supreme Court stated: "enhanced damages under the Patent Act . . . are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." <u>Halo</u>, 579 U.S. at 103.

8

LG is capable of paying an enhanced verdict.  LG responds that this is an immaterial

consideration.  The Court is not persuaded that, in this case, LG's size and financial stability

weigh for or against a finding of egregious infringement behavior.

The fifth <u>Read</u> factor is the closeness of the case.[8]   Mondis argues that it "prevailed on

every major event in the case up through trial."  (Pl.'s Br. at 25.)  Mondis also contends, on

various grounds, that LG's defenses were weak.  LG, in opposition, begins by pointing to the

decimation of Plaintiff's case during reexamination at the USPTO.  The Mondis MIL summary,

quoted above, establishes this: in the original Complaint filed by Mondis that initiated this case,

it asserted infringement of five patents, the '180, '088, '970, '588 and '342 patents.  These

patents were reexamined by the USPTO and, as Mondis concedes, there was a point in the

reexamination process in which every claim of every patent was rejected.  Ultimately, Mondis

persuaded the PTO to change its view of the contents of the Schmidt reference, and only claims

14-16 of the '180 patent were confirmed.  (Final Office Action in Ex Parte Reexamination, dated

June 30, 2015, at 21, Ex. B to Walsh Letter of July 24, 2015, Docket Entry No. 86.)  Three

claims survived reexamination, but four patents and all the other claims of the '180 patent did

---

[8] Mondis, in reply, argues that <u>Read</u> factor 5 considers only the issues actually tried, but cites no Federal Circuit authority in support of this position.  The Federal Circuit's decision in <u>Funai</u> runs contrary to Plaintiff's contention: the Federal Circuit reviewed the district court's analysis of this factor and found no abuse of discretion, noting that the district court had considered a party's success on three pre-trial motions.  <u>Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp</u>., 616 F.3d 1357, 1377 (Fed. Cir. 2010).  The fifth <u>Read</u> factor says "case," not "trial."  The instant case began with five valid patents and the subsequent rejection on reexamination of so many claims is an objective indicator of the closeness of the case.  Moreover, even if Mondis is correct that "case" in <u>Read</u> means "trial," the case presented at trial was close enough that the Court would not agree that LG was in a very weak position at trial.  Finally, inasmuch as <u>Halo</u> held that a district court should exercise its discretion to award enhanced damages, and "we eschew any rigid formula for awarding enhanced damages under §284," the <u>Read</u> factors no longer constrain the inquiry.  579 U.S. at 107.

not.  The reexamination history provides an objective indicator of the closeness of this case: it

has been a close case, as demonstrated by the undisputed fact that, at one point in time, all claims

at issue were rejected by the PTO during reexamination.

The Court also agrees with LG that it presented substantial defenses to the claims of

infringement for the 3 claims that did survive reexamination.  Although the jury was ultimately

not persuaded by LG's invalidity defense of lack of written description, and its non-infringement

defenses about the communication controller and the identification number, they were colorable

positions.  In particular, the issue about the presence of the identification number was a hotly

contested and close one, as evidenced by the oral argument between the parties at the end of day

1 and the start of day 2 of trial.  (First Trial Tr. 138-152; 156-172.)  Although the jury was not, in

the end, persuaded by LG's evidence and argument that the part of the Feature Support Byte in

question did not actually identify anything, and therefore was not an identification number, it

was a viable enough argument that Mondis worked hard to convince the Court to bar Dr.

Stevenson's testimony about his experiments.  (Id.)  As the Court stated at the end of the parties'

argument on day 2: "it's the Court's opinion that the evidence that manipulating these bits has no

impact may very well be relevant to the jury's determination as to whether or not this is an

identification number or not within the meaning of the claim."  (First Trial Tr. 172:2-7.)  Had the

jury been persuaded by LG on this point, it could not have made a finding of infringement, and

LG would have won the case.

As to the sixth and seventh Read factors, the facts are clear.  As to the duration of the

misconduct, the sixth factor, there is no dispute that LG infringed for the life of the patent, with

notice of the patent for most of that time.  As to remedial action by the defendant, the seventh

10

factor, it is undisputed that LG took none.  The question is the significance of these facts, to be discussed further below.

As to the eighth <u>Read</u> factor, Defendant's motivation for harm, Mondis offers a few paragraphs which cite to no evidence that LG demonstrated a motivation to harm Mondis or Hitachi.  As already noted, the parties did not litigate the question of the origin of LG's infringing design.

As to the ninth <u>Read</u> factor, whether Defendant attempted to conceal its misconduct, Mondis argues that LG, during the course of litigation, attempted to shield a portion of infringing television sales from discovery.  Both Plaintiff's moving brief and LG's opposition brief offer little clarity on this discovery dispute that, Mondis agrees, was resolved before trial.  The most that this Court can say, based on the briefs, is that Mondis has cited no evidence that tends to show that it is more likely than not that LG actually concealed particular sales data from discovery.  Plaintiff's brief offers rhetoric, but not evidence of discovery misconduct worthy of punishment.  For example, as evidence, Mondis offers a draft of a letter, dated December 1, 2016, from (LG counsel) Edwards to Magistrate Judge Waldor, describing the discovery dispute. (Goldberg Dec. Ex. 15.)  The draft letter includes descriptions of Plaintiff's understanding of LG's position on various relevant issues, and it described LG as taking the position that Mondis should specifically identify by model number each model for which it sought sales data.  (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 4 ("LG asserted that it was Mondis' burden, not LG's, to determine from public sources all the models that LG sold in the U.S. during the damages period, and whether they had the infringing features."))  Mondis also offers the letter, dated April 19, 2017, from (LG counsel) Beaber to (Mondis counsel) Edwards on this subject.  (Goldberg Dec. Ex. 36.)  In that letter,

counsel for LG explains that LG's sales database does not track which models contain an HDMI port.  (Id. at 1.)  There appears to have been a dispute between the parties about whose job it was to figure out which television models contained HDMI ports.  (See, e.g., id. at 2.)

These letters show the parties working toward resolution of a discovery dispute, and do not support the contention that LG deliberately concealed sales data.  Mondis has not persuaded the Court that LG deliberately concealed sales data on infringing televisions.  In light of the fact that it is undisputed that, during the infringement period, LG advertised and sold its televisions to the public, and that Plug and Play functionality was promoted as a feature, the evidence suggests that LG did not attempt to conceal its infringement of the '180 patent.

Lastly, Mondis points to LG's conduct during pre-litigation license negotiations which, it contends, demonstrates a pattern of bad faith and dishonesty.  Yet the thread that runs through Plaintiff's brief review of the negotiation history is that LG agreed to pay for a license for its computer monitors but did not agree to pay for a license for its televisions.  This is not evidence of egregious infringement misconduct.  To the contrary, the fact that LG paid Mondis for a license for use of the technology in monitors weighs against viewing LG as a pirate.

The Court has considered Plaintiff's arguments in favor of enhancement of infringement damages, pursuant to § 284.  The Court is satisfied that viewing Mondis' arguments under the Read approach hardly makes a compelling case for enhanced damages.  The Court proceeds to consider the motion under the more generalized Halo approach, and likewise concludes that Mondis has failed to demonstrate that enhanced damages are warranted.

In Halo, the Supreme Court summarized the standard as follows: "Awards of enhanced damages under the Patent Act over the past 180 years establish that they are not to be meted out

in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior."  579 U.S. at 103.  Mondis argues:  "The <u>Read</u> and other pertinent factors support enhancement."  (Pl.'s Br. at 13.)  Mondis has not, however, cited evidence from which this Court concludes that it is more likely than not that LG's infringement behavior was egregious, within the meaning of <u>Halo</u>.  The evidence cited by Mondis supports the jury's verdict that LG's infringement was willful: the evidence supports inferences that, during the period of infringement, LG knew about the '180 patent, knew that Mondis believed that LG's televisions infringed the '180 patent, and infringed.

A finding of willfulness alone does not provide sufficient basis for enhancement of damages.  The Federal Circuit has stated:

> [A]n award of enhanced damages does not necessarily flow from a willfulness finding.  Discretion remains with the court to determine whether the conduct is sufficiently egregious to warrant enhanced damages.

<u>Presidio Components, Inc. v. Am. Tech. Ceramics Corp.</u>, 875 F.3d 1369, 1382 (Fed. Cir. 2017) (citations omitted); <u>see</u> <u>also</u> <u>Halo</u>, 579 U.S. at 105 ("The subjective willfulness of a patent infringer, intentional or knowing, *may* warrant enhanced damages") (italics added).  Mondis has demonstrated that LG's infringement conduct was willful, but not that it was sufficiently egregious to warrant enhanced damages.

Having considered the particular circumstances of this case, the Court finds scant evidence to support a finding that LG's infringement conduct was egregious, within the meaning of <u>Halo</u>: "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or— indeed—characteristic of a pirate."  579 U.S. at 103-04.  Instead, the Court finds that, considering all the circumstances of this case, LG's infringement conduct was not egregious.

One circumstance that weighs strongly against the view of LG as a pirate is that LG licensed the DDC2B technology for use in its computer monitors, paying Mondis almost $9 million for that license, plus running royalties.  This is not the conduct of a pirate.

Nor does the history otherwise support the conclusion that LG's infringement conduct was egregious.  No evidence has been presented that demonstrates that LG in fact copied any element of its televisions from Mondis or Hitachi; there is no dispute that the DDC2B technology had been incorporated into a VESA standard that many television manufacturers incorporated into their products, well before Mondis filed suit in 2007 against LG and other manufacturers in Texas with regard to computer monitors.  For the majority of the period of infringement, the claims at issue were under rejection during reexamination at the PTO.[9]

For purposes of deciding the motion for enhanced damages, it is sufficient to determine that Mondis has not demonstrated that, considering all the circumstances of the case, it is more likely than not that LG's conduct as an infringer was egregious.  The Court is not tasked with determining whether LG's conduct as an infringer was reasonable, yet it is not difficult to see LG's conduct during the period of infringement as consistent with a reasonable belief that LG's televisions did not infringe any valid patent.  The key historical facts which support this view have been discussed with regard to the fifth Read factor, the closeness of the case.  LG has contended in this case that its televisions do not infringe any valid patents, and the results of the USPTO reexamination show not only that this contention was proven largely correct, but that

---

[9] As previously stated, the history of the reexamination of the '180 patent shows that, on October 6, 2009, the PTO issued a First Action on the Merits with claims 14 and 15, the claims presently at issue, under rejection.  Until this reexamination was dismissed on April 11, 2014, the PTO had not reversed or modified the initial rejection of claims 14 and 15.

Mondis came quite close to having all the patents at issue invalidated.  Viewed in hindsight and in the context of these historical facts, it is not difficult to see LG's infringement conduct as consistent with a reasonable belief of no infringement of any valid patent.

In Halo, the Supreme Court exemplified "the most culpable offender[] . . . as the 'wanton and malicious pirate' who intentionally infringes another's patent—with no doubts about its validity or any notion of a defense—for no purpose other than to steal the patentee's business." 579 U.S. at 104.  This is a very helpful example of egregious infringement conduct, and the evidence of record supports the conclusion that LG's infringement conduct differed greatly from this extreme case.  First, Mondis does not contend that LG sought to steal its licensing business, or that LG sought to steal Hitachi's television business.  There is no evidence about how LG came to use DDC2B technology in its televisions, and thus no evidence that LG copied anything from Mondis or Hitachi (rather than the VESA standard).  Rather, LG purchased from Mondis a license for use of the technology in monitors, the total opposite of theft.

In arguing for enhanced damages, Mondis contends that LG has offered no exculpatory evidence that would show a good faith belief in non-infringement or patent invalidity, but that shifts the burden of proof off of Mondis.  On this motion for enhanced damages, Mondis bears the burden of proof of LG's egregious infringement conduct, and Mondis has offered no evidence that LG believed that the '180 patent was valid and that LG's televisions infringed.  To the contrary, the evidence shows that, for the majority of the period of infringement, the claims at issue were under rejection during reexamination at the PTO.  After the expiration of the '180 patent in 2014, and after the PTO dismissed a pending reexamination of the '180 patent, LG quickly challenged the validity of the '180 patent and other patents in the '090 family by

requesting reexamination.  Mondis admits that in one period during reexamination, all claims of all patents at issue had been rejected by the USPTO.  This is not evidence of LG's beliefs or motives during the period of infringement, but it still weighs against a conclusion that LG's conduct was egregious.  Although LG's requests for reexamination occurred after the expiration of the '180 patent, this is circumstantial evidence that LG had doubts about the validity of the patents, and that these doubts were largely proven to be justified.  Mondis has offered no evidence that LG believed that its televisions infringed any valid patents.

Considering the totality of the circumstances, the Court finds that Mondis has failed to prove, by a preponderance of the evidence, that LG's infringement conduct was anywhere close to the example of egregious misconduct provided by the Supreme Court in Halo.  Mondis has not persuaded the Court that LG's conduct as an infringer, though willful, is sufficiently culpable as to deserve punishment, pursuant to 35 U.S.C. § 284.

C.  Plaintiff's motion to declare this an exceptional case

Mondis argues that the Court should declare this to be an exceptional case, pursuant to § 285, on four grounds:

> (1) to give life to the jury's finding of willfulness, (2) because of the unreasonableness of LG's positions and litigation conduct, (3) to ensure proper compensation to Mondis for the lengthy path to trial, and (4) to deter LG and others from acting similarly in future cases.

(Pl.'s Br. at 35.)  The Supreme Court has held:

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.  As in the comparable context of the Copyright Act, there is no precise rule or formula for making these determinations, but instead equitable

16

discretion should be exercised in light of the considerations we have identified.

Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014).

As to the first element cited by Plaintiff, the jury's finding of willfulness, in opposition, LG cites Sionyx LLC v. Hamamatsu Photonics K.K., 981 F.3d 1339, 1355 (Fed. Cir. 2020), in which the Federal Circuit stated: "While willfulness is among the reasons that a court may find a case to be exceptional, an attorney fee award is not mandatory when willful infringement has been found."  Mondis does not argue that the willfulness finding reflects the substantive strength of its litigating position or unreasonableness in the manner in which the case was litigated, and thus has failed to connect the willfulness verdict in this case to the Octane standard.

As to the second element cited by Plaintiff, the unreasonableness of LG's positions and litigation conduct, the Court has addressed these issues in its discussion of the Read factors.  This has been a close case and neither party has shown a striking imbalance, or advantage, in the relative strength or weakness of its substantive litigating positions.

As to the third element, to ensure that Mondis receives proper compensation, Octane does not reference that as a policy goal of § 285.  While Octane does include a footnote to a case under the Copyright Act in which compensation and deterrence goals were relevant, the Supreme Court's discussion about § 285 focuses on the losing party's position in and conduct of the litigation, not compensation for the winner.  572 U.S. at 554 n.6.  The same is true for Plaintiff's fourth element, deterrence: Octane does not state that the exceptional case analysis should incorporate deterrence considerations.

In opposition, LG argues that Mondis does not deserve a fee award, given its own litigation misconduct, citing Power Mosfet Techs., L.L.C. v. Siemens AG, 378 F.3d 1396, 1415

(Fed. Cir. 2004): "A party subjected to behavior warranting an award of sanctions or fees might justifiably be denied those fees in a district court's discretion for the behavior to which it subjected others."  LG points to the chapter of this litigation involving Bratic's supplemental report.

In brief, this chapter begins with the Court's Opinion and Order of April 22, 2020, which granted LG's motion for a new trial, and stated:

> This Court grants LG's motion for a new trial, subject to the following
> limitations. At the new trial, the parties may not offer evidence that was not
> presented at the previous trial, with one potential exception: should Mondis seek
> to offer the expert testimony of Mr. Bratic, based solely on the evidence presented
> at the previous trial, Mondis may submit an updated expert report,
> which this Court will consider in a Daubert hearing. All expert testimony must
> reflect the Federal Circuit law on apportionment, as discussed in the Court's
> Opinion in which it vacated the jury damages verdict.

(Opinion and Order of April 22, 2020 at 9.)  In June of 2020, Mondis submitted to LG two new expert reports, one from Bratic and one from Lamm.  (See Docket Entry No. 635 at 1.)  A chapter of the litigation ensued in which LG moved to strike both expert reports.  Several rounds of motions followed in which the Court struck the new Lamm report and parts of the new Bratic report.  This chapter ended in September of 2021, when the Court granted LG's motion to exclude what remained of the new Bratic report under Rule 702.

The details of what happened during this chapter are described at length in the Court's Opinions and Orders dated July 15, 2020, August 15, 2020, August 18, 2020, October 2, 2020, November 6, 2020, and September 8, 2021.  The long story short is that Mondis was responsible for the waste of a considerable amount of time.  See Mondis Tech. Ltd. v. LG Elecs., Inc., 2020 U.S. Dist. LEXIS 208019, at *4-5 (D.N.J. Nov. 6, 2020) ("This Court has now before it the fourth round of briefing which has resulted from Plaintiffs' flagrant disregard of the Opinion &

18

Order of April 22, 2020. This Court is now presented with two motions for reconsideration after having been required to minutely parse the Bratic Supplement for compliance with the Court's Orders. The Court is tired of this nonsense . . .")

At the end of this chapter, in the <u>Daubert</u> Opinion, this Court stated: "This Court agrees with LG that 'Mr. Bratic has squandered his second opportunity to present a legally permissible damages theory.'"  (Opinion and Order of September 8, 2021 at 29.)  The Court's concern now, however, is not with Mr. Bratic, but with the amount of wasted time and effort that were required to get to that conclusion.  Mondis had persistent difficulty complying with the simple restriction that the Court imposed in the Opinion and Order of April 22, 2020, when it granted LG's motion for a new trial: no new evidence.  Time was also wasted by Mondis as Plaintiff offered and defended reasonable royalty theories that, the Court concluded, were new versions of the threshold theory that the Court had held to be in violation of the Federal Circuit law of apportionment.  <u>Mondis Tech. Ltd v. LG Elecs., Inc.</u>, 407 F. Supp. 3d 482, 501 (D.N.J. 2019).

This Court finds that Mondis has not persuaded that it is entitled to an "exceptional case" declaration and an award of attorney fees, pursuant to § 285.  This is so without consideration of the chapter of the litigation involving the revised expert reports.  As already discussed, this Court does not consider either party to this case to have had, overall, an exceptionally strong or weak litigation position, nor to have litigated this case in an exceptionally unreasonable manner, overall.  LG does have a point, however, when it cites <u>Mosfet</u> and urges the Court to consider Mondis' own conduct in the litigation: as to the issue of litigation misconduct, what comes closest to standing out to the Court as "exceptional" in this case was the chapter in which Mondis struggled to comply with the Opinion and Order of April 22, 2020 – not misconduct by LG.

19

Pursuant to <u>Octane</u>, Plaintiff's motion for a declaration that this case is exceptional will be denied.

## II.   Mondis' motion for prejudgment and postjudgment interest

Pursuant to § 284, Mondis seeks roughly $8 million in prejudgment interest on the damages award.  LG, in opposition, argues that an award of prejudgment interest should be withheld in its entirety because Mondis was not diligent in prosecuting this case.

Section 284 states:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284.  The Supreme Court has held: "Prejudgment interest should be awarded under § 284 absent some justification for withholding such an award."  <u>GM Corp. v. Devex Corp.</u>, 461 U.S. 648, 657 (1983).

The parties agree that an award of prejudgment interest is a matter entrusted to the Court's discretion.  Plaintiff's moving brief, on the whole, cites Federal Circuit law in arguing for prejudgment interest.  LG, in opposition, argues that the Federal Circuit applies regional circuit law to this issue.  <u>See</u> <u>Sulzer Textil A.G. v. Picanol N.V.</u>, 358 F.3d 1356, 1362-63 (Fed. Cir. 2004) ("We answer this question on an issue by issue basis and will apply the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law.")  LG contends that the Third Circuit applies the four-factor test stated in <u>Feather v. United Mine Workers</u>, 711 F.2d 530, 540 (3d Cir. 1983.)  Mondis, in reply, does not disagree, but contends that it is entitled to prejudgment interest under the <u>Feather</u> standard, too.

The issue of which circuit's law to apply has no material impact on this Court's

discretionary decision to award prejudgment interest.  Mondis and LG do not disagree on the principle that, in the appropriate case, a court has the discretion to reduce or withhold an award of prejudgment interest based on a finding of pre-suit delay;[10] the question now is whether this Court should do so.  LG argues for a reduction in prejudgment interest on two independent bases: 1) delay in filing this case; and 2) delays during litigation.  The Court declines to reduce the award of prejudgment interest on the basis of delays during the litigation, once commenced; both parties contributed to the pace of events during the litigation and the Court sees no equitable basis for reducing the award of prejudgment interest to Mondis on this ground.

As to the delay in filing the case, as a factual matter, it is undisputed that Mondis accused LG of infringing the '180 patent with its televisions in 2009, but did not file suit until 2014, after the patent had expired.  Mondis delayed filing this suit for five years.  The only significant

---

[10] In Kaufman v. Microsoft Corp., 34 F.4th 1360, 1374-75 (Fed. Cir. 2022), the Federal Circuit stated:

> The Court added, however, that because interest is "fixed by the court," a district court has some discretion to decide whether to award prejudgment interest, and "it may be appropriate to limit prejudgment interest, or perhaps even to deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit," among other potential, unnamed circumstances. . . [T]o show that delay was undue, a defendant must, at least generally, show that it was prejudiced.

In Feather v. United Mine Workers, 711 F.2d 530, 540 (3d Cir. 1983), the Third Circuit stated:

> [A] district court is to consider four factors in determining whether an award of prejudgment interest is appropriate:
> (1) whether the claimant has been less than diligent in prosecuting the action;
> (2) whether the defendant has been unjustly enriched;
> (3) whether an award would be compensatory; and
> (4) whether countervailing equitable considerations militate against a surcharge.

dispute is about whether this delay justifies reducing or withholding the award of prejudgment interest.

The Court concludes that the circumstances of this case justify reducing the award of prejudgment interest because of the 5-year delay in filing. It is clear that Mondis could have filed the case in 2009; Mondis initiated litigation for infringement by televisions of the '180 patent in the Texas Case against other manufacturers in 2009. This Court is persuaded that Mondis chose not to file suit against LG in 2009 as a calculated, strategic decision; the circumstances support the inference that Mondis waited until the Texas Case had been fully resolved, as it was by settlement in 2013, before filing suit.[11] These circumstances also support the inference that Mondis waited until it had sufficient certainty about the likely outcome of television infringement litigation against LG, before filing suit. In June of 2014, Mondis filed this case. In hindsight, given the outcome of the USPTO reexamination of the asserted DDC2B patents, to the extent that Mondis delayed filing out of uncertainty about the case against LG, there was reason for uncertainty.

The Court finds that, considering the circumstances of this case, it would not be equitable to award Mondis prejudgment interest for the period in which it chose to delay filing. Mondis delayed filing for strategic reasons, and it would not be fair to make LG pay prejudgment interest

---

[11] It is not clear exactly when in 2013 the Innolux settlement was executed. LG, in its brief in opposition to the motion for prejudgment interest, states that the settlement occurred in December of 2013. (Def.'s Opp. Br. re: Interest at 10.) Bratic's expert report, dated February 5, 2018, states a date of March 5, 2013 for the Mondis/Innolux settlement agreement. (Docket Entry No. 639 Ex. 2 at ¶ 113.) In the First Trial, Spiro testified that negotiations restarted in December 2013 after the Innolux settlement, but did not state the date the Innolux settlement was executed. (First Trial Tr. 997:4-6.)

for a period in which Mondis delayed filing for its own strategic benefit.  Mondis was absolutely

entitled to delay the filing of the case, but LG should not be made to compensate Plaintiff for a

strategic decision made for Plaintiff's own benefit.  As in <u>Crystal Semiconductor Corp. v.</u>

<u>Tritech Microelectronics Int'l, Inc.</u>, 246 F.3d 1336, 1362 (Fed. Cir. 2001), the delay was a

litigation tactic that prejudiced LG.  Mondis is awarded prejudgment interest running from the

day it filed this case.

The parties also contest the interest rate and the frequency of compounding.  Mondis asks

for use of the prime rate, compounded quarterly.  LG asks for use of the Treasury Bill rate, with

simple interest, no compounding.  LG argues that Mondis has made no demonstration of actual

damages it suffered as a result of not having the royalty payment from LG in 2014, or earlier,

such as interest costs on loans.  It is undisputed that Mondis has no employees and is a non-

practicing entity.  In the absence of a demonstration that Mondis actually suffered increased

damages related to the disparity between Treasury Bill rates and commercial interest rates, such

as having actually paid to borrow money at commercial interest rates, the Court declines to

award prejudgment interest at the prime rate.  <u>Laitram Corp. v. NEC Corp.</u>, 115 F.3d 947, 955

(Fed. Cir. 1997) (affirming district court's award of prejudgment interest at Treasury Bill rate

based on absence of evidence of actual costs at a higher rate.)  The award of prejudgment interest

is at the Treasury Bill rate, the same rate referenced in the postjudgment interest statute, 28

U.S.C. § 1961(a).  Similarly, in the absence of any demonstration that Mondis is entitled to

quarterly compounding of interest, rather than simple interest, prejudgment interest will be

calculated as simple interest.

The parties agree that the award of postjudgment interest is set by statute, 28 U.S.C. §

1961(a).  Postjudgment interest is awarded in conformity with the statutory requirement.

**III.    LG's motion for judgment as a matter of law, a new trial, and remittitur**

LG moves for judgment as a matter of law, a new trial, and/or remittitur.  LG's moving

brief spends no time on supporting the motion for a new trial.  Under Third Circuit law:

> While a court may grant a new trial under Rule 59 'for any reason for which a
> new trial has heretofore been granted in an action at law in federal court,' Fed. R.
> Civ. P. 59(a)(1)(A), it should do so only when 'the great weight of the evidence
> cuts against the verdict and . . . [ ] a miscarriage of justice would result if the
> verdict were to stand.'

Leonard v. Stemtech Int'l, Inc., 834 F.3d 376, 386 (3d Cir. 2016).  LG offers no arguments of

any substance that the great weight of the evidence cuts against the verdict or that a miscarriage

of justice would result if the verdict were to stand.  There is no basis to grant the motion for a

new trial.

As to the motion for judgment as a matter of law, LG argues that the damages award

should be set aside on two grounds: A) it relies on an unapportioned television ASP that was not

in evidence; and B) it relies on an application of a legally unsupported tripling multiplier.

The Third Circuit has stated:

> We will vacate a jury verdict if, "viewing the evidence in the light most favorable
> to the nonmovant and giving it the advantage of every fair and reasonable
> inference, there is insufficient evidence from which a jury reasonably" could have
> reached the result it did.  *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1166 (3d
> Cir. 1993).

Hill v. Reederei F. Laeisz G.M.B.H., 435 F.3d 404, 422 (3d Cir. 2006).  Neither of LG's

arguments succeed in persuading that there is insufficient evidence from which a jury could have

reasonably awarded $14.3 million in damages.  The problem for LG, in short, is that the jury

verdict is a "black box" general verdict: all we know is the result, the amount of damages

24

awarded.  LG's two challenges on this motion rest on speculations about the jury's reasoning,

but LG does not even attempt to demonstrate that, under Third Circuit law, a mere speculative

hypothesis about the jury lacking sufficient evidence is sufficient to support the determination

that there is insufficient evidence from which the jury reasonably could have reached the result it

did.  Nor has LG even attempted to persuade that the universe of possible paths to the jury's

verdict is so limited that its hypotheses are likely possibilities.  Instead, LG's ASP hypothesis,

for example, appears to be one of myriad paths that the jury might have taken to reach the $14.3

million damages verdict.

A. The television ASP hypothesis

1. *LG: the television ASP was not in evidence*

LG begins its JMOL argument with a reminiscence about one of Bratic's excluded

theories.  (Def.'s Br. at 4.)  LG then cites a closing argument Mondis made to the jury, admitting

that the calculation argued by Mondis is crucially different from Bratic's excluded theory.

Bratic's excluded theory is a red herring and has nothing to do with the jury's verdict or LG's

argument.

LG then presents a formula derived from Plaintiff's closing argument to the jury, and

states:

> While the re-trial jury appears to have rounded the award by reducing it by
> $500,000 (to $14.3 million), it is clear that the jury adopted Plaintiffs' barely-
> modified theory by using an improper television ASP, and applying a legally-
> unsupported tripling uplift multiplier. Because these two bases lack sufficient
> support in the evidentiary record and the law, the Court should grant JMOL, a
> new trial, and/or remittitur.

(Def.'s Br. at 5-6.)  This is the foundation of LG's JMOL argument, and it begins with a glancing

acknowledgement that, in fact, the actual amount the jury awarded is ***not*** the amount they would

have awarded if LG's theory about adopting the Mondis closing argument is correct.  Implicit

here is an acknowledgement that, had the jury applied the calculation method urged by Mondis

in closing, it would have arrived at a different damages award.  LG tries to minimize the half-a-

million-dollar difference as rounding.  The Court inquires: what did the jury round and why?[12]

Does this shed any light on the question of how the jury reached its verdict?

LG's opening brief proceeds to rely on the proposition that the jury's damages

calculation relied on a television ASP of $518 – despite its acknowledgement that the jury's

verdict is inconsistent with the calculation Mondis argued for in closing.  It is not until the reply

brief that LG says a little more about these numbers:

> But [Plaintiff's] closing, as quoted in LG's brief, presented a methodology using
> the $518 ASP that would result in $14.8 million. The $14.3 million award
> is either a downward adjustment, or the result of rounding the $518 ASP to an
> even $500 to output $14,287,484 (essentially $14.3 million). This is no
> coincidence.

(Def.'s Reply Br. at 2.)  The Court agrees with LG that this is no coincidence – but because

nothing coincides here: at closing, Mondis argued a calculation leading to one number ($14.8

million), and the jury chose something different ($14.3 million.)  LG attempts to minimize the

difference as a "downward adjustment" or the result of rounding.  The Court observes that

"downward adjustment" is a fudge factor[13] here, something that looks like an explanation but is

not one.  As for the rounding of $518 to $500, it is pure speculation.  LG has offered no evidence

to support the inference that the jury took the figure of $518 from Plaintiff's closing argument

---

[12] On what basis should the Court conclude that the figure of $14.3 million was the result of
rounding?  Wouldn't the rounded version of that figure be an even $14 million?

[13] "A term or factor inserted into a calculation to compensate for anticipated errors, or to
arbitrarily make the result conform to some desired conclusion."  The American Heritage®
Dictionary of the English Language, 5th Edition.

and rounded it to $500, nor even any logical rationale to explain why it might do so. This is simply playing with numbers to support speculation about the jury's decision. LG has no foundation for its theories about the $14.3 million damages verdict. There is no reason to infer that the jury followed the model proposed by Mondis at closing, nor any other.

From this erroneous premise, LG argues that the ASP of $518 was not in evidence, and the parties have a robust debate about whether it was or it wasn't. The Court does not find that this dispute has any relevance to the question of whether the jury's damages verdict is supported by legally sufficient evidence, since the number produced by LG's ASP $518 theory does not coincide with the jury's damages verdict.

The parties appear to agree that, if you take the Mondis closing argument theory, and you substitute $500 as the television ASP, the end result is $14.3 million, same as the jury verdict. While this appears to be an accurate observation, what is the significance of this observation for the motion presently before this Court? As Mondis points out – and LG agrees –, Mr. Hansen, LG's reasonable royalty expert, testified that the range of prices for LG's infringing TVs was $217-$768,[14] and Alessi testified that the range was $300-$700. Mondis argues that both of those ranges have a midpoint of $500, which is true for the range of $300-$700; the midpoint of $217-$768 is actually $492.50, not $500. If, in fact, the jury used a $500 ASP, Alessi's testimony provides exact evidentiary support for the figure, and the midpoint of Hansen's price range is close to $500.

In reply, LG argues that Mondis cannot rely on either Hansen's or Alessi's price range testimony because neither provided any information about the volume distribution of sales prices

_____

[14] LG even referred to this range of television prices in its closing argument. (T2 Tr. 263:16-18.)

that would enable someone to calculate an average sales price.  LG argues that, if the jury did

rely on those ranges to estimate an ASP, it was mere speculation.  In support, LG quotes the

Federal Circuit's decision Finjan, Inc. v. Blue Coat Sys., 879 F.3d 1299, 1312 (Fed. Cir. 2018),

in which the jury relied on a witness's statement of a specific figure that "appears to have been

plucked from thin air" with no evidence to support it.  In the instant case, however, two

witnesses testified about a television sales price range with a midpoint around $500, and, at

closing, LG reminded the jury about Hansen's testimony about the television price range.  In

Finjan, the Federal Circuit stated: "While any reasonable royalty analysis necessarily involves an

element of approximation and uncertainty, a trier of fact must have some factual basis for a

determination of a reasonable royalty."  Id.  Under Finjan, the television price range testimony

need only have given the jury "some factual basis."  The Court finds that there was sufficient

evidence to support a factual determination by the jury of an average television sales price of

$500.

It is at this point that it becomes apparent that LG's challenge to the legal sufficiency of

the evidence to support the verdict has backfired, and has led to the recognition of a possible

path, supported by sufficient evidence, which the jury could have followed in order to arrive at

the damages verdict of $14.3 million.  This is the opposite result that LG intended and, as to the

ASP theory, provides a sound basis to deny LG's renewed motion for judgment as a matter of

law.  The Federal Circuit has stated:

> We review decisions on motions for JMOL under the law of the regional circuit. .
> . In the Third Circuit, a 'court may grant a judgment as a matter of law contrary to
> the verdict only if the record is critically deficient of the minimum quantum of
> evidence to sustain the verdict.  The court should grant JMOL 'sparingly' and
> 'only if, viewing the evidence in the light most favorable to the nonmovant and
> giving it the advantage of every fair and reasonable inference, there is insufficient

evidence from which a jury reasonably could find liability.'

SRI Int'l, Inc. v. Cisco Sys., 918 F.3d 1368, 1380 (Fed. Cir. 2019) (citations omitted).  This

Court finds that the record is not critically deficient of the minimum quantum of evidence to

sustain the verdict, and, as to LG's theory that there was insufficient evidence of record of the

television ASP, LG's motion for judgment as a matter of law must be denied.

### 2.  *LG: the TV ASP was not apportioned*

LG next argues that the verdict must be set aside because it is based on the entire market

value of televisions, rather than a value which has been apportioned for the value of non-

infringing features, as required by Federal Circuit law.  This challenge fails from the start,

because, as LG itself wrote in its opening brief, the formula on which Mondis based its closing

argument was derived from the testimony of LG's expert, "Mr. Hansen's formula for the

Monitor Agreement."[15]  (Def.'s Br. at 5.)  It is undisputed that the Mondis/LG monitor licensing

agreement applied a per-unit royalty rate to the average sales price ("ASP") of the product, and

that Hansen's formula further apportioned this by dividing by the number of patents covered by

the license.[16]  This is the approach to apportionment of LG's expert, and it was LG's expert that

---

[15] It is surprising, to say the least, that LG now – at the end of everything – makes an argument that implies that its own expert's analysis of the data point he called the "most instructive," the Mondis/LG monitor agreement, failed to properly apportion the entire market value of the product.

[16] Both parties presented evidence and argument to the jury in which a reasonable royalty was calculated by multiplying a product average sales price by a royalty rate.  Spiro testified that the Mondis/LG licensing agreement multiplied an average price per monitor of $126 by a royalty rate.  (T2 Tr. 116:8-13.)  Hansen presented a reasonable royalty analysis based on the Mondis/LG licensing agreement, and at the re-trial, he agreed that he "assumed that in the negotiation the parties would use the monitor average price of 126 and not the TV average price of 518."  (T2 Tr. 173:4-8.)  Mondis argued to the jury that Spiro and Mondis would not have agreed to a royalty based on the monitor average price, that it was too low, and that the average sales price of televisions should be used instead.  Even Hansen's "excess price analysis," which

characterized this data point as the "most instructive."  (Re-trial Tr. 219:10-14.)

Leading up to the re-trial, and at the re-trial itself, the parties litigated many questions about how Mondis could make use of Hansen's testimony.  In particular, at sidebars during the re-trial, the parties debated the question of what Mondis would be allowed to argue to the jury about the ASP value Hansen used, and this Court ruled that Mondis could argue that the ASP used by Hansen was too low and that, in the hypothetical negotiation, Mondis would take the position that that the ASP should be $518.

> THE COURT: I am going to bar you from arguing that the 518 ASP rate should be a base. You were allowed to examine Mr. Hansen and cross him on why he did not use the ASP rate; but there's no evidence in the case that the ASP rate is, in fact, a reasonable start for the hypothetical negotiation. So while you can impeach and discredit Mr. Hansen, you can't turn around and, in fact, attempt to affirmatively use his testimony as a basis for your calculation with a 518 ASP rate, because he never, in fact, endorses a 518 ASP rate in any way, shape, or form.

> MR. BLACK: But, Your Honor, we don't need Mr. Hansen's endorsement if there's record evidence which we have from Mr. Spiro, from a real-world witness and a negotiator, that that's how the program rate was developed. We also have the evidence that they used the ASP of the product, both in the program and specifically in an agreement between Mondis and LG.  It's a fair argument to say that when they sat down at the table, that they would have used the price of the actual product at issue. In fact, I don't think the evidence supports any other conclusion. And that the jury should, therefore, be able to consider that they would have negotiated over the ASP of the televisions, rather than the ASP of the monitors.

---

LG cites as if Hansen opined that further apportionment was needed (he did not do so), was based on a "product average selling price."  (T2 Tr. 216:25-217:1.)  It is worth noting that Hansen's ultimate conclusion that $.10/unit was the reasonable royalty implies a belief that his excess price analysis estimate of $.09/unit was too low.  (T2 Tr. 218:23-219:2.)  When Hansen identified the two data points he found "most instructive," he did not mention his excess price analysis.  (T2 Tr. 219:10-23.)  The Court does not agree that Hansen testified that further apportionment of the entire market value was needed, and, to the extent that LG reads his excess price analysis as advocating the importance of doing so, a reasonable jury could have concluded that Hansen believed that that analysis gave a royalty estimate that was too low.

THE COURT: Thank you, Mr. Black. I'm not going to let you do the math on 518 ASP.

MR. BLACK: Am I allowed to tell the jury that -- am I allowed to argue the point that when they sat down at the negotiation, that the evidence in the case suggested they would have started with the television price, rather than the monitor price? That is supported in the record. In fact, it's largely undisputed.

THE COURT: Yes, you can.

(Re-trial Tr. 211:13-212:19.)  The sidebar continued:

MR. BLACK: I won't do the math. Can I use this slide, which was 30, then? I'm sorry. I think that's consistent with what I just said. I would say you may consider these facts that LG says 126. We think the negotiation would have been 518. They say .25. We think .75.

THE COURT: At this point, no. Okay. Let's see how the further examination of Mr. Hansen goes, but at this point that's essentially doing what your other slide does. It's doing the math for them.

MR. BLACK: Okay. Can I -- well, okay. I'm allowed to say that -- that the negotiation, Mr. Spiro would have presented the 518 and the .75 percent, and they would have had Mr. Lamm's evidence that the '180 is really important, you must apportion -- you've got -- I can do that. I just can't use the slides.

THE COURT: That, you can do.

(Re-trial Tr. 213:18-214:8.)  Another sidebar on the subject occurred shortly after:

THE COURT: Fine. And, Mr. Black, just to clarify. All right. You can argue to the jury that Mr. Hansen's base figure, the 220 or whatever it is, is low. But what you can't argue for is that your 500 and whatever it is ASP is the correct figure. You can argue that the record reflects that Mr. Hansen was too low. You can determine if he was too low, what would be the appropriate base.

MR. BLACK: I'm trying real hard here, Your Honor. This is not easy. So what I would like -- intend to do, then, is say that the parties walk into the negotiating room, we know what Mr. Spiro's position is, 518 at .75. He's got to give on the issue because he doesn't have as many patents anymore. That's his position. LG's position is whatever it is Mr. Hansen says. We think that Mr. Hansen did not give full credit to the evidence in the case because his 220 was too low, his multiplier was too low, whatever, that's okay.

THE COURT: That you can do. And you can do -- and based upon the evidence, you can determine whether or not your position is correct, which is it should be higher.

(Re-trial Tr. 227:2-21.)

In its closing argument, Mondis stated:

So I'm going to close the case the way I opened it. I'm going to tell you it's an undisputed fact that there are 19,049,978 infringing televisions. You'll have to construct the hypothetical negotiation. I'm not going to give you a number, I'm not going to give you an answer.
. . .
But you're entitled to consider what would have happened in that negotiation. Mr. Spiro would have walked in and he would have said, look at the Mondis/LG monitor agreement we had. That's the base. We have to start there. My program rates, as you know, were . 75 percent for the 2B family. We use the ASP 518, and I got to make an adjustment. That's his position.

He might not win. You'll decide. You'll tell us. You're entitled to consider that the 2B family has to be reduced to the '180 patent. And that Mr. Hansen divided by five or six. And that Mr. Lamm said that the '180 patent is the most important of all.

(Re-trial Tr. 300:15-301:10.)

In short, LG offered its expert, Hansen, who testified that, in the hypothetical negotiation, the parties would agree to a royalty based on multiplying the monitor ASP by a royalty rate and adjusting for the number of patents covered.  Mondis presented evidence about the position that Mondis and Spiro would take at the beginning of the hypothetical negotiation, that the ASP should be the television ASP, not the monitor ASP.  Having presented this case, LG cannot now complain that further apportionment of the ASP was needed; LG cannot have it both ways.[17] The Court rejects LG's argument that the jury's verdict is based on reasoning that failed to

---

[17] To some extent, LG appears to belatedly argue that it is fine to use the product ASP without further apportionment for unclaimed features when it is a lower number, but not fine when it is a higher number.

properly apportion the entire market value of the televisions.

LG's brief also argues that Mondis flouted the Court's rulings in arguing to the jury that they should substitute the TV ASP for the monitor ASP in Hansen's formula.  As just discussed, the Court has reviewed both the rulings and Plaintiff's closing argument and disagrees with LG on this point.  The record shows that the Court and the parties were very careful at the re-trial about how the jury would encounter evidence and argument about the television average sales price.  This Court was careful to prohibit Mondis from making any suggestion to the jury that Hansen had endorsed the use of any television average sales price.  Mondis complied and argued only that Spiro would have started the hypothetical negotiation with the $518 average sales price as a starting position.  Spiro testified that, during license negotiations, he used the product average sales price as the base.  (Re-trial Tr. 106:3-24.)  Plaintiff's closing argument about how Spiro would have approached the hypothetical negotiation is supported by the evidence and did not violate the prohibition against suggesting that Hansen endorsed use of the television sales price.

LG also argues that Mondis' closing argument urged the jury to make a royalty calculation without the guidance of an expert.  The jury's damages verdict is limited by the evidence, not by the opinions of the experts.  Finjan, Inc. v. Blue Coat Sys., 879 F.3d 1299, 1313 n.2 (Fed. Cir. 2018); Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1328 (Fed. Cir. 2014) ("if the record evidence does not fully support either party's royalty estimate, the fact finder must still determine what constitutes a reasonable royalty from the record evidence"); i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 856 (Fed. Cir. 2010) ("Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury. The jury was entitled to

hear the expert testimony and decide for itself what to accept or reject.")

    B.  <u>The uplift multiplier</u>

    LG argues that the trial record lacks sufficient evidence to support use of the uplift multiplier (or uncertainty discount) by the jury.  Again, given the "black box" nature of the jury verdict, we have no idea how the jury arrived at the damages verdict and whether the jury used any uplift multiplier; LG simply assumes that the jury must have.  Mondis responds, persuasively, that LG has raised this argument in this case repeatedly, and this Court has rejected it repeatedly; the Court did so broadly in the Opinion on LG's first JMOL (Docket Entry No. 558 at 22-29),[18] and denied LG's first re-trial *in limine* motion, which sought to exclude Hansen's testimony about the uplift in the <u>Varian</u> case (ruling in the Opinion of January 10, 2023, that the subject could be raised for the purpose of impeachment of Hansen.)  At the re-trial, both Spiro and Hansen testified at some length about the principles and application of the uncertainty discount; LG acknowledges Spiro's testimony, but argues that there is no evidence that anyone ever actually accepted an uplifted rate.  Hansen testified that he recognized the principle underlying the uncertainty discount[19] and that he considered the impact of the condition of certainty or uncertainty as he considered the data in his analysis (<u>see</u> Re-trial Tr. 163-66.)  Asked whether he had made an adjustment to reflect the fact that the hypothetical negotiation would occur under conditions of certainty that the patent is valid and infringed, Hansen replied: "I dealt

---

[18] In deciding the LG's motion for JMOL after the first trial, the Court's analysis of the evidence for the uncertainty discount included testimony from Bratic, who did not appear at the re-trial. The Court discussed both Bratic's testimony about the Innolux verdict and settlement, as well as Spiro's.  Bratic did not testify at re-trial, but Spiro and Hansen did testify again about the Innolux verdict and settlement.

[19] "I'm familiar with the concept that a patent that is determined to be valid and infringed is more valuable."  (T2 Tr. 176:10-11.)

with that on the broad scope of my analysis on an overall basis." (Re-trial Tr. 166:21-22.) A reasonable jury hearing Hansen's testimony could well have understood the expert to agree with the valuation principle on which the uncertainty discount is based, to have considered conditions of certainty or uncertainty when evaluating the comparable license data, to have agreed that he "dealt with that on the broad scope" of his analysis, and to have declined to explain in any detail just how he did so. (See, generally, Re-trial Tr. 163-67, 174-77.) LG even mentioned Plaintiff's position on the uplift in its closing argument. (Re-trial Tr. 270:16-18.)

Furthermore, the Mondis/LG license and the TPV license were in evidence and demonstrated the use of pre-litigation discounted rates; both Hansen and Spiro testified that the later-occurring Innolux settlement was at the full rate awarded by the jury. In its closing argument, LG even reminded the jury that the Innolux jury verdict was at .75%.[20] (Re-trial Tr. 269:11-22.) While there is no way to know whether or not the jury applied an upward adjustment to account for the hypothetical negotiation's condition of certainty, there was sufficient evidence in the record to support its doing so.

LG also argues that Mondis improperly used the Hansen/Varian evidence substantively, contrary to the Court's limitation to impeachment purposes only, in the closing argument:

Now, another thing about the uplift, the uncertainty discount removal issue. Mr.

---

[20] LG also argues that the jury verdict was tainted by the admission of the evidence of the Innolux verdict and settlement, and by Plaintiff's "misuse" of this evidence. (Def.'s Br. at 31.) As Mondis points out in opposition, the admissibility of the Innolux evidence has been litigated repeatedly in this case, most recently in the *in limine* Opinion of January 10, 2023, when this Court ruled that, at re-trial, the Innolux evidence would be admitted or excluded to the same extent as in the first trial. Mondis Tech. Ltd. v. LG Elecs., Inc., 2023 U.S. Dist. LEXIS 4160, at *12 (D.N.J. Jan. 10, 2023). See also Mondis Tech. Ltd. v. LG Elecs., Inc., 2021 U.S. Dist. LEXIS 169919, at *19 (D.N.J. Sep. 8, 2021) ("The decision that the Innolux verdict is admissible as relevant to the reasonable royalty analysis is nothing new in this case.") This is the law of the case, and the Court declines to relitigate the settled issue.

> Hansen testified, I asked him: Isn't it true that you applied a three times
> uncertainty adjustment to the Stanford license in the Varian case? Yes or no.
> Well, the man just didn't want to answer that yes or no. The answer was yes. So
> he said I applied a particular clause that was three times as indicative of the
> upward influence for a patent that has been determined to be valid and infringed.
> And then I said: In the previous proceeding in this case, you said an upward
> evaluation of something that's appropriate and it's upward -- up to the jury to
> decide how much that should be in this case, based on the facts that you've heard.
> Correct? You said yes, it's the jury's decision. Correct? I did. The jury decides the
> damages. So in the end he applied a three X rate in another case. It's appropriate
> for you to consider that, as well as his credibility when he said he did every single
> one of his analyses that came to $0.10 without doing any adjustment for
> uncertainty. And what that means is that Mr. Spiro's efforts to warn LG and to tell
> them what the terms of negotiation would be back in '08 would have been for
> naught if you accept Mr. Hansen.

(Re-trial Tr. 295:10-296:6.)  As the record shows, Mondis directed this closing argument to the

issue of Hansen's credibility.  A reasonable jury could hear about Hansen's clear Varian

testimony on the subject of the uncertainty adjustment and compare it to his testimony in this

case, in order to make an inference about his credibility on the subject of the uncertainty

adjustment in this case.  A reasonable jury could have decided that Hansen's testimony about the

role of the uncertainty adjustment in his analysis in this case was vague and of uncertain

credibility, or deserving of less weight.  The evidence of record contains legally sufficient

evidence for the jury to decide that the condition of certainty in the hypothetical negotiation

warranted a tripling uplift to the royalty rate, even though Hansen did not agree that this was

warranted in this case.  LG did not object to Plaintiff's closing argument at trial.

Although the JMOL standard to be applied in this case is a matter of Third Circuit law,

the Federal Circuit has stated:

> [W]e will not set aside a general verdict simply because the jury might have
> decided on a ground that was supported by insufficient evidence.  We will uphold
> such a verdict if there was sufficient evidence to support any of the plaintiff's
> alternative factual theories; we assume the jury considered all the evidence and

relied upon a factual theory for which the burden of proof was satisfied.

i4i Ltd., 598 F.3d at 849-50 (citation omitted).  In the end, LG's JMOL arguments ask this Court to do what the Federal Circuit has declared it will not do: "set aside a general verdict simply because the jury might have decided on a ground that was supported by insufficient evidence."

LG has failed to persuade the Court that the re-trial damages verdict is not supported by legally sufficient evidence.  Instead, consideration of LG's motion spotlights the support for the verdict in the evidence.  LG's approach demonstrates at least a recognition of a path the jury could have taken to arrive at its determination of a reasonable royalty, using the calculation Mondis argued in closing, but with a $500 ASP.  LG challenged two elements of this possible calculation, and the Court has found that the two challenged elements of that calculation are supported by legally sufficient evidence.  Pursuant to i4i Ltd., the Court assumes that "the jury considered all the evidence and relied upon a factual theory for which the burden of proof was satisfied."  Id.

In McGinley, the Federal Circuit discussed issues quite similar to the ones raised by LG's JMOL motion:

> Due to the "black box" nature of the jury's verdict, it is impossible to determine which of the above pieces of evidence, alone or in combination, carried the day in the jury room, and how much weight was assigned to each piece. All that can be said with certainty is that -- as a whole -- the evidence enumerated above (all of which was admittedly before the jury) constitutes substantial evidence to support the jury's verdict. . . . But when a dispositive element of the factual equation, here whether to combine or modify key references, so clearly could have been decided by the jury in McGinley's favor, it is not our place to elide the vagaries of a black box jury verdict by overriding the jury's decision. Our law does not compel the use of special verdicts in these cases, and so long as the parties are content to give the jury unfettered room to operate on dispositive factual issues within the scope of a general verdict request, we must be mindful of our role as an appellate court and respect the verdict reached . . .

McGinley v. Franklin Sports, Inc., 262 F.3d 1339, 1356 (Fed. Cir. 2001).  In the instant case, LG has directed its argument to two "dispositive elements" – the television ASP and the uncertainty adjustment.  The Court has considered the evidence at trial and finds that, as to the two key elements picked out by LG: 1) while the $518 television ASP does not appear to have been a dispositive element, there was legally sufficient evidence for the jury to find a $500 television ASP; and 2) as to the uncertainty adjustment, there was legally sufficient evidence for the jury to make findings in Plaintiff's favor.  These findings support the jury's damages award.  The jury's verdict is supported by legally sufficient evidence and must be respected.

LG argues, in the alternative, that the Court should remit the damages award to Hansen's $1.9 million.  The evidence at trial supports the jury's award as it stands.

In conclusion, LG's motion for judgment as a matter of law under Rule 50(b), a new trial under Rule 59, and/or remittitur regarding damages is denied; Plaintiff's motion for enhanced damages and attorneys' fees, pursuant to 35 U.S.C. §§ 284 and 285, is denied; and Plaintiff's motion for prejudgment and postjudgment interest is granted in part and denied in part.


    s/ Stanley R. Chesler    
Stanley R. Chesler, U.S.D.J.

Dated:  June 1, 2023

38